MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By:    MATTHEW L. SCHWARTZ
        JOSEPH N. CORDARO
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel.: (212) 637-1945
Fax: (212) 637-2750
E-mail:  matthew.schwartz@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:

      DELPHI CORPORATION, *et al.*,

            Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

            Appellant,

      - against -                    08 Civ. 3753 (NRB) (AJP)

DELPHI CORPORATION, *et al.*,

            Appellees.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF MATTHEW L. SCHWARTZ

     MATTHEW L. SCHWARTZ, pursuant to 28 U.S.C. § 1746, declares the

following under penalty of perjury:

     1.     I am an Assistant United States Attorney in the office of Michael J.

Garcia, United States Attorney for the Southern District of New York, attorney for

appellant the United States of America in the above-captioned appeal.  I have been

assigned to handle this matter, and am familiar with the proceedings herein.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the

complaint in *Delphi Corp. v. Appaloosa Management, L.P., et al. (In re Delphi*

*Corp.)*, Adv. Proc. No. 08-01232 (RDD) (Bankr. S.D.N.Y. filed May 16, 2008).

3.      Attached hereto as **Exhibit B** is a true and correct copy of the

complaint in *Delphi Corp. v. UBS Securities LLC (In re Delphi Corp.)*, Adv. Proc.

No. 08-01233 (RDD) (Bankr. S.D.N.Y. filed May 16, 2008).

4.      Attached hereto as **Exhibit C** is a true and correct copy of the

transcript of the May 29, 2008 hearing before the United States Bankruptcy Court

for the Southern District of New York in *In re Delphi Corp.* and several related

adversary proceedings.

Dated:      New York, New York
            July 14, 2008

                                    /s/ Matthew L. Schwartz
                                    MATTHEW L. SCHWARTZ
                                    Assistant United States Attorney

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
1633 Broadway
New York, New York  10019-6708
Telephone:  (212) 833-1100
Facsimile:  (212) 833-1250
Edward A. Friedman (EF-1995)
William P. Weintraub (WW-2897)
Andrew W. Schilling (AS-7872)
Shira D. Weiner (SW-9219)
Danya S. Reda (DR-3036)

Attorneys for Delphi Corporation,
 DEBTOR AND DEBTOR-IN-POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------x
In re:                                        :
                                              :  Chapter 11
DELPHI CORPORATION,                           :  Case No. 05-44481 (RDD)
                                              :  (Jointly Administered)
                             Debtor.          :
                                              :
                                              :
---------------------------------------------------------------- x
DELPHI CORPORATION,                           :
                                              :
                             Plaintiff,       :
                                              :
             - against -                      :
                                              :
APPALOOSA MANAGEMENT L.P., A-D                :  Adversary Proceeding
ACQUISITION HOLDINGS, LLC, HARBINGER          :  Case No ___-_____
DEL-AUTO INVESTMENT COMPANY, LTD.,            :
PARDUS DPH HOLDING LLC, MERRILL LYNCH,        :
PIERCE, FENNER & SMITH INCORPORATED,          :
GOLDMAN SACHS & CO., HARBINGER CAPITAL        :
PARTNERS MASTER FUND I, LTD., and PARDUS      :
SPECIAL OPPORTUNITIES MASTER FUND L.P.,       :
                                              :
                             Defendants.      :
----------------------------------------------------------------x
```

600950.13


0544481080516000000000006

## COMPLAINT

Plaintiff Delphi Corporation ("Delphi"), by its undersigned attorneys, for its Complaint against Appaloosa Management L.P. ("Appaloosa"), A-D Acquisition Holdings, LLC ("ADAH"), Harbinger Del-Auto Investment Company, Ltd. ("Harbinger Del-Auto"), Pardus DPH Holding LLC ("Pardus DPH Holding"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and Goldman Sachs & Co. ("Goldman," and, collectively with ADAH, Harbinger Del-Auto, Pardus DPH Holding, and Merrill, the "Investors"), and against Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger") and Pardus Special Opportunities Master Fund L.P. ("Pardus," and collectively with Appaloosa and Harbinger, the "Commitment Parties"), alleges upon knowledge as to its own actions and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This is a story of trust and betrayal.  Delphi trusted David Tepper ("Tepper") and his hedge fund, Appaloosa, and planned its emergence from Chapter 11 in reliance on the equity financing they promised.  Tepper assured everyone in this case – including the Statutory Committees, General Motors Corporation ("General Motors" or "GM"), Delphi's labor unions, and the Bankruptcy Court – that Appaloosa could be trusted and would honor its commitments.  This action arises from Appaloosa's betrayal of that trust.

2.      In this lawsuit, Delphi seeks a decree of specific performance compelling the Investors and the Commitment Parties to provide equity financing to Delphi as they committed to do, pursuant to agreements that are essential building blocks of the confirmed First Amended Joint Plan of Reorganization (the "Plan") in these

jointly-administered Chapter 11 proceedings for Delphi and forty-one of its subsidiaries (collectively, the "Debtors").  The Investors, together with UBS Securities LLC ("UBS") which is sued in a separate action, committed to fund up to $2.55 billion as necessary for the consummation of the Plan.  Appaloosa's affiliate, ADAH, itself committed to provide approximately half of the total equity financing – $1.076 billion.

3.      If a final judgment of specific performance is not awarded, Delphi seeks, in the alternative, to recover damages in an amount to be determined at trial for the wrongful termination of the parties' agreements, for other contractual breaches, and for the tortious and fraudulent conduct of Appaloosa.  Under the agreements executed by the defendants, all defendants are jointly and severally liable for the wrongful termination and other breaches.

4.      Defendants' failure to honor their contractual commitments – at the eleventh hour when all other parties were ready, willing and able to close on all financing and other agreements embodied in the Plan – derailed Delphi's progress toward emergence from Chapter 11 in April 2008, and has prevented the consummation of the Plan.  Plaintiff alleges and believes that a judgment of this Court requiring defendants to comply with their obligations is warranted as a matter of law and equity, and necessary for the consummation of the confirmed Plan.

5.      On April 4, 2008, the Debtors were set to emerge from Chapter 11 pursuant to the Plan and the agreements embodied therein, all of which are the product of years of negotiation, accommodation, conflict, litigation and ultimately resolution among Delphi, the Debtors' Statutory Committees, the Debtors' principal labor unions, General Motors, certain claimants in multidistrict ERISA and securities litigation, the Internal

Revenue Service, the Pension Benefit Guaranty Corporation and the defendants. That date was the deadline for closing under the Investment Agreement based on the provision therein granting ADAH the right to terminate if the closing did not occur by March 31, 2008, and ADAH's commitment to the Bankruptcy Court and Delphi that ADAH waived such right to terminate unless the closing did not occur by April 4, 2008.

6.      One crucial piece of the intricate and complex arrangements necessary for the consummation of the Plan is the Equity Purchase and Commitment Agreement dated as of August 3, 2007 as amended on December 10, 2007 (the "Investment Agreement" and sometimes referred to as the "EPCA"), pursuant to which ADAH and the other Investors (and UBS) commit to invest up to $2.55 billion of equity financing in the reorganized Delphi. (The commitments of the Investors sued herein amount to $2.383 billion; the commitment of UBS is $166 million.) The commitments of defendants ADAH, Harbinger Del-Auto and Pardus DPH Holding are backed by Commitment Letter Agreements of their respective parents, defendants Appaloosa, Harbinger and Pardus, dated December 10, 2007. The Investment Agreement and the Commitment Letter Agreements were developed through a process that involved intense and protracted negotiations among the various parties in these Chapter 11 cases as well as numerous conferences and hearings with the Court over a period of eighteen months. Appaloosa, in particular, aggressively pursued for itself, and achieved, a dominant and critical role in the equity financing necessary for the Debtors' emergence from Chapter 11 pursuant to the Plan — and Delphi and all of its stakeholders relied on Appaloosa's repeated assurances that it would honor its commitments.

7.     The stakes at the closing scheduled for April 4, 2008, could not have been higher for Debtors, their employees, creditors, and other stakeholders.  The equity financing promised by the Investors and the Commitment Parties was and is essential to the consummation of the Plan.  In light of the complexity and inter-relatedness of all the agreements with lenders, unions, General Motors, government agencies, etc., as well as market conditions, and after having devoted more than a year to reaching agreement with the defendants on all the terms and conditions of their equity investment, there is no possible alternative source of equity financing that could save the Plan.  Indeed, because of the vital importance of the equity financing committed by defendants, the agreements in question do not contain any "outs" for the defendants based on market conditions or like contingencies.  Rather, the defendants are required to honor their commitments, just as Delphi has honored its commitments.

8.     Unfortunately, just hours before the scheduled closing, instead of funding and honoring its obligations, ADAH sent Delphi a written notice purporting to terminate the Investment Agreement.  ADAH asserted in its notice that Delphi had breached the Investment Agreement, entered into agreements for an "Alternate Transaction" and effectuated a "Change of Recommendation" (as those terms are defined in the Investment Agreement).  ADAH claimed that Delphi was obligated to pay an Alternative Transaction Fee of $82,500,000.  In fact, ADAH's assertions were false.  Delphi had not breached the Investment Agreement, had not entered into agreements for an "Alternate Transaction" and had not effectuated a "Change in Recommendation."

9.     Delphi believes that defendants backed out of the transaction simply because they decided they did not like the economics of the deal they had agreed

to, and that they never intended to close if the deal was under water. By their refusal to close on April 4, 2008, defendants breached the binding commitments upon which the consummation of the Plan depended.

10.    Delphi brings this action to enforce the commitments of the Investors and the Commitment Parties – in other words, to require defendants to honor their obligations in accordance with the terms of the parties' written agreements. In particular, Delphi seeks a decree of specific performance as against all the defendants because that equitable remedy is necessary and proper under all of the circumstances of this case, and any legal remedy would be inadequate; in addition, Delphi seeks compensation for damages caused by defendants that have been and will be suffered even if specific performance is awarded. In the alternative, Delphi seeks redress for the substantial damages the Investors and Commitment Parties have inflicted on Delphi, the Debtors, their employees, creditors, and other stakeholders.

### JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This proceeding is a core proceeding under 28 U.S.C. § 157(b) arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

12.    In the Investment Agreement, the Investors "irrevocably submit to the jurisdiction of, and venue in, the United States Bankruptcy Court for the Southern District of New York and waive any objection based on forum non conveniens." Investment Agreement ¶ 16.

13.    In the Commitment Letter Agreements, the Commitment Parties "irrevocably submit to the jurisdiction of, and venue in, the United States Bankruptcy Court for the Southern District of New York and waive any objection based on forum non conveniens."

14.    In the Plan, which was confirmed by Order of this Court dated January 25, 2008, this Court retained jurisdiction, pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, over all matters arising out of, and related to, Debtors' Chapter 11 cases and the Plan, including for purposes of adjudicating all adversary proceedings commenced pursuant to the Plan, issuing any orders in aid of execution, implementation, or consummation of the Plan, enforcing all orders previously entered by the Bankruptcy Court, and hearing and determining all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement.

## THE PARTIES

15.    Plaintiff Delphi is a leading global supplier of mobile electronics and transportation systems.  Headquartered in Troy, Michigan, Delphi and its subsidiaries have approximately 163,500 employees and operate 152 wholly-owned manufacturing sites in 34 countries.  Delphi supplies products to nearly every major global automotive original equipment manufacturer ("OEM"), including General Motors, Ford Motor Company, Chrysler LLC, Volkswagen Group, Hyundai, and Renault/Nissan Motor Company.

16.    Defendant ADAH is a limited liability company organized under the laws of the State of Delaware with an office located at 26 Main Street, Chatham, New Jersey.  ADAH is an affiliate of defendant Appaloosa and a party to the Investment

Agreement.  The amount of ADAH's commitment under the Investment Agreement is $1,076,394,180.91.

17.     Defendant Harbinger Del-Auto is a company organized under the laws of the Cayman Islands with an office located at 555 Madison Avenue, New York, New York. Harbinger Del-Auto is an affiliate of defendant Harbinger and a party to the Investment Agreement.  The amount of Harbinger Del-Auto's commitment under the Investment Agreement is $397,225,891.24.

18.     Defendant Pardus DPH Holding is a limited liability company organized under the laws of the State of Delaware with an office located at 590 Madison Avenue, New York, New York.  Pardus DPH Holding is an affiliate of defendant Pardus and a party to the Investment Agreement.  The amount of Pardus DPH Holding's commitment under the Investment Agreement is $342,655,959.96.

19.     Defendant Merrill is a corporation organized under the laws of the state of Delaware with an office located at 4 World Financial Center, New York, New York.  Merrill is a party to the Investment Agreement.  The amount of Merrill's commitment under the Investment Agreement is $166,866,749.19.

20.     Defendant Goldman is a limited partnership organized under the laws of the State of New York with an office located at 1 New York Plaza, New York, New York.  Goldman is a party to the Investment Agreement.  The amount of Goldman's commitment under the Investment Agreement is $166,866,749.19.

21.     The total commitment of the Investors under the Investment Agreement is $2,383,142,727.05.  UBS Securities LLC ("UBS"), which is not a party to this action, and which is being sued separately, committed $166,866,749.19 under the

Investment Agreement.  Thus, the total commitment under the Investment Agreement, including the commitments of the Investors and UBS, is $2,550,009,476.24.

22.    Defendant Appaloosa is a limited partnership organized under the laws of the State of Delaware with an office located at 26 Main Street, Chatham, New Jersey.  Appaloosa is a signatory to a Commitment Letter Agreement with Delphi and ADAH, dated December 10, 2007 (the "Appaloosa Commitment Letter Agreement"). The amount of Appaloosa's commitment under the Appaloosa Commitment Letter Agreement is $1,076,394,180.91 subject to escalation to a maximum of $2,550,009,476.24, if Merrill, UBS, Harbinger Del-Auto, Goldman, and/or Pardus DPH Holding terminates the Investment Agreement as to itself or themselves in accordance with the terms of that agreement.

23.    Defendant Harbinger is a company organized under the laws of the Cayman Islands with an office located at 555 Madison Avenue, New York, New York. Harbinger is a signatory to a Commitment Letter Agreement with Delphi and Harbinger Del-Auto dated December 10, 2007 (the "Harbinger Commitment Letter Agreement"). The amount of Harbinger's commitment under the Harbinger Commitment Letter Agreement is $397,225,891.24.

24.    Defendant Pardus is a limited partnership organized under the laws of the Cayman Islands with an office located at 590 Madison Avenue, New York, New York.  Pardus is a signatory to a Commitment Letter Agreement with Delphi and Pardus DPH Holding dated December 10, 2007 (the "Pardus Commitment Letter Agreement"). The amount of Pardus' commitment under the Pardus Commitment Letter Agreement is $342,655,959.96.

# FACTUAL ALLEGATIONS

## *Delphi's Early Years and Bankruptcy Filing*

25.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors, and separated from GM in or about January 1999.  Delphi has evolved from a North-American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although General Motors remains Delphi's single largest customer, Delphi generates more than half of its revenue from non-GM sources.

26.     In the first two years following Delphi's separation from General Motors, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In 2004, the last full year prior to the filing of these Chapter 11 cases, Delphi reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.

27.     Delphi believes that its financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Company from exiting non-profitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs; (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of General Motors' annual U.S. production and related pricing pressures; and (c) increasing commodity prices.

28.     In order to address these issues, on October 8, 2005 (the "Petition Date"), Delphi and 38 of its U.S. subsidiaries filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")

for reorganization relief under Chapter 11 of the United States Bankruptcy Code. On

October 14, 2005, three additional U.S. Delphi affiliates filed voluntary petitions. As of

the Petition Date, Delphi ranked as the fifth largest public company business

reorganization in terms of revenues and the thirteenth largest public company business

reorganization in terms of assets. Since the Petition Date, Delphi and its U.S. subsidiaries

have operated its business subject to the restrictions imposed by the Bankruptcy Code.

Until defendants refused to fund their commitments on April 4, 2008, Delphi expected

that the consummation of the Plan and the emergence from chapter 11 on that date would

hasten Delphi's return to economic viability and health.

**The Plan of Reorganization**

        29.    Almost two years before the Plan was confirmed, Delphi outlined

the key tenets of a transformation plan that Delphi believed would enable a return to

stable, profitable business operations. The Transformation Plan covered five (5) key

areas and set goals within those areas:

        <u>Labor</u>. Modify Debtors' labor agreements to create a competitive arena in

which to conduct business.

        <u>General Motors</u>. Conclude negotiations with General Motors to finalize

General Motors' financial support for certain of the Debtors' legacy and labor costs and

to ascertain General Motors' business commitment to the Company.

        <u>Product Portfolio and Manufacturing Footprint</u>. Streamline Debtors'

product portfolio to capitalize on world-class technology and market strengths and make

the necessary manufacturing alignment with its new focus.

Cost Structure. Transform Delphi's salaried workforce and reduce general

and administrative expenses to ensure that Delphi's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.

Pension. Devise a workable solution to Delphi's pension funding

situation.

30.     The effort and cooperation required of multiple disparate parties to

make progress toward those goals has been tremendous, and essential to the formulation

of a plan of reorganization.  During the course of these Chapter 11 cases, there has been

significant progress by Debtors toward achieving the objectives of their Transformation

Plan.  First, Delphi negotiated amended collective bargaining agreements with its labor

unions that will enable Debtors to be more competitive in their U.S. operations.  Second,

Delphi entered into comprehensive settlement and restructuring agreements with General

Motors – specifically, on September 6, 2007, a Global Settlement Agreement and a

Master Restructuring Agreement, both of which were later approved by the Bankruptcy

Court as part of the plan confirmation process.  These agreements were intended to

resolve all major pre-petition disputes between Delphi and General Motors, and were

filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively.  Third, with respect to its

product portfolio and manufacturing facility realignment, Debtors made substantial

progress in identifying and beginning to divest or wind down those facilities and business

lines that are not within Delphi's future plans.  Fourth, Delphi is implementing important

cost savings in its organizational cost structure and rationalization of its salaried

workforce to competitive levels that will allow it to emerge from Chapter 11 much leaner

and in a better competitive position.  Fifth, Delphi received favorable pension funding

waivers from the IRS which, combined with the transaction under the Internal Revenue Code of 1986 (the "IRC"), Section 414(l) and Section 208 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"), and adequate debt financing and equity infusions, will allow Delphi to fund its pension plans after emergence from Chapter 11.

31.     In the early stages of these Chapter 11 cases, Appaloosa pushed, with the grace and diplomacy of a battering ram, to play a central role in the reorganization of the Debtors.

32.     In the course of these Chapter 11 proceedings, Appaloosa acquired substantial Delphi equity and debt in several places in Delphi's capital structure, and Appaloosa actively campaigned and litigated for the appointment of an Equity Committee, on the basis of its contention that Delphi's equity had significant value.

33.     Although Appaloosa did not obtain a place for itself on the Equity Committee, Appaloosa ultimately succeeded in its quest for a prominent role in Delphi's restructuring.  During 2006, Delphi, and also the Statutory Committees and General Motors, interviewed potential plan investors.  The competition was intense, but Appaloosa, together with Cerberus Capital Management L.P. ("Cerberus"), was the winner.  The first version of the Investment Agreement was signed in December 2006; by mid-2007, however, Cerberus was engaged in the acquisition of what is now Chrysler LLC and the completion of its acquisition of 50% of General Motors Acceptance Corporation and decided not to invest in Delphi.

34.    In August 2007, a second version of the Investment Agreement (sometimes referred to as the July EPCA) was executed, with Appaloosa as the sole lead plan investor.

35.    This Court has explained the central importance of the Investment Agreement in Delphi's reorganization effort:  "The building block or basis for that plan or a critical building block or basis for that plan was the July EPCA  in that it provided for, among other things, an aggregate potential cash investment of 2.55 billion dollars by a group of plan investors in return for a stake in the debtors' reorganized equity." (Transcript, December 7, 2007, at p. 14.)

36.    At a hearing on November 16, 2007, this Court reviewed the history concerning the Investment Agreement and explained that the central role achieved by Appaloosa was the result of Delphi's trust, and the Court's trust, that the Appaloosa group would honor its commitments:

> "You may recall that there was competition for the plan investment opportunity . . .and I ruled in favor of this investor group [i.e., Appaloosa, et al.] not just because they were the highest bid, because they weren't, but because they were the best bid, because they had done their due diligence, *because they were presented to me, and I believed it*, that two of the nation's biggest investment banks, including Goldman Sachs, and the large hedge funds that had also their own reputational interests, *would stick by this debtor and their fundamental economic commitments*, unlike the competitive -- the competitor investor who had not done due diligence originally, when this was first negotiated…."

(Nov. 16, 2007 Tr. at 22, emphasis added.)

37.    The Investment Agreement is thus a crucial and irreplaceable component of the agreements and arrangements embodied in the Plan and is necessary

for the successful consummation of the Plan.  The Bankruptcy Court approved Delphi's entry into the final form of Investment Agreement, as amended, in a ruling from the bench on December 7, 2007 and a written order dated December 10, 2007.

38.    The Plan confirmed by the Bankruptcy Court on January 25, 2008 was the culmination of all the settlements that Debtors reached with General Motors, with Debtors' labor unions and with other critical stakeholders in the reorganization cases, as well as all the other agreements Delphi negotiated, including the Investment Agreement, to obtain the necessary financing to fund the Plan and emerge from Chapter 11 as a viable business.

**The Investment Agreement**

39.    The Investment Agreement, which is incorporated in the Plan (s*ee* Article 1, ¶ F; Exhibit 7.11), sets forth the terms upon which the Investors (plus UBS) commit to purchase (i) $175 million of common stock in the reorganized Delphi (the "Direct Subscription Shares"), (ii) $800 million of preferred shares in the reorganized Delphi (the "Preferred Shares") and (iii) any unsubscribed shares of common stock (the "Backstop Commitment") up to $1.575 billion in connection with a certain rights offering (the "Rights Offering").

40.    The Rights Offering contemplated by the Investment Agreement provides for Delphi to distribute, at no charge, to each general unsecured claim holder (an "Eligible Holder") certain rights to acquire new common stock in reorganized Delphi. The "rights" would permit the Eligible Holders to purchase their pro rata share of a set number of shares (41,026,309) at a set purchase price ($38.39 per share).  To the extent that any of these shares are not purchased by Eligible Holders, the Investors and UBS,

through the Backstop Commitment, agree to purchase such shares, resulting in a commitment of approximately $1.575 billion in respect of such shares. The Rights Offering raised approximately $20 million as of April 4, 2008, so the Backstop Commitment as of that date was approximately $1.555 billion.

41.    Accordingly, after taking into account the proceeds of the Rights Offering, the total commitment of the Investors (and UBS), including the Backstop Commitment and the commitments to purchase Direct Subscription Shares and the Preferred Shares, amounts to $2.53 billion as of April 4, 2008.

42.    In consideration of the Investors' commitment, the Investment Agreement obligates Delphi to pay fees to the Investors in the amount of approximately $60 million. Such fees are comprised of a "Preferred Commitment Fee," a fee regarding the Direct Subscription Shares and the Backstop Commitment, and a fee to ADAH for arranging the transactions contemplated by the Investment Agreement. In addition, Delphi agrees to pay certain transaction expenses of the Investors.

43.    At the time Delphi entered into the Investment Agreement, it believed that these fees demanded by the Investors, although considerable, were appropriate given the size and crucial importance of the equity investment to which the Investors were committing. In fact, Delphi represented to the Bankruptcy Court that these fees represent a small fraction of the investment that the Investors would make to acquire the various securities to be issued by reorganized Delphi.

44.    The Investment Agreement includes each Investor's representation that the Commitment Letter Agreement of its parent constitutes "valid and binding obligations of the parties thereto enforceable in accordance with its terms subject to . . .

general equitable principles." Investment Agreement ¶ 4(o). In the proceedings leading to the Bankruptcy Court approval of the Investment Agreement, Appaloosa represented to Delphi and the Court that it had agreed to commit a minimum of approximately $1.1 billion of its own capital.

45.    The Investment Agreement obligates each Investor to "use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the GM Settlement, and the Plan." Investment Agreement ¶ 6(b).

46.    In section 12 of the Investment Agreement, the parties agree that Delphi would have the right to terminate the Investment Agreement if Delphi's Board of Directors determines that their fiduciary duties require them to pursue an alternative transaction. In that event, the Investment Agreement provides for an agreed-upon fee to be paid by Delphi to the Investors. The Investment Agreement, however, does not provide a similar termination right for the Investors.

47.    Appaloosa has nonetheless taken the position that the Investment Agreement – for which it received from Delphi the lion's share of commitment fees in excess of $60 million and reimbursement of transaction expenses in the tens of million of dollars – essentially grants it and the other defendants and UBS an option to fulfill their commitments or not, in their sole discretion, and that Delphi's sole remedy for a wrongful termination is to assert a claim for breach (if the breach is willful) and recover whatever damages are proven up to a cap of $250 million.

48.     In fact, the Investment Agreement does not contain such a limitation on the remedies available to Delphi.  For example, section 18 of the Investment Agreement provides that "[t]he rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights and remedies which any party otherwise may have in law or in equity."  (Investment Agreement ¶ 18.)  Moreover, the Investment Agreement does not contain any limitation on equitable remedies available to Delphi, nor does it purport to limit the power of the Bankruptcy Court to award equitable relief such as specific performance in appropriate circumstances.

### The Commitment Letter Agreements

49.     In connection with the Investment Agreement, three of the Investors – ADAH, Harbinger Del-Auto, and Pardus DPH Holding – entered into commitment letter agreements, dated December 10, 2007, with their parent entities, Appaloosa, Harbinger, and Pardus, respectively.  Delphi is also a party to each of these Commitment Letter Agreements.  The Commitment Letter Agreements set forth the agreement of the Commitment Parties to provide the funds necessary for their affiliated Investors to fulfill their obligations under the Investment Agreement.

50.     In the Appaloosa Commitment Letter Agreement, Appaloosa commits "on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the 'Funds') to [ADAH] in an amount up to $1,076,394,180.91," subject to the terms and conditions set forth in the letter.  The Appaloosa Commitment Letter Agreement further provides that Appaloosa's financial commitment would increase by amounts totaling as much as $1.473 billion in the event of Limited Termination(s) by the other Investors under the Investment

Agreement, thus making Appaloosa's maximum financial commitment approximately $2.5 billion. The Appaloosa Commitment Letter provides that the Funds are to be used, *inter alia*, to provide the financing for ADAH to fulfill its commitment to purchase equity interests in reorganized Delphi and to satisfy its other obligations under the Investment Agreement.

51.     In the Harbinger Commitment Letter Agreement, Harbinger commits "on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the 'Funds') to [Harbinger Del-Auto] in an amount up to $397,225,891.24," subject to the terms and conditions set forth in the Commitment Letter Agreement.

52.     In the Pardus Commitment Letter Agreements, Pardus commits "to provide or cause to be provided funds (the 'Funds') to [Pardus DPH Holding] in an amount up to $342,655,959.96," subject to the terms and conditions set forth in the Commitment Letter Agreement.

53.     Each of the Harbinger and Pardus Commitment Letter Agreements, like the Appaloosa Commitment Letter Agreement, provides that the Commitment Party's "Funds" are to be used to provide the financing for its affiliated Investor to fulfill its commitment to purchase the equity interests in reorganized Delphi and satisfy its other obligations under the Investment Agreement.

54.     In the Commitment Letter Agreements, all the Commitment Parties represent that they have "and will have on the closing date, available funding necessary to provide the Funds in accordance with this letter agreement."

55.     Each of the Commitment Parties also represents that its respective Commitment Letter Agreement "has been duly authorized and validly executed and delivered and constitutes its valid and binding obligation, enforceable against it in accordance with its terms."

56.     All the Commitment Letter Agreements became effective upon their execution by the parties and expire "on the earliest to occur of (i) the closing of the transaction contemplated by the [Investment] Agreement, and (ii) termination of the [Investment] Agreement in accordance with its terms."  To date, none of the Commitment Letter Agreements has expired since there has not been a closing or a termination of the Investment Agreement in accordance with its terms.

57.     As defendants well know, the Investment Agreement and Commitment Letter Agreements have been recognized by the Court and the parties as forming the foundation for, and being a crucial component of, the Plan (along with the other inter-related agreements, settlements and commitments embodied in the Plan).

58.     The Commitment Letter Agreements, like the Investment Agreement, do not expressly mention or preclude the equitable remedy of specific performance.  In fact, the only provision in the Commitment Letter Agreements reflecting a limitation on equitable remedies applies to third parties, not to Delphi, *i.e.*, the provision that "nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company."

59.     Accordingly, the Commitment Letter Agreements preserve Delphi's equitable rights, including the right to seek and obtain a decree of specific

performance if a legal remedy is unavailable or inadequate in case the Commitment Parties fail to honor their commitments.

***Appaloosa's Repeated Assurances to Delphi and the Court***

60.    In several days of hearings before the Bankruptcy Court concerning the Investment Agreement – including hearings in July 2007 and two days of hearings in December 2007 (when the Bankruptcy court approved the current form of the Investment Agreement and the Disclosure Statement) – neither Appaloosa nor ADAH or any other Investors or Commitment Parties suggested to the Court that their commitments, including the express commitment of Appaloosa to fund up to $1.076 billion or more, could not be enforced by the Court even if Delphi complied with all the conditions and covenants applicable to it.

61.    On the contrary, all the statements of the parties and rulings of the Court reflected the understanding that the commitments of the Investors and the Commitment Parties were binding in accordance with their terms and would be funded to provide the equity financing necessary for Delphi's emergence from Chapter 11. *See*, *for example*, Exhibit 203 (Declaration of David Tepper, under penalty of perjury, November 27, 2007) introduced into evidence at the hearing before the Bankruptcy Court on December 6, 2007, in which Mr. Tepper states:  Appaloosa "committed a minimum of $1.1 billion of its own capital." *See also* Mr. Tepper's testimony at p. 124 of the transcript of the hearing on December 6, 2007:  "I understand that when I gave my word to somebody and shake somebody's hand I have a deal, I have a deal.  That's what I understand." *See also* the December 7, 2007 hearing transcript (the Court ruling) at p. 39, lines 5-7:  "I don't believe Mr. Tepper was blowing smoke at me yesterday when he

said a handshake is a handshake, a deal is a deal,'' and a few lines later at p. 39 lines 13-

14, "Consequently, I will approve the debtors' entry into the amended EPCA agreement

[i.e., the Investment Agreement]."

       62.    In the months leading up to the scheduled closing on April 4, 2008,

both before and after Appaloosa and the other defendants signed the final versions of the

Investment Agreements and Commitment Letter Agreements, the Court repeatedly made

clear to them the importance of the commitments they were making, and Delphi's

reliance thereon.  For example, on November 16, 2007, the Court stated:

> "The premise of the negotiations that this company has
> been undertaking over the past several months, and upon
> which thousands of workers have made enormous personal
> sacrifices was the framework of these agreements [i.e.,
> Investment Agreement and Commitment Letter
> Agreements]…."

(November 16, 2007 Tr. at 23.)

The Court also explained that the whole point of an equity sponsor, such as Appaloosa,

for a plan, is that the sponsor has to honor its commitment and stand by the company:

> "… if the parties don't come to their senses and appreciate
> that as a sponsor of this company they have to stand by the
> company – because otherwise why have a sponsor, why not
> give the equity to those who are in the debt already and in
> the equity already …."

(*Id.*)

       63.    Most recently, at the hearing on March 7, 2008, concerning

Delphi's motion pursuant to 11 U.S.C. §1142, the Court referred to the parties'

obligations under the Investment Agreement and stated:

> "As I've said repeatedly during this hearing, those
> obligations include reciprocal, reasonable best efforts
> obligations to take all actions and do all things reasonably

> necessary, proper or advisable to cooperate with each other
> and *to consummate and make effective the transactions
> contemplated by the EPCA [i.e., the Investment Agreement]*
> including the financing."

(March 7, 2008 Tr. at 119.)

### *The Bankruptcy Court Confirms the Plan*

       64.    On January 25, 2008, the Bankruptcy Court entered an order confirming the Plan. The Plan is based on a series of global settlements, compromises and agreements that involve nearly every major constituency in the Debtors' reorganization cases. The Plan provides, *inter alia*, that, on its effective date, the reorganized Debtors would receive the proceeds of the equity financing arrangements as defined in the Plan and the Investment Agreement.

       65.    The Plan, including all agreements and documents encompassed therein, was confirmed with the unqualified support of Appaloosa and the Investors, among others. Under the terms of the Investment Agreement, the conditions relating to the terms of any and all post-confirmation amendments and supplements have been deemed to be conclusively satisfied.

### *Delphi Arranges Its Exit Financing*

       66.    On November 16, 2007, the Bankruptcy Court entered an order authorizing Delphi to enter into a "commercially reasonable best efforts" engagement letter and fee letter with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. (the "Lead Arrangers"). At the time, Delphi anticipated that its exit financing would consist of: (i) a senior secured first-lien asset-based revolving credit facility in an aggregate principal amount of $1.6 billion (the "ABL Facility"); (ii) a senior secured first-lien term facility in an aggregate amount of $3.7

billion (the "First-Lien Loan"); and (iii) a senior secured second-lien term facility in the amount of $1.5 billion (the "Second-Lien Loan"), of which up to $750 million would be in the form of a note issued to General Motors in connection with the distributions contemplated under the Plan.

67.    On January 9, 2008, Delphi announced the commencement of the syndication of its exit financing package to support the Debtors' planned emergence from Chapter 11.  Primarily as a result of improved operating performance and lower than forecast capital expenditures for the 2007 fiscal year, Delphi reduced its planned exit facilities from the previously announced $6.8 billion to approximately $6.1 billion. Specifically, Delphi reduced the Second-Lien Loan from $1.5 billion to $825 million, of which up to $750 million would be in the form of a note issued to General Motors in connection with the distributions contemplated under the Plan.  At the time of the financing launch in January, Delphi discussed with the Investors this reduction in the amount of the financing to be sought, and the Investors gave their approval.

68.    Pursuant to the Plan, the Debtors were to "receive the proceeds of the Exit Financing Arrangements, in the aggregate amount necessary to implement the Plan within the terms and conditions previously approved by the Bankruptcy Court as described in the exit financing engagement letter and term sheet attached [to the Plan] as Exhibit 7.14, as such term sheet may be amended, modified or supplemented….." (Plan art. 7.14.)

69.    With respect to exit financing, the Investment Agreement requires that the amount of the exit financing be "sufficient" to fund the Plan (Investment Agreement § 9(a)(xix)) and additionally requires that Delphi "demonstrate[], to the

reasonable satisfaction of ADAH, that the pro forma interest (cash or noncash) expense for the Company during 2008 on the Company's indebtedness will not exceed $585 million…." (Investment Agreement § 9(a)(xx)).

70.    During the syndication process, it became apparent to Delphi and the Lead Arrangers that the likelihood of consummation of the syndication in its proposed amount, structure, and terms would be improved by General Motors' participation, pursuant to which General Motors would purchase up to $2 billion of the First-Lien Loan and, if necessary, all of the $825 million Second-Lien Loan without any original issue discount ("OID") and at an interest rate calculated to ensure compliance with the Investment Agreement interest expense limitation.  It was anticipated that the aggregate effect of General Motors' exit financing participation would result in General Motors holding an up-to-$2 billion first-lien note and an up-to $825 million second-lien note, and receiving at least $175 million in cash. General Motors' position in the First-Lien Loan would be junior to that of other lenders and would be subject to voting restrictions during any time period in which it holds $1 billion or more in first-lien financing.  Delphi and the Lead Arrangers reasonably determined that the increased General Motors' participation would allow the Debtors to obtain the remaining exit financing required to consummate the Plan.

***Appaloosa's Clandestine Efforts to Avoid Its Obligations***

71.    Even before the Plan was confirmed on January 25, 2008, Appaloosa, unbeknownst to Delphi, had started engaging in efforts to avoid its obligations and undermine the consummation of the Plan.

72.     In or about November and December 2007, prior to the date the Court approved the Investment Agreement and the Commitment Letter Agreements, Appaloosa discussed with other investors the concern that the fulfillment of commitments to purchase equity securities pursuant to the Investment Agreement would be a poor investment.  These communications occurred among Appaloosa and certain other investors who had agreed with the Investors and UBS to participate in the purchase of equity securities under the Investment Agreement.

73.     The other investors referred to in the preceding paragraph were among a group of about a dozen investors (referred to as the "Additional Investors") who had entered into an agreement with the Investors and UBS dated July 20, 2007 titled Additional Investors Agreement (to which Delphi was not a signatory).  The Additional Investors Agreement sets forth the terms on which the Additional Investors agree to participate in the equity purchase obligations of the Investors and UBS (referred to as the Initial Investors in such agreement).  Under the terms of the Additional Investor Agreement, the obligations of the Additional Investors would continue, and did continue, under the amended and final form of the Investment Agreement executed in December 2007.  The decision to enter into the amended Investment Agreement belonged to the Initial Investors, and was not subject to approval by the Additional Investors.

74.     Prior to December 10, 2007, certain of the Additional Investors urged Appaloosa not to enter into the amended and final form of the Investment Agreement because they believed that the purchase of equity securities under the Investment Agreement would be a poor investment.  Delphi alleges and believes,

although Delphi was never privy to any such communications and was unaware of them until much later, that Appaloosa agreed with the views of the Additional Investors.

75.     Delphi alleges and believes that Appaloosa agreed to the final form of Investment Agreement and Commitment Letter Agreements, in order to obtain substantial commitment fees being paid by Delphi, and with the intention and plan to avoid its obligations if the equity was out of the money at the time scheduled for closing even if Delphi proved able to fulfill the conditions and covenants applicable to it.

76.     On or about January 18, 2008, Appaloosa and certain of the Additional Investors engaged in communications concerning a plan to avoid closing under the Investment Agreement, and to pay Delphi what they characterized as a reverse break-up fee of $250 million rather than fulfilling their commitments.  Appaloosa, instead of fulfilling its obligation to use its reasonable best efforts to take all actions and do all things reasonably necessary, proper or advisable to cooperate with Delphi and to consummate the transactions under the Investment Agreement – which would have required Appaloosa to refrain from and/or shut down the planning with these Additional Investors as soon as it began – encouraged such planning, and sought to protect and advance its own financial self-interest in disregard of its commitments and obligations to Delphi.

77.     In connection with the illicit planning referred to in the preceding paragraph, Appaloosa asked the Additional Investors to agree to pay to Appaloosa a pro-rata share of any liability if Appaloosa were to terminate the Investment Agreement.

78.     In addition, on or about March 26, 2008, Delphi was shocked to learn from a credible source that certain of Delphi's committed equity investors had been

trying to avoid their obligations by seeking to persuade exit financing lenders to withdraw their commitments, in an effort to render Delphi unable to satisfy the financing condition under the Investment Agreement. This source advised Delphi, and Delphi alleges and believes, that the direct communications with exit lenders were engaged in by certain of the Additional Investors, not by Appaloosa itself, because Appaloosa was too smart to engage in such conduct directly. Nonetheless, Appaloosa and the other Initial Investors – defendants herein – remain legally responsible for the misconduct of the Additional Investors. Such misconduct also includes short-selling of Delphi's securities – which could only have had the purpose or effect of depressing the value of Delphi and making it only more difficult for Delphi to obtain the exit financing needed for consummation of the Plan – all in violation of the Investment Agreement.

79. On or about April 2, 2008, Appaloosa transmitted to the Additional Investors a proposed form of agreement to amend the Additional Investor Agreement and provide that certain indemnification obligations, which otherwise would terminate upon termination of the Investment Agreement, would survive such termination. Delphi alleges and believes that the above-described actions and communications were part of a plan and scheme by Appaloosa to avoid its obligations and prevent a closing under the Investment Agreement and Commitment Letter Agreements and to have the Additional Investors share in Appaloosa's liability, and the liability of the other Initial Investors, for refusing to fund their commitments.

80. Delphi further alleges and believes that Appaloosa knew the Investment Agreement did not grant the Investors and UBS the right to terminate as Appaloosa was planning to do. Indeed, as early as January 18, 2008, at least one of the

Additional Investors explicitly cautioned that there is no provision in the Investment Agreement for a reverse break-up fee if the plan investors walk away from their obligations, and that the investors could be exposed to litigation and a larger charge for failing to honor their obligations. Nonetheless, during the period leading up to the scheduled closing on April 4, 2008, Delphi alleges and believes that Appaloosa's strategy and goal was to avoid fulfilling its commitments.

81.    Moreover, instead of using its reasonable best efforts to honor its obligations, as it was contractually obligated to do, Appaloosa tasked its army of lawyers to comb the Investment Agreement for the purpose of trying to manufacture an excuse that might justify defendants' refusal to close the transactions contemplated by the Investment Agreement and the Commitment Letter Agreements that were vital to the consummation of the Plan.

82.    The hope by defendants that Delphi would fail to fulfill its obligations with respect to obtaining exit financing were dashed when General Motors agreed to participate in the loan syndicate. Indeed, in late February 2008, one of the Additional Investors expressed the gloomy (to defendants) prognosis: "If General Motors takes down the financing, we will not have a choice but to fund." Nonetheless, Appaloosa and its lawyers came up with an argument that General Motors' participation – which in fact benefited all of Delphi's stakeholders and enabled Delphi to achieve the necessary exit financing on terms more favorable than otherwise contemplated – somehow violated an unrelated covenant that was intended for an entirely different purpose. As alleged herein, that argument has ultimately been shown to be specious.

83.    Thus, at a time when to all outward appearances Appaloosa was fully committed to the consummation of the Plan, just the opposite was true. Delphi was deceived as a result of its trust in Mr. Tepper and Appaloosa. Delphi reasonably believed that Appaloosa had the intention to honor its funding commitment – as Mr. Tepper had explicitly stated in open court (*see*, e.g., paragraph 61 above). During Appaloosa's involvement as lead equity investor for Delphi, tens of millions of dollars were spent developing the Plan, and then taking steps to implement it. Complex settlements were negotiated and approved by the Bankruptcy Court because Appaloosa conditioned its investment on resolutions with many parties such as General Motors, Delphi's labor unions and the IRS. Changes were made to the Investment Agreement after it had been approved by the Court in August 2007 – over strenuous objections – to improve the economics for Appaloosa. Contested court hearings were held in December of 2007 and January of 2008 as Delphi fulfilled its obligations to obtain Court approval for the EPCA and the Plan. Thousands of hours and millions of dollars were spent readying for the exit from chapter 11. Documents were drafted and redrafted. The plan and solicitation materials were prepared and sent out. Filings were made with the SEC. The rights offering was prepared and completed. The exit financing was arranged and documented. Creditors and shareholders read the voluminous plan materials and voted on the Plan. Only when it was too late did Delphi learn that Appaloosa never intended to fulfill its commitment if the equity investment was under water at the time of closing, and that after the Investment Agreement was signed, Appaloosa and its allies were secretly working behind the scenes to undermine all of the efforts to achieve Plan

consummation that the Debtors and their employees and other stakeholders were trying

so hard to complete in good faith.

*ADAH Objects  to the Exit Financing Arrangements*

84.     On February 6, 2008, Delphi, General Motors, ADAH, and their

respective representatives met to discuss the proposal for General Motors' enhanced

participation in the Exit Financing Arrangements (the "Proposal") as summarized in a

draft term sheet.  Subsequently, in a February 13, 2008 letter, counsel for Appaloosa and

ADAH, on behalf of the Investors (other than Goldman), set forth various concerns with

that Proposal.  The February 13 letter also advised that the Investors as defined in the

EPCA (other than Goldman) had entered into a common interest agreement.  In fact, the

parties to the common interest agreement are two of the Investors (Merrill and UBS) plus

Appaloosa, Harbinger and Pardus, i.e., the Commitment Parties acting for their affiliated

shell entities who are among the Investors.  The common interest agreement recites that

the signatories thereto (defined as the "Common Interest Parties") have a common

interest in "potential litigation between the Common Interest Parties, on the one hand,

and Delphi … on the other hand."

85.     Delphi responded to the February 13 letter on February 20, 2008,

explaining why the concerns of the Investors under the EPCA were unfounded and

requesting that such Investors proceed with their reasonable best efforts to take all

actions, and do all things, reasonably necessary, proper, or advisable to cooperate with

the Debtors and to consummate and make effective the transactions contemplated by the

Investment Agreement and the Plan.  In a February 24, 2008 letter, however, counsel for

ADAH asserted that the Proposal was "non-compliant, and inconsistent, with the EPCA."

86.     As a result of the Investors' intransigence concerning the proposed terms of the exit financing, Delphi filed a motion under section 1142 of the Bankruptcy Code.  Although that motion was not granted, the guidance from the Court – that the objection to GM's participation in the exit financing could be addressed if a GM affiliate were substituted for GM – was accepted by Delphi.

**Delphi Performs under the Investment Agreement**

87.     In reliance on the binding commitments of defendants, as set forth in the Investment Agreement and the Commitment Letter Agreements, Delphi proceeded to take all actions necessary to consummate the Plan, with an announced goal of emerging from bankruptcy during the first quarter of 2008.  For example, in order to ensure that the more than $6 billion in exit financing would be available on April 4, 2008, Delphi paid all commitment fees due to the Lead Arrangers ($10 million) plus millions more in expenses, and proceeded with the Rights Offering and complied with all conditions necessary to obtain such financing.  As of April 4, 2008, Delphi fulfilled all applicable conditions and covenants for closing under the Investment Agreement and consummation of the Plan.

**ADAH's Purported Termination of the Investment Agreement**

88.     On April 4, 2008, all the parties (other than defendants and UBS) required for a successful closing under the Plan and emergence from Chapter 11 – including Delphi's exit financing lenders, GM, and the Creditors Committee and Equity Committee – were ready, willing and able to move forward.  All actions necessary to consummate the Plan were prepared to be taken – other than the concurrent closing and funding of the Investment Agreement.  Thus, the closing would have been consummated,

and Delphi would have successfully emerged from Chapter 11, but for the wrongful

termination by ADAH and the refusal of the Investors and the Commitment Parties to

honor their commitments.

        89.     Just hours before the scheduled closing, Delphi received a letter

from ADAH stating that "this letter constitutes a notice of immediate termination of the

Agreement…."  In its letter, ADAH asserted a right to terminate under sections 12(d)(v),

12(d)(vi)(A) and 12(d)(vi)(B) of the Investment Agreement.

        90.     In fact, because Delphi had complied with all conditions and

requirements under the Investment Agreement, ADAH had no right to terminate, and

ADAH's April 4 notice constituted a wrongful termination of the Investment Agreement.

        91.     There are many deficiencies in the ADAH notice of April 4.  For

example, section 12(d)(vi)(B) of the Investment Agreement, cited by ADAH, concerns

termination if Delphi enters into an "Alternate Transaction Agreement."  In fact, although

ADAH asserted that it was terminating under 12(d)(vi)(B) and that Delphi was obligated

to pay an Alternate Transaction Fee of $82,500,000, Delphi had not entered into an

Alternate Transaction Agreement.  As defined in the Investment Agreement, an Alternate

Transaction Agreement is an agreement that relates to an Alternate Transaction, which

means any plan, proposal, offer or transaction that is inconsistent with the Investment

Agreement, the Preferred Term Sheet, the GM Settlement, or the Plan.  Delphi did not

enter in any such agreement.  On the contrary, Delphi did everything that was required of

it in order to consummate the Agreement, the Preferred Term Sheet, the GM Settlement

and the Plan.

92.    ADAH also asserted a right of termination under section 12(d)(vi)(A) of the Investment Agreement which provides that ADAH has a right of termination if there has been a "Change of Recommendation," as defined in the Agreement.  A Change of Recommendation means that Delphi or its Board of Directors or any committee thereof shall have (i) withheld, withdrawn, qualified or modified (or resolved to do any of those things), in a manner adverse to the Investors, its approval or recommendation of the Agreement, the Preferred Term Sheet, the GM Settlement or the Plan or the Transactions contemplated hereby or thereby, or (ii) approved or recommended, or proposed to approve or recommend, any Alternate Transaction.  In fact, Delphi and its Board and the committees thereof have done everything appropriate to consummate the Agreement, the Preferred Term Sheet, the GM Settlement and the Plan, and there has been no Change of Recommendation.

93.    With respect to section 12(d)(v) of the Investment Agreement, which provides that ADAH may terminate if the Company has breached any provision of the Investment Agreement, which breach would cause the failure of any condition set forth in section 9(a)(xvi) or (xvii) to be satisfied, Delphi committed no such breach.  Sections 9(a)(xvi) and (xvii) set forth the closing conditions that all the representations and warranties of Delphi contained in the Investment Agreement shall be true and correct and that Delphi shall have performed and complied with all of its covenants.  In fact, as of April 4, all of the representations and warranties of Delphi were true and correct and Delphi had performed and complied with all of its covenants and agreements.

94.    On April 5, 2008, ADAH delivered to Delphi a second letter, described as "a supplement to the April 4 Termination Notice," stating "this letter

constitutes a notice of an additional ground for termination" of the Investment

Agreement.  The April 5 letter cited Section 12(d)(iii) of the Investment Agreement based

on the Plan not having become effective on or before the deadline of April 4, 2008.

Having already derailed the closing by its wrongful termination the previous day,

however, ADAH could not profit or benefit from its own wrongful refusal to close on

April 4, 2008.  The second letter thus had no legal or practical significance.

95.      Defendants' refusal to proceed to closing constitutes a willful

breach or, in the alternative, a breach of their obligations under the Investment

Agreement.  Similarly, Appaloosa, Harbinger and Pardus have breached, or willfully

breached, their obligations under the Commitment Letter Agreements.

96.      Even after ADAH sent its notices of termination of the Investment

Agreement, Appaloosa sought to maintain control over Delphi's prospects and impede

Delphi's ability to pursue an alternative transaction with other equity investors.

Specifically, on April 7, 2008, ADAH wrote to the Additional Investors and advised –

falsely – that the Initial Investors have submitted to Delphi "a substantive proposal for, or

are actively negotiating with the Company, a transaction similar to the transactions

contemplated by the EPCA…."  The effect of such notice was to prevent the Additional

Investors from independently discussing with Delphi an alternative transaction for equity

financing.  Fortunately, Delphi learned of this improper notice from one of the Additional

Investors who received it, and demanded that Appaloosa cease its interference with

Delphi's reorganization efforts.

97.      As things now stand, unless a decree of specific performance is

issued by the Court as requested herein, there is no possibility that the confirmed Plan can

be consummated, and Delphi, which on April 4 was literally on the brink of emerging from Chapter 11, will have to develop a modified plan with the resultant burdens, costs and delays for all stakeholders that such process entails.  Monetary damages could not adequately compensate Delphi for such harm, and would not protect Delphi's employees and other stakeholders from the consequences of defendants' wrongful conduct.

**Delphi's Exit Financing Complied with the Investment Agreement**

98.    Contrary to the Plan Investors' contentions, as of April 4, 2008, Delphi's exit financing arrangements satisfied all requirements of the Investment Agreement.

99.    The Investment Agreement does not specify the terms of Delphi's exit financing.  Rather, that Agreement provides two principal closing conditions concerning Delphi's exit financing.  First, the Investment Agreement requires that that amount of the exit financing be "sufficient" to fund the Plan.  (Investment Agreement § 9(a)(xix).)  Second, the Investment Agreement requires that Delphi's aggregate interest expense for 2008 not exceed $585 million.  (*Id.* § 9(a) (xx).)

100.    Delphi's exit financing, as available on April 4, satisfied both conditions.

101.    Nonetheless, in its April 4 termination notice, ADAH contended that Delphi's exit financing arrangements breached certain representations, warranties, or covenants contained in the Investment Agreement.  First, the Investors contend that Section 5(p) of the Investment Agreement prohibits GM from participating in Delphi's exit financing because such participation would constitute an "agreement with GM . . . outside the ordinary course of business."  The Bankruptcy Court, however, in the hearing

on March 7, 2008, addressed this contention and provided guidance to Delphi and the Plan Investors, *i.e.*, that the proposed exit financing would *not* violate Paragraph 5(p) of the Investment Agreement so long as the financing was entered into between Delphi and an affiliate or subsidiary of GM, rather than GM itself.  Informed by that guidance, Delphi arranged its exit financing in a manner that would comply with the Court's direction.

102.    ADAH also contended in its April 4 notice that Delphi's exit financing breached Paragraph 5(t) of the Investment Agreement.  In order to justify their decision not to close, the Investors took the position that the Investment Agreement's definition of "debt financing" required Delphi to obtain financing on the <u>exact</u> financing terms described in the "best efforts" financing letter provided by Delphi's lead arrangers.  However, subject to the specific covenants concerning sufficiency to fund the Plan and cap on first-year interest, the Investors did not retain the right to reject the exit financing if the "best efforts" resulted in terms that were different from those expressly indicated in the financing letter.

103.    Because Delphi satisfied its obligations under Paragraph 5(t), that covenant was satisfied.

### FIRST CLAIM FOR RELIEF
**(against the Investors for Breach of Contract:  the Investment Agreement)**

104.    Delphi repeats and re-alleges the allegations contained in paragraphs 1 through 103 above as if fully set forth in this paragraph.

105.    Delphi and the Investors are parties to the Investment Agreement, which is a valid and binding contract.

106.    The Investment Agreement sets forth the obligation of the Investors and UBS to invest up to $2.55 billion in reorganized Delphi.

107.    Delphi substantially performed under the Investment Agreement.

108.    On April 4, 2008, Delphi was ready, willing, and able to fulfill its obligations under the Investment Agreement and had fulfilled all of its covenants and satisfied all of the conditions under the Investment Agreement.  Delphi alleges in the alternative that as to each condition, it was either satisfied by Delphi or waived by defendants and/or defendants by their conduct are estopped from asserting any non-compliance.

109.    The Investors breached the Investment Agreement, as well as the implied covenant of good faith and fair dealing inherent in the Investment Agreement, by refusing to comply with their obligations under the Investment Agreement, and by wrongfully and without cause terminating the Investment Agreement.  The Investors also breached their contractual obligations and their duty of good faith by failing to use their reasonable best efforts to consummate the transactions under the Investment Agreement, and by offering pretextual reasons for their refusal to fulfill their obligations.

110.    Delphi has no adequate remedy at law.

111.    Delphi is entitled to a decree of specific performance ordering the Investors to perform their obligations under the terms of the Investment Agreement, including, without limitation, the obligation of the Investors to purchase $164.8 million (a total of $175 million with UBS) of common stock in the reorganized Delphi; to purchase $735 million of preferred shares (a total of $800 million with UBS)  in the reorganized Delphi; and to purchase all unsubscribed shares of common stock in connection with the

Rights Offering, up to a total investment of $2.383 billion (or a total of $2.55 billion with

UBS).  In addition, Delphi is entitled to damages in an amount to be determined at trial to

compensate for harm incurred as a result of costs and losses due to the delay in

defendants' performance from April 4, 2008 to the date performance occurs pursuant to a

judgment of the Court.

112.    In the alternative, Delphi is entitled to damages from the Investors

in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

**(against the Commitment Parties for Breach of Contract:
the Commitment Letter Agreements)**

113.    Delphi repeats and re-alleges the allegations set forth in paragraphs

1 through 112 above as if fully set forth in this paragraph.

114.    Delphi and the Commitment Parties are parties to the Commitment

Letter Agreements, which are valid and binding contracts.

115.    The Commitment Letter Agreements set forth the obligation of the

Commitment Parties to fund the obligations of the Investors under the Investment

Agreement.

116.    Delphi substantially performed any obligations it has under the

Commitment Letter Agreements.

117.    On April 4, 2008, Delphi was ready, willing, and able to fulfill its

obligations under the Investment Agreement and the Commitment Letter Agreements,

and had fulfilled all applicable conditions and covenants under the Investment Agreement

and the Commitment Letter Agreements.  Delphi alleges in the alternative that as to each

condition, it was either satisfied by Delphi or waived by defendants and/or defendants by their conduct are estopped from asserting any non-compliance.

118.    The Commitment Parties breached the Commitment Letter Agreements, as well as the implied covenant of good faith and fair dealing inherent in the Commitment Letter Agreements, by refusing to fund the obligations of the applicable Investors under the Investment Agreement.

119.    Delphi has no adequate remedy at law.

120.    Delphi is entitled to a decree of specific performance ordering the Commitment Parties to perform their obligations under the terms of the Commitment Letter Agreements, including the obligation to fund the obligations of the applicable Investors under the Investment Agreement.  If, in the alternative, the Court concludes that the Commitment Letter Agreements are not subject to specific enforcement, the Court should pierce the corporate veil of the shell companies that are signatories to the Investment Agreement and impose liability upon their parent entities, who are signatories to the Commitment Letter Agreements, to fund the obligations of their affiliates under the Investment Agreement.  Such affiliates are shell corporations entirely dominated and controlled by their parent entities, and existing solely to serve the interests of their parents.  The parent entities caused their affiliates to breach their obligations under the Investment Agreement, and the parent entities controlled in all respects the negotiation of and performance (or lack thereof) under the Investment Agreement. Under the circumstances alleged herein, the corporate veil should be pierced to prevent fraud or to achieve equity.

121.    In the alternative, Delphi is entitled to damages from Appaloosa and the other Commitment Parties in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (against All Defendants under 11 U.S.C. § 1142)

122.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 121 above as if fully set forth in this paragraph.

123.    The Bankruptcy Code empowers the Bankruptcy Court to direct any necessary party to perform any act that is necessary for the consummation of a plan. 11 U.S.C. § 1142(b).

124.    The Plan would have been consummated on April 4, 2008, but for the wrongful conduct of the defendants.

125.    It is necessary for the consummation of the Plan for the Investors and the Commitment Parties to comply with their obligations under the Plan, the Investment Agreement, and the Commitment Letter Agreements.

126.    Absent an order of the Bankruptcy Court compelling their performance, the Investors and Commitment Parties will continue to refuse to fulfill their obligations and to perform the acts necessary to consummate the Plan.

127.    The Bankruptcy Court should exercise its equitable authority under 11 U.S.C. § 1142 to order defendants to comply with their obligations under the Plan, the Investment Agreement and the Commitment Letter Agreements.

## FOURTH CLAIM FOR RELIEF
### (against Appaloosa for Fraud)

128.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 127 as if fully act forth in this paragraph.

129.    By virtue of its role as Plan sponsor and its relationship of trust with Delphi, Appaloosa had a duty not to omit to disclose to Delphi, in the period from on or about December 1, 2007 to April 4, 2008, that Appaloosa, in concert with other Plan investors, had decided to seek to avoid their commitments rather than fulfill such commitments that were necessary for the consummation of the Plan.

130.    During the critical period from on or about December 1, 2007 to April 4, 2008, Appaloosa deliberately, intentionally and knowingly concealed from Delphi that Appaloosa and others among the Investors and Additional Investors had decided to pursue a plan of avoiding rather than fulfilling their investment obligations and commitments with respect to Delphi's equity financing necessary for consummation of the Plan.  Appaloosa knew that Delphi, in litigating for approval of the amended EPCA and the confirmation of the Plan, and engaging in extensive efforts to achieve consummation of the Plan, was acting on incomplete, inaccurate, and mistaken information regarding Appaloosa's actions and intentions.  Indeed, as alleged herein, Appaloosa had repeatedly represented to Delphi that it was committed to providing the equity financing necessary for consummation of the Plan.

131.    Delphi reasonably relied on Appaloosa's repeated assurances and commitments, and was deceived by Appaloosa's concealment as alleged herein of its plans, decisions and actions to undermine the Investment Agreement and the Plan and the equity financing needed for consummation of the Plan, and thus refrained from pursuing alternatives, to its own detriment and the detriment of all its stakeholders.  Delphi's reliance was justified as Delphi had no other means of ascertaining the facts concerning Appaloosa's decisions and actions to avoid its commitments.

132.    Delphi would not have entered into, and litigated for approval of the amended EPCA in December 2007 and the confirmation of the Plan in January 2008, nor would Delphi have undertaken all of the other tremendous efforts and costs as alleged herein to achieve consummation of the Plan, if Delphi had known the truth concerning Appaloosa's intentions and plans to avoid fulfillment of its commitments and obligations. If Delphi had known the truth about Appaloosa's plans and actions to avoid its commitment, Delphi would have pursued legal relief and alternative business plans well before April 4, 2008.

133.    Appaloosa had a duty to disclose the truth to Delphi because (i) Appaloosa had repeatedly and publicly declared its commitment to provide the equity financing that was essential for consummation of the Plan, (ii) Appaloosa had particular and superior knowledge not available to Delphi by virtue of Appaloosa's leadership role as Plan investor and sponsor, and (iii) Appaloosa had a special relationship with Delphi such that disclosure required.

134.    By virtue of the foregoing, Delphi is entitled to damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (against All Defendants for Equitable Subordination and Disallowance)

135.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 134 above as if fully set forth in this paragraph.

136.    Because the Investors and the Commitment Parties were selected as sponsors of the Plan and undertook both fiduciary and contractual duties in connection

with that role, the Investors and Commitment Parties are insiders and/or fiduciaries of Delphi and the other Debtors.

137.    The Investors and Commitment Parties have acted inequitably and breached their duties to the Debtors, and caused substantial harm to the Debtors, their employees, creditors and other stakeholders. Therefore, any claim or interest of the defendants in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent of the law.

138.    Defendants' conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed the Debtors, their employees, creditors and other stakeholders. Any claim or interest of the defendants in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Delphi respectfully requests that this Bankruptcy Court enter judgment in its favor and grant the following relief:

(1)    ordering the Investors to fully comply with their obligations under the Investment Agreement and the Plan, including their obligation to invest up to $2.383 billion (or $2.55 billion including the UBS investment) in reorganized Delphi;

(2)    ordering the Commitment Parties to fully comply with their obligations under the Commitment Letter Agreements and the Plan, including their obligation to provide the funds necessary for the Investors to make the investments committed under the Investment Agreement;

(3)     in the alternative, ordering the Investors and the Commitment

Parties to pay damages in an amount to be determined at trial;

(4)     equitably subordinating and/or disallowing defendants' claims and

interests in respect of the Debtors' estates;

(5)     awarding Delphi punitive damages, as against Appaloosa, in an

amount to be determined at trial;

(6)     awarding Delphi costs and attorneys' fees; and

(7)     awarding any other and further relief the Court deems just.

Dated:   New York, New York
         May 16, 2008

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP


/s/ Edward A. Friedman
Edward A. Friedman (EF-1995)
William P. Weintraub (WW-2897)
Andrew W. Schilling (AS-7872)
Shira D. Weiner (SW-9219)
Danya Shocair Reda (DR-3036)

1633 Broadway
New York, NY 10019-6708
(212) 833-1100
*Attorneys for Plaintiff Delphi Corporation*

SUSMAN GODFREY LLP
654 Madison Avenue, 5th Floor
New York, New York 10065
Telephone:  (212) 336-8330
Facsimile:  (212) 336-8340
Jacob W. Buchdahl (JB-1902)

1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
Kenneth S. Marks

Attorneys for Delphi Corporation,
 DEBTOR AND DEBTOR-IN-POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
In re:                                            :
                                                  :  Chapter 11
DELPHI CORPORATION,                               :  Case No. 05-44481 (RDD)
                                                  :  (Jointly Administered)
                              Debtor.             :
                                                  :
                                                  :
----------------------------------------------------------- x
DELPHI CORPORATION,                               :
                                                  :
                              Plaintiff,          :
                                                  :  Adversary Proceeding
              - against -                         :  Case No ___-_____
                                                  :
                                                  :
UBS SECURITIES LLC,                               :
                                                  :
                              Defendant.          :
-----------------------------------------------------------------x
```



0544481080516000000000007

## COMPLAINT

Plaintiff Delphi Corporation ("Delphi"), by its undersigned attorneys, for its Complaint against UBS Securities LLC ("UBS"), alleges upon knowledge as to its own actions and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.     In this lawsuit, Delphi seeks a decree of specific performance compelling UBS to provide equity financing to Delphi as it committed to do pursuant to agreements that are essential building blocks of the confirmed First Amended Joint Plan of Reorganization (the "Plan") in these jointly-administered Chapter 11 proceedings for Delphi and forty-one of its subsidiaries (collectively, the "Debtors").  UBS, together with A-D Acquisition Holdings, LLC ("ADAH"), Harbinger Del-Auto Investment Company, Ltd. ("Harbinger Del-Auto"), Pardus DPH Holding LLC ("Pardus DPH Holding"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and Goldman Sachs & Co. ("Goldman") (collectively, the "Other Investors"), committed to fund up to $2.55 billion as necessary for the consummation of the Plan.

2.     If a final judgment of specific performance is not awarded, Delphi seeks, in the alternative, to recover damages in an amount to be determined at trial for the wrongful termination of the parties' agreements and other contractual breaches.  Under the agreements executed by UBS, UBS is jointly and severally liable with the Other Investors for its wrongful termination and other breaches.

3.     UBS's failure to honor its contractual commitments – at the eleventh hour, when all parties other than UBS and the Other Investors were ready, willing and able to close on all financing and other agreements embodied in the Plan –

has derailed Delphi's progress toward emergence from Chapter 11 in April 2008, and has prevented the consummation of the Plan. Plaintiff alleges and believes that a judgment of this Court requiring UBS to comply with its obligations is warranted as a matter of law and equity, and necessary for the consummation of the confirmed Plan.

4.       On April 4, 2008, the Debtors were set to emerge from Chapter 11 pursuant to the Plan and the agreements embodied therein, all of which are the product of years of negotiation, accommodation, conflict, litigation and ultimately resolution among Delphi, the Debtors' Statutory Committees, the Debtors' principal labor unions, General Motors, certain claimants in multidistrict ERISA and securities litigation, the Internal Revenue Service, the Pension Benefit Guaranty Corporation, UBS, and the Other Investors.

5.       One crucial piece of the intricate and complex arrangements necessary for the consummation of the Plan is the Equity Purchase and Commitment Agreement dated as of August 3, 2007 as amended on December 10, 2007 (the "Investment Agreement" and sometimes referred to as the "EPCA"), pursuant to which UBS and the Other Investors (together, the "Equity Investors") commit to invest up to $2.55 billion of equity financing in the reorganized Delphi. (UBS's commitment is $166,866,749.19; the commitments of the Other Investors, which are sued separately, amount to approximately $2.383 billion.[1]) The Investment Agreement was developed

---

[1] The commitments of ADAH, Harbinger Del-Auto and Pardus DPH Holding are backed by Commitment Letter Agreements executed on December 10, 2007 by their respective parents, Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., and Pardus Special Opportunities Master Fund L.P. (the "Commitment Parties"). The Commitment Parties are also named as defendants in a separate action brought by Delphi.

through a process that involved intense and protracted negotiations among the various parties in these Chapter 11 cases as well as numerous conferences and hearings with the Court over a period of eighteen months.

6.    The stakes at the closing scheduled for April 4, 2008, could not have been higher for the Debtors, their employees, creditors, and other stakeholders. The equity financing promised by the Equity Investors was and is essential to the consummation of the Plan. In light of the complexity and inter-relatedness of all the agreements with lenders, unions, General Motors, government agencies, etc., as well as market conditions, and after having devoted more than a year to reaching agreement with the Equity Investors on all the terms and conditions of their equity investment, there is no possible alternative source of equity financing that could save the Plan. Indeed, because of the vital importance of the equity financing committed by the Equity Investors, the agreements in question do not contain any "outs" for the Equity Investors based on market conditions or like contingencies. Rather, UBS and the Other Investors are required to honor their commitments, just as Delphi has honored its commitments.

7.    Unfortunately, just hours before the scheduled closing, instead of funding and honoring its obligations, ADAH sent Delphi a written notice purporting to terminate the Investment Agreement. ADAH asserted in its notice that Delphi had breached the Investment Agreement, entered into agreements for an "Alternate Transaction" and effectuated a "Change of Recommendation" (as those terms are defined in the Investment Agreement). ADAH claimed that Delphi was obligated to pay an Alternative Transaction Fee of $82,500,000. In fact, ADAH's assertions were false.

3

Delphi had not breached the Investment Agreement, had not entered into agreements for an "Alternate Transaction" and had not effectuated a "Change in Recommendation."

8.      Delphi believes that UBS and the Other Investors backed out of the transaction simply because they decided they did not like the economics of the deal they had agreed to, and that they never intended to close if the deal was under water.  By its refusal to close on April 4, 2008, UBS breached its binding commitment upon which the consummation of the Plan depended.

9.      Delphi brings this action to enforce UBS's commitment – in other words, to require UBS to honor its obligation in accordance with the terms of the parties' written agreements.  In particular, Delphi seeks a decree of specific performance as against UBS because that equitable remedy is necessary and proper in all of the circumstances of this case, and any legal remedy would be inadequate; in addition, Delphi seeks compensation for damages caused by UBS that have been and will be suffered even if specific performance is awarded.  In the alternative, Delphi seeks redress for the substantial damages UBS has inflicted on the Debtors, their employees, creditors, and other stakeholders.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This proceeding is a core proceeding under 28 U.S.C. § 157(b) arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

11.    In the Investment Agreement, UBS "irrevocably submit[s] to the jurisdiction of, and venue in, the United States Bankruptcy Court for the Southern District of New York and waive[s] any objection based on forum non conveniens." Investment Agreement ¶ 16.

12.    In the Plan, which was confirmed by Order of this Court dated January 25, 2008, this Court retained jurisdiction, pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, over all matters arising out of, and related to, Debtors' Chapter 11 cases and the Plan, including for purposes of adjudicating all adversary proceedings commenced pursuant to the Plan, issuing any orders in aid of execution, implementation, or consummation of the Plan, enforcing all orders previously entered by the Bankruptcy Court, and hearing and determining all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement.

## THE PARTIES

13.    Plaintiff Delphi is a leading global supplier of mobile electronics and transportation systems.  Headquartered in Troy, Michigan, Delphi and its subsidiaries have approximately 163,500 employees and operate 152 wholly-owned manufacturing sites in 34 countries.  Delphi supplies products to nearly every major global automotive original equipment manufacturer ("OEM"), including General Motors, Ford Motor Company, Chrysler LLC, Volkswagen Group, Hyundai, and Renault/Nissan Motor Company.

14.    Defendant UBS is a Delaware limited liability company with its principal place of business in New York, New York.

**FACTUAL ALLEGATIONS**

*Delphi's Early Years and Bankruptcy Filing*

15.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors, and separated from GM in or about January 1999.  Delphi has evolved from a North America-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although General Motors remains Delphi's single largest customer, Delphi generates more than half of its revenue from non-GM sources.

16.     In the first two years following Delphi's separation from General Motors, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In 2004, the last full year prior to the filing of these Chapter 11 cases, Delphi reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.

17.     Delphi believes that its financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Company from exiting non-profitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs; (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of GM's annual U.S. production and related pricing pressures; and (c) increasing commodity prices.

18.     In order to address these issues, on October 8, 2005 (the "Petition Date"), Delphi and 38 of its U.S. subsidiaries filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for reorganization relief under Chapter 11 of the United States Bankruptcy Code.  On

6

October 14, 2005, three additional U.S. Delphi affiliates filed voluntary petitions.  As of the Petition Date, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Since the Petition Date, Delphi and its U.S. subsidiaries have operated its business subject to the restrictions imposed by the Bankruptcy Code.  Until UBS and the other Investors refused to fund their commitments on April 4, 2008, Delphi expected that the consummation of the Plan and the emergence from Chapter 11 on that date would hasten Delphi's return to economic viability and health.

***The Plan of Reorganization***

19.    Almost two years before the Plan was confirmed, Delphi outlined the key tenets of a transformation plan that Delphi believed would enable a return to stable, profitable business operations.  The Transformation Plan covered five (5) key areas and set goals within those areas:

Labor.  Modify Debtors' labor agreements to create a competitive arena in which to conduct business.

General Motors.  Conclude negotiations with General Motors to finalize General Motors' financial support for certain of the Debtors' legacy and labor costs and to ascertain General Motors' business commitment to the Company.

Product Portfolio and Manufacturing Footprint.  Streamline Debtors' product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus.

Cost Structure.  Transform Delphi's salaried workforce and reduce general and administrative expenses to ensure that Delphi's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.

Pension.  Devise a workable solution to Delphi's pension funding situation.

20.    The effort and cooperation required of multiple disparate parties to make progress toward those goals has been tremendous, and essential to the formulation of a plan of reorganization.  During the course of these Chapter 11 cases, there has been significant progress by Debtors toward achieving the objectives of their Transformation Plan.  First, Delphi negotiated amended collective bargaining agreements with its labor unions that will enable Debtors to be more competitive in their U.S. operations.  Second, Delphi entered into comprehensive settlement and restructuring agreements with General Motors – specifically, on September 6, 2007, a Global Settlement Agreement and a Master Restructuring Agreement, both of which were later approved by the Bankruptcy Court as part of the plan confirmation process.  These agreements were intended to resolve all major pre-petition disputes between Delphi and General Motors, and were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively.  Third, with respect to its product portfolio and manufacturing facility realignment, Debtors made substantial progress in identifying and beginning to divest or wind down those facilities and business lines that are not within Delphi's future plans.  Fourth, Delphi is implementing important cost savings in its organizational cost structure and rationalization of its salaried workforce to competitive levels that will allow it to emerge from Chapter 11 much leaner and in a better competitive position.  Fifth, Delphi received favorable pension funding

waivers from the IRS which, combined with the transaction under the Internal Revenue Code of 1986 (the "IRC"), Section 414(l) and Section 208 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"), and adequate debt financing and equity infusions, will allow Delphi to fund its pension plans after emergence from Chapter 11.

21.    In the early stages of these Chapter 11 cases, Appaloosa Management L.P. ("Appaloosa") pushed, with the grace and diplomacy of a battering ram, to play a central role in the reorganization of the Debtors.

22.    In the course of these Chapter 11 proceedings, Appaloosa acquired substantial Delphi equity and debt in several places in Delphi's capital structure, and Appaloosa actively campaigned and litigated for the appointment of an Equity Committee, on the basis of its contention that Delphi's equity had significant value.

23.    Although Appaloosa did not obtain a place for itself on the Equity Committee, Appaloosa ultimately succeeded in its quest for a prominent role in Delphi's restructuring. During 2006, Delphi, and also the Statutory Committees and General Motors, interviewed potential plan investors. The competition was intense, but Appaloosa, together with Cerberus Capital Management L.P. ("Cerberus"), was the winner. The first version of the Investment Agreement was signed in December 2006; by mid-2007, however, Cerberus was engaged in the acquisition of what is now Chrysler LLC and the completion of its acquisition of 50% of General Motors Acceptance Corporation and decided not to invest in Delphi.

24.     In August 2007, a second version of the Investment Agreement (sometimes referred to as the July EPCA) was executed, with Appaloosa as the sole lead plan investor.

25.     The Investment Agreement, which rests on the commitments of some of the world's largest and best-known financial institutions, is a crucial and irreplaceable component of the agreements and arrangements embodied in the Plan and is necessary for the successful consummation of the Plan.  The Bankruptcy Court approved Delphi's entry into the final form of Investment Agreement, as amended, in a ruling from the bench on December 7, 2007 and a written order dated December 10, 2007.

26.     The Plan confirmed by the Bankruptcy Court on January 25, 2008 was the culmination of all the settlements that Debtors reached with General Motors, with Debtors' labor unions and with other critical stakeholders in the reorganization cases, as well as all the other agreements Delphi negotiated, including the Investment Agreement, to obtain the necessary financing to fund the Plan and emerge from Chapter 11 as a viable business.

**The Investment Agreement**

27.     The Investment Agreement, which is incorporated in the Plan (*see* Article 1, ¶ F; Exhibit 7.11), sets forth the terms upon which UBS and the Other Investors commit to purchase (i) $175 million of common stock in the reorganized Delphi (the "Direct Subscription Shares"), (ii) $800 million of preferred shares in the reorganized Delphi (the "Preferred Shares") and (iii) any unsubscribed shares of common stock (the "Backstop Commitment") up to $1.575 billion in connection with a certain rights offering (the "Rights Offering").

28.    The Rights Offering contemplated by the Investment Agreement provides for Delphi to distribute, at no charge, to each general unsecured claim holder (an "Eligible Holder") certain rights to acquire new common stock in reorganized Delphi. The "rights" would permit the Eligible Holders to purchase their pro rata share of a set number of shares (41,026,309) at a set purchase price ($38.39 per share). To the extent that any of these shares are not purchased by Eligible Holders, UBS and the Other Investors, through the Backstop Commitment, agree to purchase such shares, resulting in a commitment of approximately $1.575 billion in respect of such shares. The Rights Offering raised approximately $20 million as of April 4, 2008, so the Backstop Commitment as of that date was approximately $1.555 billion.

29.    Accordingly, after taking into account the proceeds of the Rights Offering, the total commitment of UBS and the Other Investors, including the Backstop Commitment and the commitments to purchase Direct Subscription Shares and the Preferred Shares, amounts to $2.53 billion as of April 4, 2008.

30.    In consideration of the Investors' commitment, the Investment Agreement obligates Delphi to pay fees to UBS and the Other Investors in the amount of approximately $60 million. Such fees are comprised of a "Preferred Commitment Fee," a fee regarding the Direct Subscription Shares and the Backstop Commitment, and a fee to ADAH for arranging the transactions contemplated by the Investment Agreement. In addition, Delphi agrees to pay certain transaction expenses of the Equity Investors.

31.    At the time Delphi entered into the Investment Agreement, it believed that these fees demanded by the Equity Investors, although considerable, were appropriate given the size and crucial importance of the equity investment to which the

Investors were committing.  In fact, Delphi represented to the Bankruptcy Court that these fees represent a small fraction of the investment that the Equity Investors would make to acquire the various securities to be issued by reorganized Delphi.

32.      The Investment Agreement obligates UBS to "use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the GM Settlement, and the Plan."  Investment Agreement ¶ 6(b).

33.      In section 12 of the Investment Agreement, the parties agree that Delphi would have the right to terminate the Investment Agreement if Delphi's Board of Directors determines that their fiduciary duties require them to pursue an alternative transaction.  In that event, the Investment Agreement provides for an agreed-upon fee to be paid by Delphi to the Equity Investors.  The Investment Agreement, however, does not provide a similar termination right to UBS or the Other Investors.

34.      Appaloosa has nonetheless taken the position that the Investment Agreement – for which it received from Delphi the lion's share of commitment fees in excess of $60 million and reimbursement of transaction expenses in the tens of million of dollars – essentially grants it and the Equity Investors an option to fulfill their commitments or not, in their sole discretion, and that Delphi's sole remedy for a wrongful termination is to assert a claim for breach (if the breach is willful) and recover whatever damages are proven up to a cap of $250 million.

35.     In fact, the Investment Agreement does not contain such a limitation on the remedies available to Delphi.  Section 18 of the Investment Agreement explicitly provides that "[t]he rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights and remedies which any party otherwise may have in law or in equity."  Investment Agreement ¶ 18.  Moreover, the Investment Agreement does not contain any limitation on equitable remedies available to Delphi, nor does it purport to limit the power of the Bankruptcy Court to award equitable relief such as specific performance in appropriate circumstances.

36.     As UBS well knows, the Investment Agreement has been recognized by the Court and the parties as forming the foundation for, and being a crucial component of, the Plan (along with the other inter-related agreements, settlements and commitments embodied in the Plan).

**_The Bankruptcy Court Confirms the Plan_**

37.     On January 25, 2008, the Bankruptcy Court entered an order confirming the Plan.  The Plan is based on a series of global settlements, compromises and agreements that involve nearly every major constituency in the Debtors' reorganization cases.  The Plan provides, _inter alia_, that, on its effective date, the reorganized Debtors would receive the proceeds of the equity financing arrangements as defined in the Plan and the Investment Agreement.

38.     The Plan, including all agreements and documents encompassed therein, was confirmed with the unqualified support of UBS and the Other Investors, among others.  Under the terms of the Investment Agreement, conditions relating to the

terms of any and all post-confirmation amendments and supplements have been deemed to be conclusively satisfied.

*Delphi Arranges Its Exit Financing*

        39.     On November 16, 2007, the Bankruptcy Court entered an order authorizing Delphi to enter into a "commercially reasonable best efforts" engagement letter and fee letter with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. (the "Lead Arrangers").  At the time, Delphi anticipated that its exit financing would consist of: (i) a senior secured first-lien asset-based revolving credit facility in an aggregate principal amount of $1.6 billion (the "ABL Facility"); (ii) a senior secured first-lien term facility in an aggregate amount of $3.7 billion (the "First-Lien Loan"); and (iii) a senior secured second-lien term facility in the amount of $1.5 billion (the "Second-Lien Loan"), of which up to $750 million would be in the form of a note issued to General Motors in connection with the distributions contemplated under the Plan.

        40.     On January 9, 2008, Delphi announced the commencement of the syndication of its exit financing package to support the Debtors' planned emergence from Chapter 11.  Primarily as a result of improved operating performance and lower than forecast capital expenditures for the 2007 fiscal year, Delphi reduced its planned exit facilities from the previously announced $6.8 billion to approximately $6.1 billion. Specifically, Delphi reduced the Second-Lien Loan from $1.5 billion to $825 million, of which up to $750 million would be in the form of a note issued to General Motors in connection with the distributions contemplated under the Plan.  At the time of the

financing launch in January, Delphi discussed with the Equity Investors this reduction in the amount of the financing to be sought, and the Equity Investors gave their approval.

41.      Pursuant to the Plan, the Debtors were to "receive the proceeds of the Exit Financing Arrangements, in the aggregate amount necessary to implement the Plan within the terms and conditions previously approved by the Bankruptcy Court as described in the exit financing engagement letter and term sheet attached [to the Plan] as Exhibit 7.14, as such term sheet may be amended, modified or supplemented….." (Plan art. 7.14.)

42.      With respect to exit financing, the Investment Agreement requires that the amount of the exit financing be "sufficient" to fund the Plan (Investment Agreement § 9(a)(xix)) and additionally requires that Delphi "demonstrate[], to the reasonable satisfaction of ADAH, that the pro forma interest (cash or noncash) expense for the Company during 2008 on the Company's indebtedness will not exceed $585 million…." (Investment Agreement § 9(a)(xx)).

43.      During the syndication process, it became apparent to Delphi and the Lead Arrangers that the likelihood of consummation of the syndication in its proposed amount, structure, and terms would be improved by GM's participation, pursuant to which General Motors would purchase up to $2 billion of the First-Lien Loan and, if necessary, all of the $825 million Second-Lien Loan without any original issue discount ("OID") and at an interest rate calculated to ensure compliance with the Investment Agreement interest expense limitation.  It was anticipated that the aggregate effect of GM's exit financing participation would result in General Motors holding an up-to-$2 billion first-lien note and an up-to-$825 million second-lien note, and receiving at

least $175 million in cash. GM's position in the First-Lien Loan would be junior to that of other lenders and would be subject to voting restrictions during any time period in which it holds $1 billion or more in first-lien financing. Delphi and the Lead Arrangers reasonably determined that the increased GM's participation would allow the Debtors to obtain the remaining exit financing required to consummate the Plan.

**ADAH Objects to the Exit Financing Arrangements**

44.    On February 6, 2008, Delphi, General Motors, ADAH, and their respective representatives met to discuss the proposal for GM's enhanced participation in the Exit Financing Arrangements (the "Proposal") as summarized in a draft term sheet. Subsequently, in a February 13, 2008 letter, counsel for Appaloosa and ADAH (on behalf of UBS and all of the Other Investors except Goldman) set forth various concerns with that Proposal. The February 13 letter also advised that the UBS and the Other Investors (other than Goldman) had entered into a common interest agreement. In fact, the parties to the common interest agreement are UBS, Merrill, Appaloosa, Harbinger, and Pardus, i.e., the Commitment Parties acting for their affiliated shell entities who are among the Other Investors. The common interest agreement recites that the signatories thereto (defined as the "Common Interest Parties") have a common interest in "potential litigation between the Common Interest Parties, on the one hand, and Delphi . . . on the other hand."

45.    Delphi responded to the February 13 letter on February 20, 2008, explaining why the concerns of the Equity Investors under the EPCA were unfounded and requesting that the Equity Investors proceed with their reasonable best efforts to take all actions, and do all things, reasonably necessary, proper, or advisable to cooperate with

16

the Debtors and to consummate and make effective the transactions contemplated by the Investment Agreement and the Plan. In a February 24, 2008 letter, however, counsel for Appaloosa and ADAH asserted that the Proposal was "non-compliant, and inconsistent, with the EPCA."

46.    As a result of the Investors' intransigence concerning the proposed terms of the exit financing, Delphi filed a motion under section 1142 of the Bankruptcy Code. Although that motion was not granted, the guidance from the Court – that the Equity Investors' objection to GM's participation in the exit financing could be addressed if a GM affiliate were substituted for General Motors – was accepted by Delphi.

**Delphi Performs under the Investment Agreement**

47.    In reliance on the binding commitments made by UBS and the Other Investors, as set forth in the Investment Agreement, Delphi proceeded to take all actions necessary to consummate the Plan, with an announced goal of emerging from bankruptcy during the first quarter of 2008. For example, in order to ensure that the more than $6 billion in exit financing would be available on April 4, 2008, Delphi paid all commitment fees due to the Lead Arrangers ($10 million) plus millions more in expenses, and proceeded with the Rights Offering and complied with all conditions necessary to obtain such financing. As of April 4, 2008, Delphi fulfilled all applicable conditions and covenants for closing under the Investment Agreement and consummation of the Plan.

**ADAH's Purported Termination of the Investment Agreement**

48.    On April 4, 2008, all the parties (other than UBS and the Other Investors) required for a successful closing under the Plan and emergence from Chapter

17

11 – including Delphi's exit financing lenders, GM, and the Creditors Committee and Equity Committee – were ready, willing and able to move forward.  All actions necessary to consummate the Plan were prepared to be taken – other than the concurrent closing and funding of the Investment Agreement.  Thus, the closing would have been consummated, and Delphi would have successfully emerged from Chapter 11, but for the wrongful termination by ADAH and the refusal of UBS and the Other Investors to honor their commitments.

49.    Just hours before the scheduled closing, Delphi received a letter from ADAH stating that "this letter constitutes a notice of immediate termination of the Agreement…."  In its letter, ADAH asserted a right to terminate under sections 12(d)(v), 12(d)(vi)(A) and 12(d)(vi)(B) of the Investment Agreement.

50.    In fact, because Delphi had complied with all conditions and requirements under the Investment Agreement, ADAH had no right to terminate, and ADAH's April 4 notice constituted a wrongful termination of the Investment Agreement.

51.    There are many deficiencies in the ADAH notice of April 4.  For example, section 12(d)(vi)(B) of the Investment Agreement, cited by ADAH, concerns termination if Delphi enters into an "Alternate Transaction Agreement."  In fact, although ADAH asserted that it was terminating under 12(d)(vi)(B), and that Delphi was obligated to pay an Alternate Transaction Fee of $82,500,000, Delphi had not entered into an Alternate Transaction Agreement.  As defined in the Investment Agreement, an Alternate Transaction Agreement is an agreement that relates to an Alternate Transaction, which means any plan, proposal, offer or transaction that is inconsistent with the Investment Agreement, the Preferred Term Sheet, the GM Settlement, or the Plan.  Delphi did not

18

enter in any such agreement.  On the contrary, Delphi did everything that was required of it in order to consummate the Agreement, the Preferred Term Sheet, the GM Settlement and the Plan.

52.    ADAH also asserted a right of termination under section 12(d)(vi)(A) of the Investment Agreement which provides that ADAH has a right of termination if there has been a "Change of Recommendation," as defined in the Agreement.  A Change of Recommendation means that Delphi or its Board of Directors or any committee thereof shall have (i) withheld, withdrawn, qualified or modified (or resolved to do any of those things), in a manner adverse to the Investors, its approval or recommendation of the Agreement, the Preferred Term Sheet, the GM Settlement or the Plan or the Transactions contemplated hereby or thereby, or (ii) approved or recommended, or proposed to approve or recommend, any Alternate Transaction.  In fact, Delphi and its Board and the committees thereof have done everything appropriate to consummate the Agreement, the Preferred Term Sheet, the GM Settlement and the Plan, and there has been no Change of Recommendation.

53.    With respect to section 12(d)(v) of the Investment Agreement, which provides that ADAH may terminate if the Company has breached any provision of the Investment Agreement, which breach would cause the failure of any condition set forth in section 9(a)(xvi) or (xvii) to be satisfied, Delphi committed no such breach.  Sections 9(a)(xvi) and (xvii) set forth the closing conditions that all the representations and warranties of Delphi contained in the Investment Agreement shall be true and correct and that Delphi shall have performed and complied with all of its covenants.  In fact, as

of April 4, all of the representations and warranties of Delphi were true and correct and Delphi had performed and complied with all of its covenants and agreements.

54.    On April 5, 2008, ADAH delivered to Delphi a second letter, described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the Investment Agreement. The April 5 letter cited Section 12(d)(iii) of the Investment Agreement based on the Plan not having become effective on or before the deadline of April 4, 2008. Having already derailed the closing by its wrongful termination the previous day, however, ADAH could not profit or benefit from its own wrongful refusal to close on April 4, 2008. The second letter thus had no legal or practical significance.

55.    As things now stand, unless a decree of specific performance is issued by the Court as requested herein, there is no possibility that the confirmed Plan can be consummated, and Delphi, which on April 4 was literally on the brink of emerging from Chapter 11, will have to develop a modified plan with the resultant burdens, costs and delays for all stakeholders that such process entails. Monetary damages could not adequately compensate Delphi for such harm, and would not protect Delphi's employees and other stakeholders from the consequences of UBS's wrongful conduct.

***Delphi's Exit Financing Complied with the Investment Agreement***

56.    Contrary to ADAH's contentions, as of April 4, 2008, Delphi's exit financing arrangements satisfied all requirements of the Investment Agreement.

57.    The Investment Agreement does not specify the terms of Delphi's exit financing. Rather, that Agreement provides two principal closing conditions concerning Delphi's exit financing. First, the Investment Agreement requires that that

amount of the exit financing be "sufficient" to fund the Plan.   (Investment Agreement § 9(a)(xix).)  Second, the Investment Agreement requires that Delphi's aggregate interest expense for 2008 not exceed $585 million.  (*Id.* § 9(a) (xx).)

58.    Delphi's exit financing, as available on April 4, satisfied both conditions.

59.    Nonetheless, in its April 4 termination notice, ADAH contended that Delphi's exit financing arrangements breached certain representations, warranties, or covenants contained in the Investment Agreement.  First, ADAH contended that Section 5(p) of the Investment Agreement prohibits GM from participating in Delphi's exit financing because such participation would constitute an "agreement with GM . . . outside the ordinary course of business."  The Bankruptcy Court, however, in the hearing on March 7, 2008, addressed this contention and provided guidance to Delphi that the proposed exit financing would *not* violate Paragraph 5(p) of the Investment Agreement so long as the financing was entered into between Delphi and an affiliate or subsidiary of GM, rather than GM itself.  Informed by that guidance, Delphi arranged its exit financing in a manner that would comply with the Court's direction.

60.    ADAH also contended in its April 4 notice that Delphi's exit financing breached Paragraph 5(t) of the Investment Agreement.  In order to justify their decision not to close, the Equity Investors took the position that the Investment Agreement's definition of "debt financing" required Delphi to obtain financing on the exact financing terms described in the "best efforts" financing letter provided by Delphi's lead arrangers.  However, subject to the specific covenants concerning sufficiency to fund the Plan and cap on first-year interest, the Equity Investors did not retain the right to

reject the exit financing if the "best efforts" resulted in terms that were different from those expressly indicated in the financing letter.

61.     Because Delphi satisfied its obligations under Paragraph 5(t), that covenant was satisfied.

## FIRST CLAIM FOR RELIEF

**(Breach of Contract:  the Investment Agreement)**

62.     Delphi repeats and re-alleges the allegations contained in paragraphs 1 through 61 above as if fully set forth in this paragraph.

63.     Delphi and UBS are parties to the Investment Agreement, which is a valid and binding contract.

64.     The Investment Agreement sets forth the obligation of UBS to invest up to $166 million in reorganized Delphi.

65.     Delphi substantially performed under the Investment Agreement.

66.     On April 4, 2008, Delphi was ready, willing, and able to fulfill its obligations under the Investment Agreement and had fulfilled all of its covenants and satisfied all of the conditions under the Investment Agreement.  Delphi alleges in the alternative that as to each condition, it was either satisfied by Delphi or waived by UBS and/or UBS by its conduct is estopped from asserting any non-compliance.

67.     UBS breached the Investment Agreement, as well as the implied covenant of good faith and fair dealing inherent in the Investment Agreement, by refusing to comply with its obligations under the Investment Agreement, and by wrongfully and without cause terminating the Investment Agreement.  UBS also breached its contractual

obligation and its duty of good faith by failing to use its reasonable best efforts to consummate the transactions under the Investment Agreement.

68.    Delphi has no adequate remedy at law.

69.    Delphi is entitled to a decree of specific performance ordering UBS to perform its obligations under the terms of the Investment Agreement, including, without limitation, the obligation of UBS to purchase $10.2 million of common stock in the reorganized Delphi; to purchase $65 million of preferred shares in the reorganized Delphi; and to purchase all unsubscribed shares of common stock in connection with the Rights Offering, up to a total investment of $166,866,749.19.  In addition, Delphi is entitled to damages in an amount to be determined at trial to compensate for harm incurred as a result of costs and losses due to the delay in UBS's performance from April 4, 2008 to the date performance occurs pursuant to a judgment of the Court.

70.    In the alternative, Delphi is entitled to damages from UBS in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (11 U.S.C. § 1142)

71.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 70 above as if fully set forth in this paragraph.

72.    The Bankruptcy Code empowers the Bankruptcy Court to direct any necessary party to perform any act that is necessary for the consummation of a plan. 11 U.S.C. § 1142(b).

73.    The Plan would have been consummated on April 4, 2008, but for the wrongful conduct of UBS and the Other Investors.

74.    It is necessary for the consummation of the Plan for UBS to comply with its obligations under the Plan and the Investment Agreement.

75.    Absent an order of the Bankruptcy Court compelling its performance, UBS will continue to refuse to fulfill its obligations and to perform the acts necessary to consummate the Plan.

76.    The Bankruptcy Court should exercise its equitable authority under 11 U.S.C. § 1142 to order UBS to comply with its obligations under the Plan and the Investment Agreement.

**THIRD CLAIM FOR RELIEF**

**(Equitable Subordination and Disallowance)**

77.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 76 above as if fully set forth in this paragraph.

78.    Because UBS was selected as a sponsor of the Plan and undertook both fiduciary and contractual duties in connection with that role, UBS is an insider and/or fiduciary of Delphi and the other Debtors.

79.    UBS has acted inequitably and breached its duties to the Debtors, and caused substantial harm to the Debtors, their employees, creditors and other stakeholders.  Therefore, any claim or interest of UBS in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent of the law.

80.    UBS's conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed the Debtors, their employees, creditors and other stakeholders.  Any claim or interest of UBS in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Delphi respectfully requests that this Bankruptcy Court enter judgment in its favor and grant the following relief:

(1)     ordering UBS to fully comply with its obligations under the Investment Agreement and the Plan, including its obligation to invest up to $166,866,749.19 in reorganized Delphi;

(2)     in the alternative, ordering UBS to pay damages in an amount to be determined at trial;

(3)     equitably subordinating and/or disallowing UBS's claims and interests in respect of the Debtors' estates;

.           (4)     awarding Delphi costs and attorneys' fees; and

(5)     awarding any other and further relief the Court deems just.

Dated:   New York, New York
         May 16, 2008

SUSMAN GODFREY LLP


_____/s/ Jacob W. Buchdahl_____
Jacob W. Buchdahl (JB-1902)

654 Madison Avenue, 5th Floor
New York, New York 10065
Telephone:  (212) 336-8330
Facsimile:   (212) 336-8340

Kenneth S. Marks
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
*Attorneys for Plaintiff Delphi Corporation*

1            UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF NEW YORK
2

3   ----------------------------------------X
    IN RE:                                  : Case No. 05-44481
4                                           :
       DELPHI CORPORATION,                  : One Bowling Green
5                                           : New York, New York
                              Debtor.       : May 29, 2008
6   ----------------------------------------X
    DELPHI CORPORATION,                     :
7                                           :
                              Plaintiff,    :
8                                           : Adv. No. 08-01038
              v.                            :
9                                           :
    UNITED STATES OF AMERICA,               :
10                                          :
                              Defendant.    :
11  ----------------------------------------X
    DELPHI CORPORATION,                     :
12                                          :
                              Plaintiff,    :
13                                          : Adv. No. 08-01232
              v.                            :
14                                          :
    APPALOOSA MANAGEMENT, et al,            :
15                                          :
                              Defendants.   :
16  ----------------------------------------X
    DELPHI CORPORATION,                     :
17                                          :
                              Plaintiff,    :
18                                          : Adv. No. 08-01233
              v.                            :
19                                          :
    UBS SECURITIES, LLC,                    :
20                                          :
                              Defendant.    :
21  ----------------------------------------X

22     TRANSCRIPT OF HEARING ON MOTION FOR AUTHORIZATION TO ENTER
    INTO LEASE FOR PROPERTY LOCATED IN WARREN, OHIO
23     MOTION FOR ORDER SUPPLEMENTING SECOND DIP EXTENSION ORDER
          MOTION FOR OMITTED CONTRACTS ASSUMPTION PROCEDURES
24  MOTION FOR ADEQUATE PROTECTION, MOTION FOR PRETRIAL CONFERENCE
           EMERGENCY MOTION FOR AN ORDER TO SHORTEN TIME
25     MOTION TO AUTHORIZE EXPEDITED DISCOVERY AND TRIAL
               MOTION TO REMOVE CHAPTER 7 TRUSTEE
               MOTION FOR THE REMOVAL OF ALL FEES
            BEFORE THE HONORABLE ROBERT D. DRAIN
               UNITED STATES BANKRUPTCY JUDGE



0544481080604000000000009

2

APPEARANCES:

| | |
|---|---|
| For the Debtor: | JACK BUTLER, ESQ.<br>KAYALYN MARAFIOTI, ESQ.<br>THOMAS MATZ, ESQ.<br>Skadden Arps |
| For the U.S.: | MATTHEW SCHWARTZ, ESQ.<br>U.S. Department of Justice<br>86 Chambers Street<br>New York, New York 10007 |
| For the Debtor: | EDWARD A. FRIEDMAN, ESQ.<br>Friedman, Kaplan, Seiler, & Adelman<br>1633 Broadway<br>New York, New York 10019 |
| For the Debtor: | JACOB BUCHDAHL, ESQ.<br>Susman Godfrey<br>654 Madison Avenue<br>New York, New York 10065 |
| For ADAH and<br>Appaloosa: | CHRISTOPHER SHORE, ESQ.<br>White & Case LLP<br>1155 Avenue of the Americas<br>New York, New York 10036 |
| For Goldman Sachs: | ROBINSON LACY<br>Seldan & Cromwell |
| For UBS Securities: | JEFFREY ROSENTHAL, ESQ.<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006 |
| For Merrill Lynch: | MARC FALCONE, ESQ.<br>Paul, Weiss, Rifkind, Wharton &<br>Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019 |
| For EDS: | MICHAEL D. WARNER, ESQ.<br>Warner Stevens LLP<br>301 Commerce Street<br>Suite 1700<br>Fort Worth, TX 76102 |

(Appearances continue on next page.)

                                                                        3

APPEARANCES:

(Continued)

For the Equity Committee: BONNIE STEINGART, ESQ.
                          Fried Frank Harris Shriver &
                          Jacobson
                          One New York Plaza
                          New York, NY 10004




Court Transcriber:        MARY GRECO
                          TypeWrite Word Processing Service
                          356 Eltingville Boulevard
                          Staten Island, New York 10312

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

4

1          THE COURT:  Okay.  Delphi Corporation.

2          MR. BUTLER:  Your Honor, good morning, Jack

3  Butler, Kayalyn Marafioti, Tom Matz from Skadden Arps here on

4  behalf of Delphi Corporation for its 31st time at this hearing.

5          Your Honor, we have filed an agenda and propose to

6  take the matters in the order on the agenda.

7          THE COURT:  Okay.  That's fine.

8          MR. BUTLER:  Your Honor, the first matter on the

9  agenda, matter number one, is the omnibus 8.2(b) cure objection

10  filed with docket number 13459.

11          Your Honor, this was a motion filed in connection

12  with a proceeding in connection with the debtor's plan of

13  reorganization of the confirmation order and pursuant to those

14  procedures, parties whose contracts are to be assumed under the

15  plan and who wish to assert a cure amount as a condition to

16  assumption are required to file and serve a cure proposal

17  within 45 days after entry of the confirmation order.  That was

18  on or about March 10, 2008.  Of all of the notices that were

19  sent out there were in fact 31 cure proposals under Section

20  8.2(b) that were filed.  Of the 31, one was withdrawn for the

21  debtor's objection deadline and four have been subsequently

22  withdrawn leaving us to deal with 26 of those cure proposals

23  that are still essentially live.  Of those 26 cure proposals

24  there are five cure proposals that the debtors objected to

25  because they did not comport with the debtor's books and

5

1   records, but there was no response filed to the objection.

2        The debtors therefore request the Court enter an

3   order modifying the cure proposal for the amount that's

4   consistent with the debtor's books and records and

5   provisionally allowing those cure proposals at the modified

6   amount.  Those particular proposals are listed in Exhibit 1 of

7   the proposed order of today's hearing.

8        There are three cure proposals that asserted an

9   amount which was consistent with the debtor's books and records

10  and as to those cure proposals we ask that the Court enter an

11  order provisionally allowing those cure claims.  Those

12  proposals are listed in Exhibit 2 of the proposed order.

13       There are 18 parties who filed responses to the

14  objection so that there's now a contested matter between the

15  debtors and those cure parties as to what the appropriate cure

16  should be for the assumption of those contracts.  A proposed

17  order would adjourn those proceedings until further notice by

18  the debtors at a subsequent hearing.  We would give notice and

19  set it for a subsequent point in time.  But we're continuing to

20  work with the parties to resolve the disputed cure proposals.

21       THE COURT:  Okay.  Does anyone want to be heard on

22  this matter?  All right.  Given that at this stage the debtors

23  are seeking uncontested relief --

24       MR. BUTLER:  That is correct, Your Honor.

25       THE COURT:  -- I'll grant the omnibus objections

6

1    as sought today.

2            MR. BUTLER:  Thank you, Your Honor.

3            Your Honor, matter number two on today's agenda is

4    the omitted contracts assumption procedures motion filed

5    originally at docket number 13029.  This deals with the

6    steering half shaft business.  Your Honor may recall that we

7    sent out in late March and early April approximately 150

8    supplemental notices relating to assumption, assignment and

9    cure with respect to approximately, as I said, 150 executory

10   contracts have been inadvertently omitted from the list of

11   contracts to be assumed and assigned.

12           Prior to today's hearing we had resolved all but

13   four of those and I reported to you at earlier hearings about

14   that.  There were four that were remaining and the four

15   remaining has to do with SKF USA, Inc. at docket number 13344,

16   Federal Screw Works at docket number 13356, S&Z Tool & Die

17   Company at docket number 13358, and Keystone Powdered Metal

18   Company at docket number 13364.

19           Over the last several days and mostly yesterday we

20   had submitted stipulations and agreed orders that resolved all

21   of those remaining matters and that resolves, fully resolves

22   the 150 that notices have been sent out under the procedures,

23   the omitted contracts assumption procedures order.  I wanted

24   the Court to be aware that in consultation with the purchaser

25   as we move towards closing tentatively scheduled at the end of

7

1    this quarter with this, the purchaser and the debtors have

2    identified seven additional contracts, have actually talked

3    with the contract vendees, largely utilities, and there are

4    seven supplemental notices of assumption assignment that are

5    being sent out pursuant to the omitted contract assumption

6    procedures order.  We expect those are all going to be resolved

7    on consent seeing as we're negotiating on a tri-party basis

8    regarding that.  To the extent that there is an objection

9    filed, Your Honor, we would bring those on at the June 24th

10   omnibus hearing in advance of the proposed closing date.

11              THE COURT:  Okay.  I think the four stipulations

12   have been entered yesterday, but if not, they'll be entered

13   shortly.

14              MR. BUTLER:  Thank you, Your Honor.  So we're down

15   I think to the last seven, but if we do have a procedure it

16   allows us to continue to address those as we prepare for

17   closing.

18              THE COURT:  Right.

19              MR. BUTLER:  Your Honor, the next matter on the

20   agenda is matter number three.  This is the Warren, Ohio lease

21   motion, docket number 13583.  This is actually one of the few

22   lease agreements that we needed to bring to Court during the

23   course of these cases because Your Honor had earlier entered a

24   procedures order at docket number 1777 earlier in the case that

25   allowed us to deal with this essentially on a notice basis with

8

1  our statutory committees and some other parties.  This

2  particular matter comes before the Court because the

3  obligations under the lease agreement exceed $5 million.  So it

4  busted the cap, if you will.  It is uncontested.  It deals with

5  renewing leases involving a property located in Warren, Ohio

6  involving about 94,000 square feet.  70,000 square feet are

7  used for Delphi Packard's North American product testing

8  laboratory.  24,000 square feet are used for the advanced

9  product process development and there's an adjacent parcel of

10 28 acres.

11         The terms of the proposed arrangements including

12 options and termination rights are all outlined in the motion.

13 As I indicated, this is uncontested, Your Honor.  I should also

14 point out if Your Honor is prepared to grant the relief here,

15 it will also resolve a prior lease cure claim that had been

16 filed at docket number 12956.

17         THE COURT:  Okay.  Does anyone have anything to

18 say on this motion?  All right.  I'll grant it.  It's clearly

19 within the debtor's business judgment.  It needs the facility

20 and the terms have been renegotiated on a basis that's

21 favorable to the prior lease and based on the status of the

22 motion.  Also fair based on the current market.

23         MR. BUTLER:  Thank you, Your Honor.

24         Your Honor, the next matter on the agenda, matter

25 number four, is the supplemental second DIP extension motion at

9

1    docket number 13584.  This is both uncontested and a good news

2    motion.  It's brought to Your Honor as a result of

3    opportunities afforded by strong market support to the debtors.

4    It allowed us to make improvements to the structure of the

5    second DIP extension.  When we were here actually getting that

6    extension approved, Your Honor appropriately asked us how we

7    thought the syndication might go.  Ultimately I can now report

8    to you it not only went as expected but in fact was over

9    subscribed and that allowed us to make a number of positive

10   changes to the transaction for the benefit of the debtor's

11   estates.

12           First, the debtors increased the amount of

13   availability under the tranche revolving credit facility to

14   $1.1 billion and decreased the amount of tranche term loan to

15   $500 million.  That would save several hundred thousand dollars

16   interest expense per month.  We believe that those matters were

17   consistent with the terms of the agreement.  We didn't bring

18   that particular matter to Your Honor.  However, with respect to

19   tranche C, we were actually able to increase the tranche term

20   loan by approximately $254 million.  I think that there was a

21   reasonable inquiry as to whether that was within the authority

22   Your Honor had granted us.  So when that was closed, and it is

23   -- this transaction has been closed and all the documents are

24   available to make that $254 million available to us subject to

25   Your Honor's approval to that.  So that was a condition of the

10

1    agreement.  So if not, there's additional amendments we have to

2    go out and execute with respect to this.

3              There is exhibits that we do have in connection

4    with this.  There are 15 exhibits.  The first is Mr. Sheehan's

5    declaration in support of authorizing an increase in the

6    financing and commitments.  The credit documents are Exhibits 2

7    and 3.  The court documents are Exhibits 4 through 12, the GM

8    settlement agreements, Exhibits 13 and 14 and the affidavits of

9    service of this are Exhibit 15.  I would, Your Honor, move

10   admission of those exhibits into evidence in this record.

11             THE COURT:  Okay.  Is there any objection to that?

12   All right.  I'll admit them.

13             MR. BUTLER:  Your Honor, so in the -- as I've

14   indicated it is now Mr. Sheehan's testimony in the record that

15   indicates it.  This upsizing of this tranche term loan which is

16   the authority we're seeking today will supply additional

17   liquidity to the debtors and does not negatively affect the

18   price and terms or other benefits of the financing for which

19   the debtor sought approval from the Court in April 2008.  As a

20   result, Your Honor, we would very much appreciate if Your Honor

21   would grant the relief requested here.

22             THE COURT:  Okay.  Does anyone have anything to

23   say on this motion?  No one wishes to cross examine

24   Mr. Sheehan?  All right.  I've reviewed the motion and as

25   Mr. Butler just said the motion seeks approval of improved

11

1    terms on the financing to the extent that the original relief

2    didn't necessarily give the debtors the ability to obtain these

3    improvements without requiring an order, or alternatively

4    because [inaudible] was worthwhile.  In either event, I

5    conclude that the motion should be granted as an appropriate

6    exercise of the debtor's business judgment and meeting Section

7    364.

8                   MR. BUTLER:  Thank you, Your Honor.

9                   Your Honor, the next matter on the agenda is

10   matter number five.  This is the PBGC adequate protection

11   motion filed at docket number 13585.  There were two objections

12   filed by Wilmington Trust Company as indentured trustee, one at

13   docket number 13623 and the other at docket number 13652.  As

14   described in our reply filed yesterday, Wilmington Trust has

15   agreed to withdraw those objections without prejudice.  We have

16   a form of order that's agreeable to Wilmington Trust and to the

17   creditors committee.  I'll address that in just a moment.  But

18   pursuant to this particular motion, Your Honor, we seek entry

19   of an order that authorizes Dashy [Ph.], one of the debtors in

20   this case, to grant adequate protection to PBGC in connection

21   with certain anticipated inter-company transfers in an amount

22   not to exceed $750 million.

23                   Your Honor, I would point out that except as to

24   the amount, the adequate protection the debtors propose to

25   provide to PBGC is identical to the adequate protection the

1    debtors agree to provide PBGC in connection with the 2007 Dashy

2    inter-company transfer order that Your Honor previously

3    approved.  That was entered on October 25, 2007 at docket

4    number 10725.

5            I also want to indicate, in connection with this,

6    that this motion does not alter the relief granted in that

7    prior order and is made in respect of unrelated inter-company

8    transfers.  Your Honor may recall from the prior order that

9    these -- that granting this adequate protection is conditional.

10   When I say conditional, eventually if it ever becomes

11   necessary, there is --the rights of the parties in this case

12   are reserved with respect to whether or not the PBGC has the

13   liens they original asserted they had pursuant to which the use

14   of these funds is raising the issue of adequate protection.  So

15   we think the parties' rights and the estate's rights here are

16   appropriately reserved.

17           In reviewing this, and in a motion, the debtors

18   have taken the position and the debtors believe that our right

19   to operate our cash management system under the prior cash

20   management system in these cases allows us to continue to make

21   these repatriations.  They've been made consistently over the

22   course of the case.  We believe it's in the ordinary course of

23   operating our business.  Both the creditor's committee and

24   Wilmington Trust have expressed a reservation as to whether

25   that is the case and want to reserve whatever rights they have,

13

1    all rights that they have in connection with that to the extent

2    that they don't agree that this adequate protection ought to

3    continue for transfers beyond July 1st.  We continue to review

4    these matters with the committee and with Wilmington Trust.

5    The proposed order that's being entered here makes it clear

6    that this order if Your Honor is prepared to grant it is in

7    fact the final order.  The creditor's committee and Wilmington

8    Trust would have the right to bring the matter on for

9    supplemental hearing at the next omnibus hearing if the file an

10   objection by June 17th.  That would only relate as to the

11   adequate protection matters for transfers subsequent to July

12   1st, and they would be reserving all of their rights as a

13   potential objection to argue that the motion should be denied

14   on any basis that they, going forward respectively, on any

15   basis that they might choose including contesting our

16   underlying predicate that the debtors have the ability to

17   repatriate funds without further order of the Court.  We would

18   deal with that at that time.  Obviously, the debtors reserve

19   all their rights as well.

20           THE COURT:  This doesn't change the burden of

21   proof in the event that such an objection were made?

22           MR. BUTLER:  Correct, Your Honor.

23           THE COURT:  Okay.

24           MR. BUTLER:  The other piece of it is that

25   assuming -- I'm actually, as one needs to be in this case, I'm

14

1    the eternal optimist that we're able to work through these

2    issues to the extent there are any because this is one of the

3    three elements.  This, the General Motors support agreement and

4    relating to payments that have been made in anticipation of the

5    GSA [inaudible] becoming effective and the DIP liquidity are

6    all integrated components of the company's liquidity program to

7    operate the businesses over the course of these cases until the

8    debtors emerge from Chapter 11.  I'm confident that we'll be

9    able to resolve any issues here.  If we can't, the order will

10   control here, but I think the more important actual comment is

11   that assuming this were, if Your Honor is prepared to grant it,

12   is not further contested as it relates to the next month or so,

13   there is still a monitoring mechanism built into the order, in

14   Paragraph 3 of the order, that provides the creditors committee

15   the right to continue to monitor any subsequent cash flows that

16   we might submit.  If there are material changes in those cash

17   flows vis a vis this proposed program, the creditors committee

18   would have an independent right to object.  In that case, we'd

19   come back for a supplemental hearing at that point in the case.

20   The same reservation of rights I described, the same burden of

21   proof, same issues as to future repatriation, adequate

22   protection relating to repatriation, and any claims the

23   committee wants to make in terms of going forward would be

24   fully preserved as I've described.  So it provides a monitoring

25   mechanism here.  I'm hopeful that with that monitoring

15

1  mechanism that's been negotiated with the committee and with

2  the progress the company continues to make in these cases that

3  this in fact will end up being the final order and we'll be

4  able to resolve this on these terms.

5          THE COURT:  Okay.

6          MR. BUTLER:  I should say one other thing I did

7  promise to say on behalf of the PBGC.  They just want to make

8  clear today that to the extent that either the creditors

9  committee or Wilmington Trust subsequently files an objection

10  that would bring on a supplemental hearing with respect to this

11  motion, the PBGC itself reserves the right to file pleadings in

12  support of the relief requested and respond to any such

13  objection.  I need to say that on the record here today.

14          THE COURT:  Okay.  All right.  Does anyone have

15  anything to say on this motion as resolved?  Okay.  Obviously,

16  the motion has -- well, the resolution highlights the two

17  components of the motion.  As far as the I think the protection

18  element of it for the PBGC's asserted lien, the motion and

19  order, as did the prior version of this back in 2007, makes it

20  clear that the amount of protection is only to the extent that

21  PBGC does have a valid enforceable lien, and as with the last

22  iteration of this given the terms of the stipulation that's an

23  appropriate resolution of the matter.  I also conclude that the

24  resolution negotiated with the creditors committee Wilmington

25  Trust is also appropriate and I too hope that in light of the

16

1   monitoring mechanism and the sharing of information related to

2   it that the reservation of rights will be just that and it

3   won't bloom into litigation.

4            MR. BUTLER:  Thank you, Your Honor.

5            Your Honor, we now move to several adversary

6   proceedings that we filed in this case.  The first of these

7   proceedings our firm is handling which is a complaint to

8   recover property of the estate, the FICA complaint involving

9   the United States Government filed at docket number 12269.

10  This is adversary proceeding number 08-01038.  This was filed

11  on January 18, 2008 and it was seeking the return of

12  approximately $26 million in overpayments of payments made

13  under the Federal Insurance Contribution Act taxes.  These

14  taxes relate to payments made by the plaintiffs, that is the

15  debtors, to certain union members upon ratification of

16  collective bargaining agreements in 1999 and 2003.  This

17  conference had been adjourned from time to time pending a

18  filing of an answer by the Internal Revenue Service.  They

19  filed an answer to the complaint on May 13, 2008.  They also

20  filed a motion to withdraw the reference of the adversary

21  proceeding at the Bankruptcy Court.  That matter has been

22  assigned to District Court Judge the Honorable Kevin Castel.

23  By agreement, our response to that motion which we will oppose

24  is due on June 9, 2008, and there will be a hearing set

25  subsequent, if one's required, there will be a hearing set

17

1   subsequent for oral argument on that motion set subsequently

2   after the filing of that response.

3          In the interim, Your Honor, there has been a

4   scheduling order that's been worked out that was submitted to

5   chambers yesterday.  We made a point of being guided by Judge

6   Castel's form of pretrial order in terms of the elements of it

7   so that hopefully it would be acceptable to Your Honor and also

8   acceptable to Judge Castel in the event that the reference is

9   ultimately withdrawn.  That would set up a scheduling order.

10  I'm not going to go through all of the details of it.

11  Essentially, I think the key issue is there is an agreement

12  between the parties that would propose that the trial of the

13  proceeding be bifurcated with the initial trial addressing

14  whether there's been an overpayment of tax by the plaintiffs.

15  That is trying the issue of liability first and then once the

16  liability is determined, trying the issue with respect to the

17  amount of damages if the parties were unable to agree after the

18  liability issue is resolved.  The parties would propose, if

19  they're not able to agree upon the liability phase of the

20  trial, they would propose procedures to the Court for a

21  disposition of a dispute over the amount of damages.

22         The proposed schedule begins with initial

23  disclosures on July 3, 2008 and it ends with a proposed trial

24  date that would be set at a pretrial conference, a further

25  pretrial conference that the parties would ask be scheduled in

18

1    February of 2009.  Again, there are, as Your Honor is aware

2    presumably from the proposed scheduling order, there are a lot

3    of dates between here and there that are in the order.  I'm not

4    going to read them on the record here unless Your Honor wants

5    to review them.

6                THE COURT:  Okay.  Paragraph 11 has a blank for

7    the next case management conference.  When do you anticipate

8    Judge Castel ruling on the -- well, at least having it being

9    heard by him on the motion to --

10               MR. BUTLER:  I don't have [unintelligible] our

11   answer, our response is filed as to what the chambers there

12   will actually do in terms of the next step.

13               THE COURT:  You worked out a discovery schedule.

14   I don't really see much of a need for a case management

15   conference given that you are working along the schedule, so --

16               MR. BUTLER:  I think we're really speaking in

17   terms of the scheduling conference in February, Your Honor --

18               THE COURT:  All right.

19               MR. BUTLER:  -- as the next date.

20               THE COURT:  All right.  That's fine.  Then you

21   don't have omnibus dates out that far?

22               MR. BUTLER:  Not quite yet.

23               THE COURT:  Why don't you say that it will be --

24               MR. SCHWARTZ:  Your Honor, I'm sorry, Matthew

25   Schwartz for the United States.  I'm not sure that we had

19

1    actually discussed the February '09 date.  The scheduling order

2    that we proposed contemplates the parties reporting back to

3    this Court, the District Court, 30 days after the close of fact

4    discovery whether or not dispositive motions will be made.  It

5    seems to me that if motions are going to be made then probably

6    we'll need a status conference at that point.  If motions are

7    not to be made, then that's a sensible time to have a status

8    conference.  So that will be 30 days after the close of fact

9    discovery which would put us I believe into March.

10            THE COURT:  Let me just check.

11            MR. BUTLER:  Fact discovery is to be completed by

12   December 19, 2008 and I think that's why we had suggested the

13   February date so there's a date held at this point.

14            THE COURT:  Yes, that's the expert discovery

15   that's March.  The fact will be in January.  Why don't I just

16   say that the next case management conference will be held on

17   the claims on the estate in February and that will be

18   scheduled.  Certainly, if you don't need it, I have no problem

19   with you all contacting chambers and saying you don't need it

20   until a later date.  It's really just a holding date.  If the

21   reference is withdrawn for some reason I'm sure the District

22   Court will have some views as to whether it wants to hear from

23   you before then.

24            MR. BUTLER:  Thank you, Your Honor.

25            THE COURT:  Okay.

20

1          MR. BUTLER:  Your Honor, matters seven, eight, and

2     nine, the emergency motion to shorten time, the motion

3     authorized expedited discovery and trial and the motion

4     authorized expedited discovery and trial to shorten time with

5     respect thereto are related to adversary proceedings that have

6     been filed by special counsel.  These are adversary proceedings

7     number 08-01232 and 08-1233.  These matters are being handled

8     by the Friedman Kaplan firm and by the Susman Godfrey firm.

9     We're dealing with those proceedings.  So Your Honor, I will

10    turn the podium over to them at this time.

11          THE COURT:  Okay.  Let me just say if there are

12    people in the audience who are here for the other matters such

13    as counsel for the U.S. who may already have left, I don't see

14    him again, you're free to be excused.

15          MR. BUTLER:  Thank you, Your Honor.

16          MR. FRIEDMAN:  Good morning, Your Honor.  May it

17    please the Court, I am Edward Friedman with the firm of

18    Friedman, Kaplan, Seiler and Adelman, special litigation

19    counsel for plaintiff Delphi Corporation in adversary

20    proceeding 08-1232.

21          I would like to address Delphi's motion for

22    expedited discovery and trial which is filed at docket number 8

23    in this adversary proceeding.  There were corrected copies of

24    the motion clean and black lined filed at docket numbers 11 and

25    12.

1          We agree, Your Honor, with counsel for the

2     defendants in this adversary proceeding that granting the

3     motion for expedited discovery and trial would impose a

4     tremendous burden on all counsel and parties but we submit that

5     burden needs to be balanced against the irreparable harm that

6     would be suffered by Delphi and the stakeholders in this

7     proceeding if the motion to expedite is not granted.  There had

8     been over two years of tremendous effort in these Chapter 11

9     cases to achieve a confirmed plan of reorganization.  Delphi

10    respectfully submits that if the issues raised in the adversary

11    proceeding cannot be determined on an expedited basis then the

12    claim is gone.  Simply put, Delphi filed this adversary

13    proceeding because it is convinced that the plan confirmed by

14    this Court cannot be consummated without a decree of specific

15    performance and any modified plan would be materially adverse

16    to all of Delphi's stakeholders.

17          Delphi did not commence this action on April 4 at

18    the latest as defendants say Delphi should have because Delphi

19    was engaged in full efforts to achieve a consummation of this

20    plan by April 4.  From the time of the 1142 hearing before Your

21    Honor in early March of 2008, Delphi, with counsel for the plan

22    investors, was engaged in confidential settlement negotiations

23    in an effort to resolve all issues that needed to be resolved

24    so that the closing could occur and the plan could be

25    consummated.  Therefore, Delphi strenuously disagrees with the

22

1    notion that Delphi should have been prepared to file this

2    litigation on April 4.  While the substance of those settlement

3    discussions is confidential, we believe the fact of those

4    discussions is not confidential especially in light of the

5    defendant's contention in opposition to the motion that Delphi

6    should have been filing this action on April 4.

7              If the proceedings in this case, including

8    motions, discovery, and trial, are not expedited, then the

9    remedy of specific performance is effectively denied without

10   Delphi's obtaining an adjudication as to whether it is legally

11   entitled to that remedy as it believes it is.  Delphi is now in

12   the unfortunate situation of needing to bring this litigation

13   because the plan investors refuse to fund their equity

14   commitments on April 4, 2008.  On that date Delphi, General

15   Motors, the exit financing lenders, all other parties necessary

16   for the consummation of the plan were ready, willing, and able

17   to close.  Delphi had fulfilled all conditions applicable to it

18   as prerequisites to the obligations of the plan investors to

19   provide the funding that they had committed to provide.

20             Defendants now say that Delphi's claim for

21   specific performance should be dismissed because today Delphi

22   is not in full compliance with all the conditions.

23             In the first place, Your Honor, we would

24   respectfully submit that that argument, as with the other

25   arguments made by the defendants in their papers, relates to

23

1   whether Delphi's claims, and in particular claims for specific

2   performance, is legally sufficient.  We have no quarrel with

3   defendant's rights to challenge the legal sufficiency and

4   factual merit of those claims.

5            With respect to their particular contention that

6   the motion to expedite should be denied because Delphi is not

7   in full compliance today with all the applicable conditions,

8   the fact is that to the extent Delphi is not today in full

9   compliance, the reason is because defendant's wrongful conduct

10  and breaches of their contractual obligations put Delphi in the

11  position it is in today.  As a practical matter, defendant's

12  contention that Delphi today should be in full compliance

13  raises issues that we submit are just unrealistic in terms of

14  the position being taken by defendants.  Delphi, for example,

15  had raised funds in connection with a rights offer.  Delphi

16  made the decision which we believe was warranted and necessary

17  in accordance with its fiduciary duties to return those funds

18  to the people who had paid them in the rights offering to

19  return those funds when the plan investors' conduct made the

20  closing impossible.

21           Similarly, Delphi should not be in the position

22  today of paying millions of dollars in commitment fees to exit

23  financing lenders in order to keep the exit financing

24  commitment alive at this day.  The complaint filed by Delphi

25  alleges that Delphi was not only in full compliance with all

24

1   conditions and ready, willing, and able to close on April 4,

2   but also that Delphi will be in full compliance with all

3   conditions and ready, willing, and able to close in connection

4   with a decree of specific performance by this Court if the

5   Court agrees with the claims asserted by Delphi, if the Court

6   agrees that the remedy of specific performance is warranted and

7   that a judgment should be entered.

8               One of the legal issues that will be determined,

9   we submit, in connection with the claim for specific

10  performance is whether the investors can profit from their own

11  wrongdoing which is exactly what we say they are trying to do.

12  Not only did the investors refuse to fund their equity

13  commitments on April 4, and not only did they send what we

14  submit is a totally wrongful termination notice on April 4, but

15  then on April 5 they submitted a second termination notice

16  asserting that because the closing had not occurred on April 4

17  they were entitled to terminate the investment agreement or the

18  EPCA as it is known.

19              The fact of the matter, Your Honor, as alleged in

20  the complaint is that Delphi is in the unfortunate position it

21  is in precisely because of the wrongful conduct by the

22  defendants which should not, we submit, give them a basis for

23  imposing further hardship on Delphi.

24              I would emphasize that Delphi is not trying to

25  foreclose the defendant's rights to move to dismiss the

25

1    complaint or for summary judgment.  In fact, the arguments

2    today in opposition to the motion to expedite probably

3    constitute a substantial portion of the arguments that

4    defendants would make in a motion to dismiss.  Delphi had

5    proposed June 13 as the date for defendants to answer or move

6    with respect to the complaint and Delphi had proposed a ten day

7    period for itself to respond to that motion.  Delphi would be

8    agreeable to accelerating and shortening those time periods to

9    the extent that defendants wish to present to the Court sooner

10   rather than later their contention that the claim for a

11   specific performance and other claims in the complaint are not

12   legally sufficient.

13           In connection with the schedule that Delphi has

14   proposed, although defendants argue that the schedule is

15   unreasonably short and unworkable, the fact of the matter is

16   Delphi has proposed a longer schedule and a longer time for

17   discovery and pretrial proceedings than was the case in other

18   recent litigations also involving multibillion dollar disputes

19   such as the Solutia case in this district and the Clear Channel

20   case in the New York State Court.  In Solutia, the time from

21   the filing of the complaint to trial was two weeks.  In Clear

22   Channel, it was five and a half weeks.  Delphi has proposed a

23   schedule which would entail approximately 11 weeks from the

24   filing of the complaint to trial.  So to the extent that

25   defendants are saying there are more issues and more complexity

26

1   in this case, the time period, although still very expedited,

2   is significantly more than was the time period in those other

3   cases.

4              I would add that in looking at the reality of

5   Delphi's situation in this case, Delphi has proposed a schedule

6   that goes out as far as possible.  The current situation for

7   Delphi and the fundamental reason why this litigation has been

8   filed is that Delphi is now in a position of impossible

9   uncertainty that is creating the potential for terrible harm

10  for all of Delphi stakeholders.  At the same time that Delphi

11  is pursuing this adversary proceeding to obtain a judgment

12  which Delphi believes will enable the consummation of the plan,

13  at the same time Delphi, in fulfillment of its fiduciary duties

14  and in an effort to mitigate damages, is pursuing alternative

15  steps to try to develop a modified plan and Delphi is committed

16  to doing everything that will enable it to fulfill its

17  fiduciary duties to all of its stakeholders.

18              In effect, the defendants are trying to litigate

19  all of the issues that will have to be litigated in the course

20  of this adversary proceeding in connection with a motion to

21  expedite.  The Court over the course of this case will have a

22  full record before it concerning the ability of Delphi to

23  consummate the plan.  We submit as alleged in the complaint

24  Delphi was and will be ready, willing, and able to fulfill all

25  the conditions, as well as the alternatives for Delphi and all

27

1    of the stakeholders.

2              Under the present circumstances, Delphi is trying

3    as hard as it can to develop a modified plan.  Delphi knows

4    that the plan will require re-solicitation.  Delphi knows the

5    plan will be materially adverse to the stakeholders.  The goal

6    is to emerge from Chapter 11 by the end of the third quarter if

7    that's humanly possible either by means of consummation of the

8    plan that has already been confirmed, or if the Court rejects

9    Delphi's claims, then Delphi and the stakeholders will be in

10    the unfortunate position of pursuing a modified plan.

11              There's no doubt that from the perspective of the

12    defendants they would like to see Delphi's ability to pursue a

13    claim for specific performance go away.  Then defendants will

14    be in the position to make whatever arguments they want to make

15    about Delphi's damages.

16              We respectfully submit, Your Honor, that under the

17    circumstances here damages are simply not an adequate remedy

18    for the wrong that occurred.  Not only would damages not be an

19    adequate remedy for Delphi itself, but the conduct of the plan

20    investors has caused serious damage to Delphi's creditors and

21    all of Delphi's stakeholders.  The whole point, we submit, of

22    the remedy of specific performance is to redress a wrong in a

23    way that puts the innocent parties in the position they should

24    have and would have been in if the wrongdoer had complied with

25    its legal obligations.

28

1       For today, Your Honor, in sum, unless the

2  proceedings in this adversary proceeding are expedited, the

3  remedy of specific performance is effectively denied without

4  Delphi having the ability to litigate the legal sufficiency and

5  factual merits of its claim.  We believe that when the record

6  is developed, the law and the facts will establish that Delphi

7  is entitled to the remedy of specific performance that it

8  seeks.  If the motion to expedite is denied, that remedy is

9  gone, the plan cannot be consummated and there will be

10 irreparable injury to Delphi and all of its stakeholders.

11      For that reason, we submit that good cause has

12 been shown for the motion to expedite and we ask that Your

13 Honor grant the motion.

14      THE COURT:  I don't understand and I want to

15 explore with you the underlying basis for the schedule which

16 will result in a trial commencing on August 1st.  I guess I

17 have two questions related to that which I guess divides into

18 two points.  The first is is Delphi contemplating doing

19 something other than operating normally and pursuing

20 discussions and groundwork for an alternative plan that would

21 cause the remedy of specific performance to go away after mid

22 August?  I don't necessarily see that that's the case.

23      MR. FRIEDMAN:  Delphi believes that if a modified

24 plan is confirmed and consummated, the remedy --

25      THE COURT:  Oh, I understand that, but you're

29

1    talking about doing that as a goal by the end of the third

2    quarter and that's some way after August 1st and would give

3    more time, for example, for the development of specific not

4    only motions to dismiss but specific summary judgment issues,

5    for example.

6              MR. FRIEDMAN:  Again, Your Honor, we have no

7    problem and we would agree the schedule should build in a time

8    for summary judgment motions.  But the August 1 date for trial

9    --

10             THE COURT:  It doesn't really -- I mean it doesn't

11   work out.  I mean if you're going to do it, if you're going

12   have a trial on August 1st, I don't see how you could have --

13             MR. FRIEDMAN:  Well here --

14             THE COURT:  -- summary judgment motions given that

15   discovery is done at the end of July.

16             MR. FRIEDMAN:  Here's the problem we're wrestling

17   with as a practical matter, Your Honor.  My understanding from

18   restructuring counsel is that by virtue of waivers previously

19   granted by PBGC and the IRS Delphi has a window of opportunity

20   to emerge from Chapter 11 between June 15 and September 30th

21   without the need to go back to the PBGC and the IRS and obtain

22   new waivers.  Whether it would be possible to obtain those

23   waivers, I don't know.  That is part of the reason why Delphi

24   is doing everything within its power to develop a plan and

25   pursue this litigation so that there could be emergence on

30

1   September 30 at the very very latest.  If there's a judgment of

2   specific performance, one of the very important issues that

3   Delphi has to wrestle with with respect to the timing of that

4   judgment, Your Honor, is that in order for the remedy of

5   specific performance to be effective, as Delphi acknowledges in

6   its complaint, Delphi would reinitiate the rights offering,

7   would redevelop the commitments for the exit financing, and the

8   notion that Delphi should do that even if it were possible in

9   advance of a decree of specific performance is highly dubious I

10  believe.  For example, Delphi would have to go to the --

11               THE COURT:  No, I understand the point.

12               MR. FRIEDMAN:  That's why the August 1 trial date

13  ties to the September 30 emergence date in order for there to

14  be obviously time for trial and a decision.  I'm not the expert

15  in these matters but it's got to be 35, 40 days to complete the

16  rights offering, have the commitments for financing.  So that's

17  the position in which Delphi finds itself.

18               THE COURT:  Is there any other anticipated event

19  besides the PBGC labor issue that impacts this schedule?

20               MR. FRIEDMAN:  The way I would answer that, Your

21  Honor, is that I'm not aware of a specific --

22               THE COURT:  Again, I'm not talking about anything

23  other than an event that would moot the specific performance

24  remedy.

25               MR. FRIEDMAN:  The way I would answer that, Your

31

1  Honor, is that there's not a specific event that I'm aware of

2  that would moot the remedy but Delphi is in this position now

3  of tremendous uncertainty which is putting tremendous pressure

4  on Delphi to develop a modified plan and seek to re-solicit,

5  seek to confirm it, and consummate it.  If the PBGC deadline

6  hypothetically were a deadline other than September 30, if it

7  were October 15 for example, then I would be talking about

8  October 15 with respect to that deadline.  There's not another

9  particular event other than the ongoing cost, harm, and

10  uncertainty from the continuation of the Chapter 11 proceeding

11  at a time when Delphi believes the plan confirmed by Your Honor

12  should be consummated.

13            THE COURT:  Okay.  All right.  As I read the

14  motion, it also, unlike at least my understanding of Solutia

15  and some of the other cases you cited, seeks an expedited

16  schedule on all aspects of the complaints including equitable

17  subordination and the fraud claim against Appaloosa.  My

18  question related to that is is there a way to bifurcate that

19  issue since specific performance is what seems to be driving

20  this matter?  Particularly since it's hard for me to see

21  raising money after you win on specific performance, assuming

22  you do, from lenders and people coming to a rights offering

23  when you've also potentially obtained a judgment saying that

24  your lead investors defrauded you.  That to me is somewhat mind

25  boggling.

32

1        MR. FRIEDMAN:  I believe, Your Honor, that there

2   could be the kind of bifurcation Your Honor is suggesting.  The

3   issues that we believe require acceleration and expedited

4   proceedings are the issues of breach of contract and the

5   appropriate remedy for that breach, i.e. did the defendants

6   breach their contractual obligations when they failed to fund

7   their equity commitment on April 4 and is the appropriate

8   remedy for that breach a judgment of specific performance

9   ordering the defendants to comply with their funding

10  obligation?  So yes, I would agree with Your Honor that those

11  issues could be bifurcated and that claims for damages and

12  other claims do not require the expedited treatment we have

13  proposed and requested with respect to the claim for breach of

14  contract and the remedy of specific performance.

15        THE COURT:  Okay.  Okay.  Does anyone other than

16  the defendants have anything to say on this motion?

17        MR. BUCHDAHL:  Good morning, Your Honor.  My name

18  is Jacob Buchdahl, Susman Godfrey and we are also litigation

19  counsel for Delphi in the other adversary proceeding that was

20  filed against UBS.  I'm going to rely on Mr. Friedman's

21  argument this morning.  We're seeking the exact same relief.

22        THE COURT:  Including his answers to my questions

23  about what could be --

24        MR. BUCHDAHL:  As Your Honor is aware, we do not

25  allege a fraud claim against UBS.

33

1          THE COURT:  Right.  There is an equitable

2    subordination --

3          MR. BUCHDAHL:  There is an equitable subordination

4    claim which we agree could be bifurcated and would not have to

5    be addressed on an expedited basis.  The only other thing that

6    I'll point out, Your Honor, is that defendants seem to advance

7    two fundamentally contradictory arguments in their papers.  The

8    first is that all of this should have been concluded by April

9    4th, and the second that all of this is far too complex to be

10   determined on any kind of quick schedule.  We believe that

11   defendants are more than in a position to answer the narrow

12   contractings in this case on a schedule that would allow us to

13   complete this litigation before it's too late for Delphi.

14   Other than that, I'll rely on comments by Mr. Friedman.

15          THE COURT:  Okay.

16          MR. SHORE:  Good morning, Your Honor.  Chris Shore

17   from White and Case for ADAH and AM LP.  I was standing before

18   and let me just address this on the record.  We did have a

19   little dispute about the motion to shorten time to respond and

20   I got the message on the call to the Court the other day but we

21   have an opportunity to address that today.

22          While I think it's probably somewhat moot at this

23   point, I did want to start my comments with just noting however

24   this moves, it's got to move in our perspective in a certain

25   way.  There are rules, procedural rules.  Procedural rules are

34

1   very clear in your case management order.  Either you file ten

2   days before an omnibus or you get everybody on the phone and

3   you call the Court and you try to figure out what day works for

4   people.

5              THE COURT:  You guys did call the Court though.

6              MR. SHORE:  No.  I called alone, Your Honor.  I

7   did not have everybody else on the phone.  I do not speak for

8   any other defendant, and I wanted to be heard on that on that

9   point which is that none of the other defendants were ever

10  called with respect to this.  I can't answer for them.

11             THE COURT:  Okay.  For the record, I gave you the

12  same answer I will give them which is that rather than have a

13  fairly half baked discussion on the phone it seemed to be a

14  better play to have the arguments, as you all have done very

15  effectively in your papers.  Unlike some orders to show cause

16  that are fairly routine, this one I think did require some

17  elucidation.  I'm treating this hearing essentially as I would

18  treat a contested hearing about an order to show cause.

19             MR. SHORE:  Very good, Your Honor.  Let me also

20  just note for the record --

21             THE COURT:  The request for an order to show cause

22  that is.

23             MR. SHORE:  With respect to all the people here, I

24  recognize this is a high stakes case.  There are high

25  temperatures right now but there are also rules and just for

35

1    the record, I think people do need to follow them.  Filing a

2    motion on a Friday before a holiday suggesting that there be an

3    amenability at least to consider an adjournment and then

4    showing up on Tuesday morning saying no adjournment for a day,

5    that's not an appropriate way to proceed.  If we're going to

6    proceed that way, it's going to be very painful for everybody

7    and ultimately is going to work out very badly for the Court

8    who's going to be dragged into disputes like this.

9                Ultimately, the procedure that was adopted just

10   wasted a week from our perspective.  Let me just say leading

11   into the motion to expedite how this should have worked.  They

12   should have filed a motion to expedite when they filed the

13   complaint.  It was not a secret that they wanted to expedite.

14   They could have filed it.  It could have been on for today and

15   we could have had an opportunity to respond and ultimately to

16   provide Your Honor with potentially one set of papers and not

17   six sets of papers.  We all could have called the Court and had

18   a discussion with how much time we needed.  We could have had

19   the discussion, for example, of how long it's going to take to

20   move to dismiss these complaints.

21               Quite frankly, I appreciate the willingness on

22   their part to handle a motion to dismiss on an expedited basis

23   and I would propose that we move to dismiss on June 13th, they

24   respond on June 19th, and we file a reply on the 23rd.  I think

25   we should be discussing whether or not we need depositions in

36

1    connection with the motion to expedite.  I don't think so but I

2    do have questions which haven't been answered and some of the

3    questions Your Honor is asking today, quite frankly we're

4    getting new facts with respect to the expiration of the PVDC

5    waiver.  We should resolve intervention issues.  We should

6    resolve the consolidation issues.  We should have a Rule 26(f)

7    conference so that we can talk about how this is going to get

8    down, and we should come back on the Rule 16(b) conference

9    which is set on 6/24 to set the schedule.  All that does is

10   that it delays that -- if Your Honor says at that point no,

11   we're going ahead, we're going on the two months schedule,

12   we've delayed it for three weeks, but at least Your Honor is

13   doing it on the record with a full understanding of the issues

14   that are going to be raised in connection with the motion to

15   dismiss, the scope of discovery, and everything else; who's

16   going to be a party to the suit, whether the suits are going to

17   be consolidated.  All that is before you and it allows you to

18   make a judgment as to whether or not an August 1 or at that

19   point August 23 deadline is in fact realistic.  But starting in

20   the papers that are filed on a Friday and then papers that are

21   brought in on the morning of the hearing and trying to decide

22   and exercise your discretion with respect to the evidence in

23   front of you as to either irreparable harm or good cause isn't

24   a way to run it.

25            THE COURT:  Well, there's no evidence in front me.

37

1          MR. SHORE:  No, there is no evidence in front of

2     you and quite frankly, that's a motion in and of -- or a reason

3     in and of itself to deny the motion to expedite until they get

4     evidence in front of you because you're abusing your discretion

5     if you're allowing this to proceed on a non-evidentiary basis.

6     There are real reasons they need to explain and questions we'd

7     like to ask with respect to what's the magic about April 1?  I

8     hear more every time --

9          THE COURT:  You mean August 1.

10          MR. SHORE:  August 1.  So let me turn to the

11     substance a bit and why it matters that we follow that

12     procedure to kind of come back on the 24th and address all of

13     these issues.

14          First, and it was touched upon in Mr. Friedman's

15     opening and more explained by him that the theory here is that

16     they're going to get an order of specific performance sometime

17     in August.  Then they're going to go start their rights

18     offering, they're going to go get their debt ratings again,

19     they're going to raise public debt with the bank and try to put

20     the whole plan back together again.  It's fundamentally flawed.

21     They can't do that.  They can't do that because it violates New

22     York law which is going to apply here.  We could debate whether

23     or not they have to allege in the complaint that they're

24     currently ready, willing, and able to close.  I think they do.

25     I don't think the complaint says that.  Quite frankly, I think

38

1    it's not true.  They're not ready, willing, and able to close

2    right now.  They've terminated their bank commitments, they

3    lost their debt rating, they have new GM agreements which were

4    just on today.  Your Honor said they can't enter in an

5    agreement with GM outside the ordinary course and satisfy the

6    condition.  They had those agreements today.  They have not

7    been performing under the EPCA.  As we put in the papers, they

8    haven't paid our fees.  They can't stop performing the EPCA and

9    then seek specific performance --

10           THE COURT:  Frankly, I think you better go on to

11    some other points besides your fees.

12           MR. SHORE:  Fair enough, Your Honor.  The point

13    being here is that when we get to trial or we get to summary

14    judgment, if they are not at that moment ready, willing, and

15    able to close the law says they can't have specific performance

16    because the alternate theory where they're going to take an

17    order of this Court that says you have specific performance,

18    the right to specific performance and shop that around, all

19    they have is an advisory opinion at that point.  We get back to

20    the same problems which were addressed in the context of the

21    1142 motion.  All that means is, and the reason we were saying

22    that this had to be done while all the commitments were in

23    place, and that would have raised a whole different set of

24    issues, they can't stop it all and then seek the remedy.

25           The second reason we should wait until the 16th is

39

1   I don't think you're getting necessarily a realistic view from
2   Delphi as to the issues that are going to be involved.  Leaving
3   out fraud, 1142, equitable subordination, veil piercing is
4   another one that they're going to have to deal with in order to
5   get specific performance if they can't get to the funds unless
6   they pierce the veil from the investment entities.  All of that
7   needs to be dealt with at some point.  But if you say we're
8   just going to deal with the contract claim, that is do they get
9   specific performance?
10          We can talk about a separate issue which is if we
11  want to try the issue of whether the remedy of specific
12  performance is available under the facts and circumstances of
13  the case, that's a different issue.  But with respect to
14  whether they get a decree of specific performance, the issue
15  there is we're past the closing date, outside date, the
16  terrible definition, and the termination has occurred.  It's
17  not an invalid termination.  The termination has been sent.
18  All parties are relieved of any obligation they're under except
19  for liability for any willful breach.
20          So the issue is going to be can Delphi establish
21  that the plan investors, each of the plan investors committed a
22  willful breach.  If they didn't, then there's no liability on
23  anybody's part and I don't think Delphi is contesting that.
24  Whether or not we breached is determined whether or not they
25  satisfied all the conditions.  Some of those conditions are

40

1    motion to dismiss issues from our perspective.  Some of them

2    are summary judgment issues.  Did they hit the equity

3    capitalization?  They in our mind blew it by five million

4    shares clearly.  That's a summary judgment issue.  There's not

5    going to be a lot of testimony.

6            Other issues is whether the GM agreement affect

7    the business, whether there was a map in the operations of the

8    company.  Those are extremely factually intensive.  They're

9    going to require a lot of work from experts.  The issues with

10   respect to drafting that Your Honor has already raised with

11   respect to a more evidentiary record on what some of this meant

12   are going to require taking depositions of drafts people,

13   taking depositions of the business people.  The concept that

14   we're going to be doing that in essentially a two week period

15   between the date the documents have to be produced and the date

16   the expert reports have to be up is completely unworkable.

17   There's no explanation given as to how that's ever going to

18   work if you're going to take 60 depositions in two week period.

19   I don't even have a sense right now, because we haven't had our

20   26(f) conference, as to how many depositions Delphi is going to

21   want.

22           So I think just from the perspective of perceiving

23   today, I just don't think the Court -- it has the record before

24   it to expedite.  I think we get the motion to dismiss up, we

25   deal with consolidation, we deal with interventions and all of

41

1   that and get back here to a point where you do have a sense of

2   how much discovery there is, how many depositions, how many

3   witnesses, how many documents.  We're all going to be in a

4   better position.  Motions to dismiss up and you can make it

5   either -- we can either hear it on that date or you can at

6   least review them to address the issue of how much of this is

7   going to go forward.  It seems like a far more prudent way to

8   go.

9           Leaving aside the issue of cause, I think the

10   explanation that other cases have done it, we all have reasons

11   in cases like that for consenting and many times a defendant

12   will say you know what?  I wanted to try the fraud case in

13   three weeks.  We're not there yet.  I don't think any of the

14   plan investors is there yet.  Nobody is in a position to

15   understand just how much there is to get done to consent to an

16   expedited schedule.  So we're not consenting to an expedited

17   schedule now.  We're not consenting to the motion to shorten

18   time either.  We think this matter should be kicked for a

19   couple of weeks to allow the record to be much more fully

20   developed and come back and allow Your Honor to make a reasoned

21   decision as to whether or not we can go forward.  I think --

22           THE COURT:  You said something I didn't -- maybe I

23   didn't hear you correctly.  You said that you can litigate

24   where the remedy of specific performance exists?

25           MR. SHORE:  Yes.

42

1          THE COURT:  Okay.  But how does that differ from –

2    –

3          MR. SHORE:  Because that is one of those limited

4    issues.  If you have established breach, now you're opening up

5    to all the conditions and all the different facets of Delphi's

6    business, corporate finance, employment, all those things.

7          THE COURT:  Right.

8          MR. SHORE:  If what you're talking about is

9    whether the remedy of specific performance exists, you have a

10   limited set of depositions.  Who are the people involved at the

11   company, who are the people involved for the plan investors

12   with respect to drafting the provisions on waiver?

13         THE COURT:  Okay.

14         MR. SHORE:  You've got questions of delay and

15   they're seeking it are ones they can probably address on

16   papers.  Whether they're ready, willing, and able to perform at

17   the time the decree of specific performance is a motion to

18   dismiss issue.  You've got issues with respect to veil piercing

19   which I think are addressed as a matter of law because Delphi

20   is a signatory to that agreement.  But to the extent that there

21   had to be some discovery, we're talking about doing that in a

22   two month period, coming back on August 1 and Delphi will know

23   give it up on specific performance.  Different issue than is

24   there a breach which I just, practically speaking, I mean I

25   have my chart here, I've gone through it.  I don't see how I go

43

1    about trying to sequence this in a manner where you're not

2    having expert depositions before the documents are in to make

3    it work in any practical fashion.

4            THE COURT:  Does your chart take into account that

5    there was obviously an enormous amount of thought given to

6    whether there was a breach or not that led not only to the

7    dress rehearsal in March but also the termination letter and a

8    lot of letters in between?

9            MR. SHORE:  I've provided, from my perspective, I

10   provided no time for our time to draft papers.  We'll get you

11   papers.  We can turn out papers.  It takes a little bit of

12   time.  I think it's better if people are given a few days to

13   deliver what's written.  But what I'm talking about is trying

14   to schedule depositions of parties during July.

15           THE COURT:  Okay.

16           MR. SHORE:  But third party witnesses --

17           THE COURT:  No, I just wanted to ask you that

18   question.

19           MR. SHORE:  Yes, it does.  Certainly, we are up to

20   speed on the legal issues.  My telling you that we'll file our

21   motion to dismiss in ten days which is -- or 11 days which is

22   earlier than they wanted us to and a week earlier than our

23   motion to dismiss is actually due, we'll do it.  But to say

24   we're just going to put our heads down and people are going to

25   just have to wait with these depositions and not talk to

44

1    parties, nobody gets an opportunity to interpose

2    interrogatories, that stuff doesn't work.  I've done trials

3    like that where depositions close before the documents are in

4    and it leads to ten hour cross examinations on the record

5    because you've never seen the witness before.  That doesn't

6    help you.

7            THE COURT:  Okay.  I've read the other responses.

8    I think I know the differences between them, particularly the

9    Goldman Sachs one.  People are free to state their case though

10   briefly if they want.

11           MR. LACY:  Your Honor, I'll be brief.  Robinson

12   Lacy, Seldan and Cromwell for Goldman Sachs.  Goldman Sachs of

13   course did not carefully consider whether the conditions were

14   satisfied.

15           THE COURT:  You are willing to go along with --

16           MR. LACY:  We were prepared to go ahead.  We

17   didn't go ahead because we know that some body else, we're not

18   sure who, but somebody else failed to perform and that relieved

19   Goldman Sachs of its obligations.  So we're starting from

20   scratch.  We were not a participant of any of the discussions

21   that happened before the closing date.  We never signed the

22   common interest agreement.  We were locked out of the room.  We

23   are starting from scratch.

24           Your Honor, Part 7 rules basically incorporate the

25   Federal Rules of Civil Procedure and those reflect 70 years of

45

1    deliberation and study and experiment and revision concerning

2    how to conduct a fair trial.  They are sometimes thought to be

3    cumbersome in small cases or simple cases.  They are designed

4    for big cases and this is a big complicated case and this is

5    the sort of case for which all of those procedures were

6    designed.  Those rules have been revised at length in the last

7    10 or 15 years in particular to provide for preliminary

8    discovery and to provide for a Rule 26 conference, to provide

9    for a Rule 16 conference.  The plaintiff's proposal is

10   scrapping all of those procedures.

11           It is not fair to the litigants to scrap the

12   procedure set out in the Part 7 rules unless there is cause.

13   You have to proceed on the basis that in this motion there is

14   no cause.  You cannot find cause to shorten time.

15           In the first place, Delphi's papers allege nothing

16   that is going to happen in August or September or October.

17   There is no deadline, there is no event that makes it necessary

18   to get this thing done.  We heard today for the first time that

19   there is in existence a PBGC waiver that ends on September

20   30th.  We know nothing about PBGC's ruling as to extend that.

21   They have obviously extended repeatedly as the Court knows and

22   it's highly unlikely that the PBGC is going to sink this thing

23   if there is a plan in the offering.

24           The debtor's own conduct makes clear that there is

25   no urgency about this.  Mr. Friedman can tell you that they

46

1    were busy doing other things but he was not busy doing anything

2    else.  Mr. Friedman's firm, Susman Godfrey, were all free to

3    continue the litigation that was begun in March under the

4    directions the Court gave concerning the issues that needed to

5    be litigated on an evidentiary record and they dropped the ball

6    and went away.  There was nothing that prevented Delphi from

7    continuing that litigation then or any other time before now.

8    There is no excuse for a ten week delay and then proposing a

9    schedule that requires us to finish the fact discovery in less

10   time than it took them to begin the proceeding.

11           Finally, even if there is some urgency now, it is

12   not legally cognizable as cause for shortening time because

13   whatever urgency there is now is the result of the plaintiff's

14   own conduct.  They cannot create a crisis by waiting for ten

15   weeks and then ask to shorten cause on that basis.  So if

16   there's any need for urgency, they created it and it is not

17   fair to put that on the defendants.

18           Your Honor has been at this for a while and you

19   are aware that litigants sometimes make procedural motions to

20   obtain tactical advantages.  I don't see how the Court can

21   conclude anything except that this motion was made to obtain a

22   tactical advantage.  Delphi itself obviously does not believe

23   this case is as urgent as [unintelligible].  We've waited nine

24   weeks.  That's from the time that you denied their motion for

25   summary judgment.  They obviously knew that there was a problem

47

1    before that.  The proposed schedule that they've offered is

2    clearly abusive.  It's manifestly undoable.  They cannot expect

3    a fair finding of fact they cannot expect a fair application of

4    the law on the schedule they are proposing.  This is completely

5    independent of the burden which they acknowledge they would

6    inflict on the defendants as part of it.  So we have to take it

7    as a given that they are asking for something that is going to

8    depart severely from the well thought out standards of the

9    Federal Rules that is going to do it in a way which is going to

10   impair a fair fact finding and fair ventilation of the issues

11   and which is going to impose tremendous expense.  They have no

12   real basis for saying there is urgency, and any urgency that

13   they do say exists is of their own making.

14              Then finally, Your Honor, if you are not startled

15   by the way in which this motion was brought on, then I have to

16   say I'm worried because to wait after the complaint was filed

17   on the 19th for another few days to serve this on the Friday

18   before a holiday weekend telling us that there was going to be

19   a hearing on the 29th which we'd be ordered to file papers on

20   the 28th -- Your Honor, the order that you were asked to sign

21   requires us to deliver papers to Delphi in Troy, Michigan

22   yesterday at 4.  There is clearly an effort here to game the

23   rules to avoid being required -- to escape from the usual

24   procedural requirements of this Court.  It is abuse.  It should

25   be recognized as such, and the motion should be denied.

48

1              THE COURT:  Okay.

2              MR. ROSENTHAL:  Good morning, Your Honor.  Jeff

3    Rosenthal, Cleary Gottlieb.  I represent UBS Securities in the

4    companion case that was filed that Mr. Buchdahl had referenced.

5              I think Mr. Lacy and Mr. Shore have covered most

6    of the comments that I wanted to make, but there's really just

7    two very short points that I wanted to add to what Mr. Lacy

8    just said one of which is Mr. Friedman argued that at the

9    appropriate time they want the ability to come to the Court and

10   show that specific performance is an available remedy, that

11   they don't have to be ready, willing, and able if they can pin

12   the fault on the defendants, and that the EPCA still allows for

13   that remedy despite the history of the EPCA.  But they're in

14   the moment today.  They have to show good cause today.  They

15   have to show the Court today that this is an available remedy

16   because without that remedy, that's the only thing that's

17   driving the request for expedited treatment.  Today, and in the

18   papers, they've shown nothing.  They haven't cited a single

19   case that says that being ready, willing, and able in the past

20   allows them to get specific performance in the future.  We've

21   cited a lot of cases [unintelligible] cited a lot to the

22   contrary.  They don't cite anything to show that the EPCA

23   permits specific performance despite the disclosure statement

24   and despite the statements previously made to the Court.  So on

25   the record today they can't carry the burden on this motion.

49

1          The only other thing that I want to mention, Your

2    Honor, is that with respect to the other cases that are cited,

3    Solutia and the like, even with bifurcation as Mr. Shore said,

4    we still have the big breach of contract issue that can't be

5    bifurcated.  The other cases like Solutia, they were narrow

6    single issue cases is there are material adverse change, for

7    example, on almost all of them.  Here we have --

8          THE COURT:  Well, they delved into what the

9    contract meant as well.

10          MR. ROSENTHAL:  But it's still, but it's an

11    interpretation issue, Your Honor.  Here we have a lot of

12    conditions precedent that are an issue for discovery.  There,

13    and in those other cases you've built up bottoms up schedules.

14          THE COURT:  I would only take that so far given

15    the letters that I've read.

16          MR. ROSENTHAL:  Well, this isn't that case, Your

17    Honor.

18          THE COURT:  But I understand that there's a

19    difference between this case and the cases cited by the

20    debtors.

21          MR. ROSENTHAL:  And obviously also the timing of

22    where we are relative to the transaction.  That's all I have to

23    say, Your Honor.

24          THE COURT:  Of course that issue also may affect

25    specific performance.  Granted the debtors have not cited cases

1    on this point, but it seems to me that if a contract party's

2    breach is preventing the debtors from being ready, willing, and

3    able they don't necessarily have to do more than show that they

4    could be able to perform if that impediment, that breach were

5    resolved.  But I agree there's no evidence in front of me today

6    showing that the debtor's lenders would be able to advance --

7                MR. ROSENTHAL:  Thank you, Your Honor.

8                THE COURT:  -- in the future.  Which raises a

9    question that I have for Mr. Friedman, but I'll hear from the

10   other parties first before I ask him.

11               MR. FALCONE:  Good morning, Your Honor.  Marc

12   Falcone from Paul Weiss for defendant Merrill Lynch.  I just

13   thought I'd make a couple of very simple points telling this

14   Court some things that have already been said.  The rules

15   provide for certain boxes to be checked before a schedule is

16   set.  They can be checked quickly and I think all of the

17   defendants are willing to work with the plaintiff to check

18   those boxes quickly, but they should be checked.  If we're

19   going to try to expedite discovery in this day of electronic

20   documents, we should have discussions about whether search

21   terms can be agreed to.  If we're going to try to set a short

22   schedule for depositions, we should at least know roughly how

23   many depositions we're talking about.  We should know how many

24   third parties are going to be involved in discovery.  We should

25   try to define the date range for documents that are going to be

51

1    searched.  We should try to address very basic issues that have

2    dramatic impact on whether certain tasks can be done within a

3    certain time.

4            The cases, Your Honor, that talk about expedited

5    discovery generally show that parties that come to Court in a

6    contested proceeding asking for expedited discovery are

7    generally asking for things that are quite specific.  In the

8    Notaro case the parties were asking to depose Ed Koch.  That's

9    all that case was about.  In other cases parties were asking

10   for specific depositions, a 30(b)(6) deposition here, a witness

11   there, for specific reasons, not sweeping orders setting a

12   schedule blindly without understanding the needs of the case

13   for every issue in the case.

14           The schedule, as Your Honor has observed, could

15   not have been proposed with any serious contemplation that

16   there would be summary judgment motions.  Pretrial submissions

17   are due on the same day the fact discovery closes.  We're

18   between there and when there'll be time to make summary

19   judgment motions much less have them duly considered.

20           We submit, Your Honor, that before setting a

21   schedule in this case certain boxes must be checked.  We can do

22   that quickly.  We can create a schedule that's both efficient

23   and fair.

24           THE COURT:  Okay.

25           MR. FALCONE:  Thank you, Your Honor.

52

1          THE COURT:  So the question I just wanted to ask

2     you, Mr. Friedman, is the debtors have not sought any

3     injunctive relief here and injunctive relief has its parameters

4     and focuses the parties on a specific set of facts that may

5     come up in the future.  But today they don't seem to be

6     available which is probably why you haven't sought it.  But

7     aren't many if not all of the defendants' issues resolved if

8     you have a somewhat more orderly process but reserved your

9     rights to seek injunctive relief if, you know, the facts

10    warrant it later this summer?

11         MR. FRIEDMAN:  Your Honor, I don't think what

12    we're talking about here and what we're seeking here is in any

13    way analogous to injunctive relief.

14         THE COURT:  I know, I know.  But I'm saying that

15    if you have indications, for example, that you're not able to

16    negotiate an extension of the PBGC or that you have a window

17    where you can get financing that resolves these people's

18    issues, you know, to me that would make your case where you

19    have very discrete discovery and perhaps a basis for injunctive

20    relief.  I mean I'm just wondering -- I know you're not seeking

21    injunctive relief --

22         MR. FRIEDMAN:  Right.

23         THE COURT:  -- today and I also know that despite

24    some of the case law the standard for expediting discovery is

25    an injunction standard.  But why not reserve your rights on

53

1  getting injunctive relief when the facts, if they do, warrant

2  it, and otherwise going ahead?  I mean yes, I can see there may

3  be some tactical basis in which you're seeking here including

4  keeping the pressure on these folks that they may have to end

5  up paying $2 billion, $5 million, $30 million.  But I think you

6  need to show more than a tactical advantage in order to

7  expedite discovery.

8              MR. FRIEDMAN:  Your Honor, the fundamental reason

9  for seeking expedited discovery and expedited trial is that the

10  ongoing Chapter 11 causes harm and the litigation schedule

11  that's being proposed by the defendants, Mr. Shore said let's

12  have a conference on June 24 --

13              THE COURT:  I understand.  There's something in

14  between those two proposals I'm sure.  But I mean this whole --

15  frankly, except if one focuses on litigation leverage, this

16  whole specific performance issue for me is a little bit

17  bizarre, frankly.  Why you'd want these people at this point is

18  somewhat beyond me.

19              MR. FRIEDMAN:  Well, the answer to that --

20              THE COURT:  I've never seen more efforts to get

21  out of a deal ever.  So you know -- yes, tell me your answer to

22  that.

23              MR. FRIEDMAN:  Let me try to address, Your Honor,

24  some of the -- because I think I understand what's being raised

25  and the decision to bring this litigation by Delphi was a

54

1    decision based on the unfortunate reality that the plan

2    confirmed by this Court if it could be consummated is vastly

3    superior for Delphi's stakeholders as compared to any other

4    possible alternative.  If there were another alternative then

5    the remedy of specific performance would be rejected.  The

6    reason for the request for expedited proceedings is so that

7    Delphi will have the ability to develop a record to show that

8    specific performance is warranted under all the circumstances.

9    The concern we have today is that defendants are making all of

10   their arguments in opposition to the remedy of specific

11   performance based on law, based on facts in connection with the

12   effort to set an expedited schedule.  The result is --

13            THE COURT:  I understand that but I also have to

14   weigh in determining cause that there is a reason to go for

15   specific performance on this type of schedule.  I mean so I

16   don't blame them for raising those points.

17            MR. FRIEDMAN:  You know, and I understand --

18            THE COURT:  But I'm not ruling on the merits on

19   these points but it's a significant factor in determining what

20   cause exists here.

21            MR. FRIEDMAN:  Well, I understand the passion with

22   which some of the defendants' lawyers addressed the normal

23   rules and procedures and we all as lawyers respect and are

24   governed by those rules but those rules also provide for

25   expedited treatment in appropriate cases.  The argument that

55

1   Delphi is making today is that when we look at the

2   extraordinary effort that went into developing the plan and

3   when we look at how everything had to come together in exactly

4   the right way in order to achieve confirmation, we're now in a

5   situation where unless there can be a judgment of specific

6   performance on an expedited basis, that plan cannot be

7   consummated and the years of work are just gone.  The

8   fundamental problem that we have with the schedule proposed by

9   defendants is that if we put ourselves on a track where we're

10  addressing this legal issue and figuring out what are the

11  search terms for electronic discovery and then coming back in

12  July to set a schedule, then it doesn't matter at that point

13  even if the Court agrees with Delphi, it will be too late

14  because there's just a limit to how long Delphi can languish,

15  endure the burdens of Chapter 11.  The costs are tremendous,

16  the uncertainty is tremendous.  On April 4 Delphi was at a

17  point where --

18              THE COURT:  I understand.  I appreciate the

19  evidentiary burden of showing that you're being lashed and

20  confused, or lashed and harmed, but this is a company that just

21  was able to raise more money than expected to.  You know, I

22  don't see it as a company that is, you know, like Camille

23  coughing on the doors of death.  I just don't see that.

24  Frankly, you know, to be rushing with open arms for the fourth

25  time to try to bring these people in is a little bit

56

1    disconcerting.  You know, it's --

2            MR. FRIEDMAN:  Well --

3            THE COURT:  So I think you're going to have to

4    give me more evidence than you've given me on this.  I

5    understand the PBGC point and I can take judicial notice of the

6    terms of their waiver which I approved and their statements

7    made to the Court about their reservation of rights, and the

8    fact that the most recent statement very clearly put me on

9    notice as well as everyone else that their position at the end

10   of the summer may be quite different than it was while the EPCA

11   is pending.

12           But the issue I guess I'm facing is I'm not by any

13   means precluding consideration on a proper record which may be

14   appropriately expedited of specific performance as a remedy.

15   But it seems to me unless the debtors see themselves doing

16   something or things over the next few months that will moot

17   that remedy, it seems to me it's probably better suited with

18   forward development where you can look into everything that

19   you've alleged in the complaint which is not pretty.  It's

20   quite ugly.  It may not be true but that's why we have

21   discovery.  Particularly given that it seems to me ultimately

22   what both parties would want here is a monetary solution as

23   opposed to a solution where people who you're accusing,

24   obviously with some evidentiary support or it wouldn't be in

25   the complaint, of fraud and perhaps securities law violations

57

1   picking your port.  I mean, you know, it's like a country

2   western song, how many times are you going to cheat on me?  All

3   right?  Now, that's why you have a trial and that's why you

4   have a lengthy discovery as opposed to rushing through it.

5   Unless I'm convinced that that remedy truly is mooted, it seems

6   to me it's fair to both sides to have a longer discovery

7   period.

8              MR. FRIEDMAN:  Well, in thinking about what

9   actions would moot the remedy, Delphi, because it has a

10  fiduciary duty to do so, is pursuing efforts to develop and

11  modify the plan.

12             THE COURT:  I understand that, but those are

13  efforts to develop; right?

14             MR. FRIEDMAN:  Yes, but --

15             THE COURT:  Now that -- listen, you've already

16  told me with some credibility that I can't accept the fact that

17  April 4th has come and gone as a basis for relieving the

18  investors of their obligation since you contend they were the

19  reason it came and went.  You've similarly told me I can't

20  relieve them of their obligations because as you allege as a

21  result of their breach you terminated the financing commitments

22  and the rights offering and sent the money back that people

23  were willing to put up as part of a rights offering.  So it

24  seems to me that it's just one more thing you're going to tell

25  me that your negotiations with other parties on an alternative

58

1    plan wouldn't relieve these people of their breach either.

2              I mean unless it's an actual closing, then I

3    understand it.  I understand that.  But it seems to me you can

4    weigh whether to close or not on an alternative plan by what's

5    coming out of the discovery and by how the trial is progressing

6    including summary judgment motions on whether specific

7    performance based on discovery exists, dealing with motions to

8    dismiss before then.  I mean, you know, people evaluate these

9    things as they go along.  Anyway, that's really where I'm

10   coming out on this.

11             MR. FRIEDMAN:  I certainly understand, Your Honor.

12   The one thing I would say is that as Delphi pursues its efforts

13   and develops a plan and embarks on a process of resolicitation

14   the choice that Delphi will face on or about September 30 is do

15   you consummate a modified plan --

16             THE COURT:  I understand that.

17             MR. FRIEDMAN:  -- or do you roll the dice --

18             THE COURT:  But that's why I raised the injunction

19   for.  If the choice becomes acute following discovery, I don't

20   see why you don't have a remedy in the injunction at that

21   point.  I mean I -- I don't know.  So --

22             MR. FRIEDMAN:  May I just address, Your Honor, a

23   couple of practical considerations?

24             THE COURT:  Yes.

25             MR. FRIEDMAN:  You know, one is I think everybody

59

1    -- I think there's general agreement or at least not strenuous

2    opposition to the idea that defendants would file a motion to

3    dismiss if that's what they're doing on June 13th.

4              THE COURT:  I thought I was signaling this before.

5    I'm going to be clear.  It seems to me that what should happen

6    here is the defendants should meet no later than Tuesday next

7    week and have their conference with you.  I think the committee

8    should participate in that conference so that we don't have a

9    second go around if I grant the committee's motion to

10   intervene, and that you should talk about an expedited

11   discovery schedule and an expedited schedule on filing motions

12   to dismiss and summary judgment but that it should be focused,

13   if you can focus it, on at least getting key discovery issues

14   complete on the specific performance issue and the fact

15   discovery in July.  As far as the trial is concerned, you know,

16   I think your schedule is too ambitious.  I don't frankly see

17   this as 60 witnesses type of case, but you all have to talk

18   that through and I'll hold a conference on it.  I'm happy to

19   carry this motion to be heard after you have that conference.

20             Again, I don't know how many witnesses you want to

21   depose, for example.  I don't think I can really deal with

22   discovery issues until I do that.  I think the other points,

23   the e-discovery protocol, who the parties are, I think this can

24   be dealt with pretty simply.  If people are being

25   obstructionist or alternatively if people are pushing too hard

60

1    for expedition, then I'll deal with that.  But I trust, as

2    Mr. Falcone said and as you said, that that won't be the case,

3    and that what you all will be talking about is not a schedule

4    that moots the relief or that puts undue pressure on the

5    parties but deals with a practical situation which is

6    developing this factual record in a way that would enable me to

7    make a decision if there's not a resolution of the matter.

8    Frankly, I'm working off of the timetable that I was focusing

9    on in March which I believe would have enabled me to make the

10   decision on an injunction basis at least around April 4th.  So

11   you may not be complete in discovery then but I think you could

12   take the main actors by then.

13            As far as third party discovery is concerned, it

14   seems to me if the debtor had the commitments, it had the

15   commitments.  If the people were ready to fund, you know, if

16   they were ready to fund I don't see why you need to do more

17   than that unless there's something fishy in the commitments.

18   The documents pretty much are going to speak for themselves.

19            So I think the focuses are going to be on terms

20   that the parties think may be ambiguous and the agreements mean

21   based upon the parties course of dealing in conduct.  The

22   issues that were all -- you were here I think, but we all had a

23   dress rehearsal for this in March and people knew pretty well

24   then what discovery would need to be taken.

25            MR. FRIEDMAN:  I would think, Your Honor, that to

61

1    be efficient the expedited discovery needs to include the issue

2    of whether or not the plan investors breached their contractual

3    obligation and whether or not Delphi complied with the

4    conditions applicable to.

5                    THE COURT:  Right.  That's what I'm talking about.

6                    MR. FRIEDMAN:  Then the idea, Your Honor, is that

7    we would have a meeting on Tuesday of next week and --

8                    THE COURT:  Well, or Monday or tomorrow.

9                    MR. FRIEDMAN:  Try to --

10                   THE COURT:  Or this afternoon since you're all

11   here.  Then if you don't have agreement you could come back

12   June 4th or June 9th which is a Monday.

13                   MR. FRIEDMAN:  If it's convenient for Your Honor's

14   schedule, may we have June 4 and --

15                   THE COURT:  I'll give you that date --

16                   MR. FRIEDMAN:  If we need it.

17                   THE COURT:  -- if you need it.  I'm hopeful though

18   that at a minimum you would have narrowed your points down

19   considerably.  The committee's motion to intervene has not been

20   scheduled yet; right?

21                   MR. WARNER:  It has not, Your Honor.

22                   THE COURT:  Okay.  Well, it would seem to me that

23   the issue there is primarily how active the committee is going

24   to be in the litigation and that's what you all should discuss

25   at the conference.

62

 1          MR. FRIEDMAN:  Your Honor, if --

 2          THE COURT:  I guess with the equity committee the

 3   same thing.  My guess is that both committees while reserving

 4   their rights will probably be willing to let the debtors carry

 5   the [inaudible] all the discovery and the like.  Is that fair

 6   to say?

 7          MR. WARNER:  It's very fair to say.  We don't

 8   intend to duplicate or supplant or replace.  We intend to

 9   assist and monitor and be involved as wholly appropriate.

10          THE COURT:

11          MR. FRIEDMAN:  Your Honor, we're actually hopeful

12   that we'll be able to reach a resolution without the need for a

13   formal ruling or a formal intervention by the committees.

14          THE COURT:  All right.

15          MS. STEINGART:  That's what we were hoping for as

16   well.  Certainly, while I can -- I'm not Mr. Joseph who leads

17   our counsel on this matter.  I'm sure that he would anticipate

18   being cooperative and not creating any issues with respect to

19   additional or, you know, excessive discovery.

20          THE COURT:  Okay.

21          MR. WARNER:  Your Honor, I don't want anything

22   that counsel just said to imply that we're agreeing not to go

23   forward with the motion.  Counsel --

24          THE COURT:  No, he just said he hopes that maybe

25   there could be an agreed order dealing with the motion.

63

1          MR. WARNER:  I'm hoping to hear that.

2          THE COURT:  Okay.

3          MR. WARNER:  But --

4          MS. STEINGART:  As always.

5          MR. WARNER:  As far as setting, we'll deal with

6    that after we have this conference.

7          THE COURT:  Okay.  All right.  Are there any

8    questions?  No?  Okay.  You don't have to wait till Tuesday.

9          MR. FRIEDMAN:  No, I'm available this afternoon.

10   Thank you, Your Honor.

11         THE COURT:  So to be clear, I'm denying the motion

12   to expedite the hearing.  The hearing will be scheduled for the

13   4th.  I'm sorry, yes, for the 4th at 10 on the merits because I

14   believe that's sufficient notice.  But I am hopeful that the

15   motion to expedite will be significantly narrowed based on your

16   discussions either this week or Monday or Tuesday of next week.

17         MR. WARNER:  Your Honor, on behalf of the

18   committee we're hopeful that something will come out of those

19   discussions vis a vis the intervention, but can we go ahead and

20   just set it for the Court also in case we don't have some

21   agreement?

22         THE COURT:  When did you file it?

23         MR. WARNER:  Tuesday.

24         THE COURT:  I don't think -- no, let's set it

25   further for a little bit more time on that.  It will be heard.

64

1   I'd rather just have you all deal with it without the debtors

2   having to respond to it, just deal with it in your conferences

3   and I'd rather hear it in the light of what you've discussed in

4   your conferences because it may be largely resolved at that

5   point.  So I'm not going to hear the committee's motion on the

6   4th.  You can get somewhat -- I mean I'm not going to delay it

7   a long time.

8           MR. WARNER:  The Court mentioned it had time on

9   the 9th.  Should I use that date and ask --

10           THE COURT:  Well, what's the -- is there a June

11   omnibus date?

12           MR. WARNER:  June 24th, Your Honor.

13           THE COURT:  Let's cross that -- I could

14   conceivably do it on the 9th but let's cross that bridge --

15   let's discuss it on the 4th.

16           MR. WARNER:  On the 4th.  Thank you.

17           MR. FRIEDMAN:  Your Honor, I just want to make

18   sure I heard correctly.  On the 4th we'll have the motion for

19   expedited discovery and trial --

20           THE COURT:  Right.

21           MR. FRIEDMAN:  -- to the extent we have to work

22   things out.

23           THE COURT:  Right.  I don't require any more

24   briefing on it obviously, but if you want to fill me in on what

25   the remaining issues are, I certainly would appreciate that

65

1    although I hope that it won't be many and I'm happy to hear

2    them without them being written down if they're not resolved

3    until shortly before the hearing.

4             MR. SHORE:  Would you expect the 4th to be an

5    evidentiary hearing though?

6             THE COURT:  I think the debtor is going to need to

7    give me some evidence.

8             MR. SHORE:  Okay.  I only raised it because I do

9    have an outstanding deposition notice then.  So we're going to

10   have to deal with that in the time frame and we'll try to work

11   out a schedule.  We may have to push it to the 9th if they

12   really want to proceed on an evidentiary case like that.

13            THE COURT:  All right.

14                          *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

66

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                    _____

6                                            Mary Greco

7   Dated:  May 30, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25