**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IN RE:

     DELPHI CORPORATION, *et al.*,

          Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

          Appellant,

     - against -              08 Civ. 3753 (NRB) (AJP)

DELPHI CORPORATION, *et al.*,

          Appellees.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## BRIEF FOR APPELLANT


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-1945
Facsimile:  (212) 637-2750
E-mail:  matthew.schwartz@usdoj.gov

MATTHEW L. SCHWARTZ
JOSEPH N. CORDARO
Assistant United States Attorneys
   - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ISSUES PRESENTED FOR REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The EEOC's Investigation of Delphi's Unlawful Sick Leave Policy. . . 4

    B.    Debtors' Bankruptcy and the Bar Date Order. . . . . . . . . . . . . . . . . . 11

    C.    The EEOC Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.    The Late Claim Motion and the Bankruptcy Court's Decision. . . . . . 13

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

POINT I    THE EEOC'S CLAIM SHOULD HAVE BEEN ACCEPTED
          FOR FILING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.    THE CLAIMS PROCESS, THE BAR DATE ORDER, AND
         THE LAW OF EXCUSABLE NEGLECT. . . . . . . . . . . . . . . . . . . . . . 18

    B.    THE GOVERNMENT WAS PROHIBITED FROM FILING
         ITS CLAIM UNTIL THE COMMISSIONERS OF THE EEOC
         AUTHORIZED SUIT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.    "Claims" Under the Bankruptcy Code. . . . . . . . . . . . . . . . . . . 21

        2.    The EEOC is Obligated to Keep Charges of Discrimination
            Strictly Confidential Until It Completes Its Administrative
            Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            a.    The EEOC's Administrative Process for Investigating
               Complaints of Discrimination. . . . . . . . . . . . . . . . . . . . . 24

            b.    The Confidentiality Requirements. . . . . . . . . . . . . . . . . 25

3.      The EEOC Is Not Required — Because It Is Not
        Authorized — To File a Proof of Claim Until Either the
        EEOC or the Charging Party Files a Civil Action.. . . . . . . . . .  32

C.      UNDER THE EXCUSABLE NEGLECT STANDARD, THE EEOC
        CLAIM SHOULD HAVE BEEN ACCEPTED. . . . . . . . . . . . . . . . . . .  37

        1.      There Was No Prejudice From the EEOC Claim. . . . . . . . . .  38

        2.      The Length of Delay Was Not Excessive. . . . . . . . . . . . . . . .  46

        3.      The EEOC Had Good Reason to Delay. . . . . . . . . . . . . . . . . .  48

        4.      The EEOC Acted in Good Faith. . . . . . . . . . . . . . . . . . . . . . . .  51

        5.      Allowing the EEOC Claim Serves the Public Interest. . . . . . .  51

D.      THE BANKRUPTCY ERRED BY DRAWING AN ANALOGY
        BETWEEN THE EEOC SUING ON BEHALF OF A CLASS
        AND A RULE 23 CLASS REPRESENTATIVE — AN ANALOGY
        THAT THE SUPREME COURT HAS EXPRESSLY REJECTED. . .  52

POINT II    IN THE ALTERNATIVE, THIS CASE SHOULD BE REMANDED
            TO THE BANKRUPTCY COURT TO RECONSIDER THE
            GOVERNMENT'S MOTION IN LIGHT OF THE IMPLOSION OF
            DELPHI'S EXIT FINANCING AGREEMENTS, WHICH
            WERE THE BASIS FOR ANY ARGUMENT THAT DELPHI
            WAS PREJUDICED BY THE EEOC'S LATE CLAIM. . . . . . . . . . .  57

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

# TABLE OF AUTHORITIES

## CASES

*Aristeia Capital, LLC v. Calpine Corp. (In re Calpine Corp.),*
    Nos. 05-60200 (BRL), 07 Civ. 8493 (JGK), 2007 WL 4326738
    (S.D.N.Y. Nov. 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Arnold v. United Parcel Service, Inc.,*
    136 F.3d 854 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Bailey v. Jamesway Corp. (In re Jamesway Corp.),*
    Nos. 95 B 44821 (JLG), 96/8389A, 1997 WL 327105
    (Bankr. S.D.N.Y. June 12, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Ball v. A.O. Smith Corp.,*
    321 B.R. 100 (N.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Butterworth v. Smith,*
    494 U.S. 624 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Castellano v. City of New York,*
    142 F.3d 58 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Concerned Citizens of Vicksburg v. Sills,*
    567 F.2d 646 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Conroy v. New York State Department of Correctional Services,*
    333 F.3d 88 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*EEOC v. Associated Dry Goods Corp.,*
    449 U.S. 590 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*EEOC v. Dinuba Medical Clinic,*
    222 F.3d 580 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*EEOC v. Jefferson Dental Clinics, PA,*
    478 F.3d 690 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*EEOC v. Morgan Stanley,*
    132 F. Supp. 2d 146  (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*EEOC v. Recruit U.S.A., Inc.,*
    939 F.2d 746 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*EEOC v. Shell Oil Co.*,
    466 U.S. 54 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*EEOC v. University of Pittsburgh*,
    643 F.2d 983 (3d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*EEOC v. Waffle House, Inc.*,
    534 U.S. 279 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*EEOC v. Westvaco Corp.*,
    372 F. Supp. 985 (D. Md. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Electronic Data Systems Corp. Iran v. Social Security Organization
    of the Government of Iran*, 610 F.2d 94 (2d Cir. 1979) (per curiam). . . . . . 59

*Federal Express Corp. v. Holowicki*,
    — U.S. —, 128 S.Ct. 1147 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*General Telephone Co. of the Northwest, Inc. v. EEOC*,
    446 U.S. 318 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.)*,
    62 F.3d 730 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Harris v. Albany County Office (In re Harris)*,
    464 F.3d 263 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Harris v. City of New York*,
    186 F.3d 243 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re 50-Off Stores, Inc.*,
    220 B.R. 897 (Bankr. W.D. Tex. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Adelphia Business Solutions, Inc.*,
    280 B.R. 63 (Bankr. S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*In re American Historical Association*,
    49 F. Supp. 2d 274 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Bemis Co.*,
    279 F.3d 419 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*In re Charter Co.*,
    876 F.2d 866 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

iv

*In re Chateaugay Corp.*,
    944 F.2d 997 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Drexel Burnham Lambert Group, Inc.*,
    148 B.R. 1002 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Ephedra Products Liability Litigation*,
    329 B.R. 1 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*In re Enron Corp.*,
    No. 01-16034 (AJG), 2007 WL 610404
    (Bankr. S.D.N.Y. Feb. 23, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 51

*In re Enron Corp.*,
    No. 01-16034, 2007 WL 294114
    (Bankr. S.D.N.Y. Jan. 31, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 49

*In re Musicland Holding Corp.*,
    362 B.R. 644 (Bankr. S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*In re Northwest Airlines, Corp.*,
    No. 05-17930 (ALG), 2007 WL 498285
    (Bankr. S.D.N.Y. Feb. 9, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*In re Pro Set, Inc.*,
    193 B.R. 812 (Bankr. N.D. Tex. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Radio-Keith-Orpheum Corp.*,
    106 F.2d 22 (2d Cir. 1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Sacred Heart Hospital of Norristown*,
    177 B.R. 16 (Bankr. E.D. Pa. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*In re Sage-Dey, Inc.*,
    170 B.R. 46 (Bankr. N.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Sundial Asphalt Co.*,
    147 B.R. 72 (E.D.N.Y. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Jones v. Chemetron Corp.*,
    212 F.3d 199 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Korn v. Franchard Corp.*,
    456 F.2d 1206 (2d Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60

*Maharaj v. Bankamerica Corp.,*
128 F.3d 94 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*McSherry v. Trans World Airlines, Inc.,*
81 F.3d 739 (8th Cir. 1996) (per curiam). . . . . . . . . . . . . . . . . . . . . . . . . 22

*Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.),*
419 F.3d 115 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*New England Merchants National Bank v. Iran Power*
*Generation & Transmission Co.,* 646 F.2d 779 (2d Cir. 1981). . . . . . . . . . . 59

*Occidental Life Insurance Co. of California v. EEOC,*
432 U.S. 355 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 35, 53

*O'Loghlin v. County of Orange,*
229 F.3d 871 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 54

*Pioneer Investment Services Co. v. Brunswick Associates*
*Limited Partnership,* 507 U.S. 380 (1993). . . . . . . . . . . . . . . . . . . . . . . *passim*

*Richardson v. Commission on Human Rights & Opportunities,*
— F.3d —, 2008 WL 2630055 (2d Cir. July 7, 2008). . . . . . . . . . . . . . . . . 35

*Schwartz v. Aquatic Dev. Group, Inc. ( In re Aquatic Dev. Group, Inc.),*
352 F.3d 671 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Schweitzer v. Consolidated Rail Corp. (In re Central Railroad Co. of*
*New Jersey),* 758 F.2d 936, (3d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 22

*Scott v. Leavenworth Unified School District,*
78 F. Supp. 2d 1198 (D. Kan. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Sears, Roebuck & Co. v. EEOC,*
581 F.2d 941 (D.C. Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30

*Silivanch v. Celebrity Cruises, Inc.,*
333 F.3d 355 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Singleton v. Wulff,*
428 U.S. 106 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Stewart v. Smith,*
673 F.2d 485 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Nixon,*
    418 U.S. 683 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Owen,*
    500 F.3d 83 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*University of Pennsylvania v. EEOC,*
    493 U.S. 182 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Venetian Casino Resort v. EEOC,*
    453 F. Supp. 2d 157 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Walker v. City of Waterbury,*
    253 Fed. Appx. 58, 62 (2d Cir. 2007) (unpublished). . . . . . . . . . . . . . . . . . 60

## STATUTES, REGULATIONS, AND RULES

Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

    11 U.S.C. § 101(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21

    11 U.S.C. § 107(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    11 U.S.C. § 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    11 U.S.C. § 502(b)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    11 U.S.C. § 523(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

28 U.S.C. § 157. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 158(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

The Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.*

    42 U.S.C. § 12112(d)(4)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    42 U.S.C. § 12117(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

    42 U.S.C. § 2000e-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 37

    42 U.S.C. § 2000e-5(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 25, 26, 27, 30

42 U.S.C. § 2000e-5(f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 53

42 U.S.C. § 2000e-5(f)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

42 U.S.C. § 2000e-8(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

29 C.F.R. § 1601.6(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.7(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29 C.F.R. § 1601.14(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

29 C.F.R. § 1610.17(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

29 C.F.R. § 1601.18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.19(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30, 32

29 C.F.R. § 1601.24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

29 C.F.R. § 1601.27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.28(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. § 1601.34. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Fed. R. Bankr. P. 3003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fed. R. Bankr. P. 9006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 18

Fed. R. Bankr. P. 8002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Bankr. P. 8013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1862

Fed. R. Civ. P. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38-40

Fed. R. Crim. P. 6(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Evid. 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Evid. 408. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 54

## OTHER AUTHORITIES

118 Cong. Rec. 4941 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

23 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5312 (2008). . . . 41, 43

S. Rep. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787. . . . . . . . . . . . 21

WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND
    PRACTICE 2d § 42:14 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## PRELIMINARY STATEMENT

When the United States Equal Employment Opportunity Commission receives a charge of discrimination, it follows a series of steps dictated by statute:  it notifies the alleged discriminator, provides the alleged discriminator an opportunity to respond, conducts an investigation into the allegations of discrimination, and makes a determination about the validity of those allegations.  If the EEOC concludes that a charge of discrimination has merit, the EEOC is required to enter into conciliation efforts with the respondent.  And if no settlement can be reached, the EEOC then decides whether to file a civil enforcement action, or to issue a "right-to-sue" letter to the complainant so that she may sue on her own behalf.  Until either the agency or the charging party sues, the EEOC is compelled to keep the existence of the charge confidential.

In this case, the EEOC received a charge of discrimination from a Delphi Corporation employee in September 2006, after that employee was fired for refusing to give Delphi a blanket release to review his medical records — an allegation which, if true, states a claim under the Americans with Disabilities Act.  After going through the process outlined above in an undisputedly efficient and diligent manner, the EEOC decided to file an enforcement action on behalf of a class of *all* Delphi employees, which the agency did in the Western District of New York. Because Delphi was then in bankruptcy, the EEOC also filed a proof of claim in Delphi's pending bankruptcy case in the Southern District of New York for monetary damages corresponding to those sought in the civil suit.  The bankruptcy court, however, rejected the EEOC's claim as untimely because it was filed after the

July 31, 2006, deadline for filing proofs of claim, and expunged the claim.

That decision was wrong, and should be reversed. *First*, the bankruptcy court incorrectly determined, as a matter of law (and on an issue of first impression), that the EEOC should have filed a proof of claim prior to filing its enforcement action in district court, even though the EEOC was statutorily constrained to keep charges of discrimination confidential until either the EEOC filed a civil enforcement action or the charging party filed suit on his own behalf — *i.e.*, until the EEOC completed its administrative process. *Second*, the bankruptcy court held that the EEOC's class claim was barred because none of the Delphi employees who comprised the class had filed their own claims. Because the individual claims had been forfeited, the bankruptcy court reasoned, the class claims were also unsustainable, analogizing the EEOC's claim to class action proofs of claim brought under Civil Rule 23. That decision, however, ignores a long line of Supreme Court cases that make clear that when the EEOC sues on behalf of a class, it does not do so under Rule 23, standing in the shoes of the employees, but rather sues on its own behalf, in its capacity as a law enforcement agency.

*Third*, and finally, the bankruptcy court abused its discretion in rejecting the EEOC's claim because it failed to consider that the proper determination "is at bottom an equitable one, taking account of all relevant circumstances." The bankruptcy court focused on imagined prejudices to the debtors' estate if the claim were allowed as timely (relying on inadmissible evidence), and wholly ignored both the public interests vindicated by the EEOC and the practical realities of a rule that

2

would require the EEOC to file a proof of claim corresponding to each and every complaint of discrimination it receives, whether substantiated or not. The actual evidentiary record in this case — including admissions from the debtors' Claims Administrator — shows that there was no prejudice to the debtors in allowing the EEOC's claim to be filed, and enormous prejudice to the victims of Delphi's discriminatory policies in rejecting it.

## JURISDICTIONAL STATEMENT

The bankruptcy court had jurisdiction over this dispute because it arose under title 11 of the United States Code, or arose in or was related to a case under title 11. *See* 28 U.S.C. §§ 157, 1334; *see also* Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting *C.J.*). Because the United States timely appealed from a final judgment of the bankruptcy court dismissing the EEOC's claim, this court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## ISSUES PRESENTED FOR REVIEW

1.    Whether the bankruptcy court erred in holding that the EEOC was required to file a proof of claim based upon a charge of employment discrimination during the period of time that the EEOC was statutorily constrained to keep the existence of that charge confidential.

2.    Whether the bankruptcy court abused its discretion in holding that the EEOC did not demonstrate "excusable neglect" for filing its proof of claim after the bar date, where all of the factors identified by the Supreme Court —

prejudice, the reason for and length of delay, and good faith — weighed in favor of the EEOC, as did the public interests.

3.    Whether the bankruptcy court erred in admitting and relying upon material protected by Federal Rule of Evidence 408 in making its excusable neglect findings.

4.    Whether the bankruptcy court erred in holding that the EEOC was precluded from asserting a claim on behalf of a class of employees because the employees had not filed individual claims, applying Civil Rule 23 principles, where the Supreme Court has held that "the EEOC is not merely a proxy for the victims of discrimination and that the EEOC's enforcement suits should not be considered representative actions subject to Rule 23."

5.    Whether the case should be remanded to the bankruptcy court to revisit its decision, in light of new developments that have dramatically altered the landscape of this bankruptcy, including the collapse of Delphi's exit financing and its need to file an amended plan of reorganization.

## STATEMENT OF THE CASE

### A.    The EEOC's Investigation of Delphi's Unlawful Sick Leave Policy

In late August 2006, the EEOC National Call Center was first contacted about a potential claim of discrimination against Delphi Corporation ("Delphi") by Stanley Straughter, a Delphi employee in Rochester, New York.  (R 297).

Over the next several months, the EEOC worked with Straughter to prepare and finalize a formal charge of discrimination.  On August 30, 2006, the EEOC sent

Straughter a questionnaire to complete. (R 297, 307). Straughter quickly filled out the questionnaire and returned it to the EEOC. Among other things, Straughter's responses indicated that he had been fired by Delphi on August 17, 2006, "for not showing [his] medical history," and that he had already complained internally at Delphi. (R 297, 309-15).

Specifically, Straughter informed the EEOC that he had been employed as a laborer by Delphi since May 2006. He called in sick to work on August 14 and 15, 2006, and returned to work on August 16, 2006, with a note from his doctor. Delphi informed Straughter that he needed to execute a medical release so that it could obtain more information about his medical condition from his personal physician. Straughter initially refused to sign, but was told that Delphi would not accept his absence as excused unless he executed the release. Straughter then signed the release, but modified it to permit Delphi only to verify that he was unable to work on August 14th and 15th, but not to discuss his actual medical condition. Delphi did not accept this modified release, and when Straughter explained that he believed Delphi's policy was unlawful, he was immediately fired for being an "unsatisfactory temporary employee." (R 297-98).

Assuming Straughter's allegations are true, Delphi's sick leave policy is a plain violation of the Americans with Disabilities Act. *See* 42 U.S.C. § 12112(d)(4)(A) ("A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless

such examination or inquiry is shown to be job-related and consistent with business necessity."); *Conroy v. New York State Dep't of Correctional Services*, 333 F.3d 88, 95-96 (2d Cir. 2003) (holding that policy of requiring employees to submit diagnoses to justify sick leave violates the ADA, and remanding to develop factual record concerning whether policy was consistent with business necessity).

On the basis of Straughter's allegations, EEOC Investigator Jennifer Carlo drafted a formal Charge of Discrimination for Straughter's signature, which she sent to him in mid-September 2006. (R 298, 317-18). Ms. Carlo and Straughter subsequently discussed the draft Charge of Discrimination, and less than a week after sending Straughter the initial draft charge, Ms. Carlo sent a revised draft charge to Straughter for his signature. (R 298, 320-21). Straughter formally filed his Charge of Discrimination with the EEOC on September 22, 2006; it was indexed as EEOC Charge No. 525-2006-01314. (R 298, 323-24).

In early October, the EEOC forwarded the Charge of Discrimination to Delphi for a response, (R 298), as required by the ADA. *See* 42 U.S.C. § 2000e-5(b).[1] The EEOC also served Delphi with a Request for Information as part of its investigation. Among other things, the Request sought basic statistical information about Delphi, a copy of the relevant union's collective bargaining agreement with Delphi, and the identities of potential witnesses, including any employees who had

---

[1]    42 U.S.C. § 2000e-5 — which governs the procedures for filing, investigating, and suing on claims of discrimination — was enacted as part of Title VII of the Civil Rights Act of 1964, but is explicitly incorporated into the ADA as well. *See* 42 U.S.C. § 12117(a); *see also Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999).

either (a) been required to sign a medical authorization form, or (b) refused to sign one.  Finally, the EEOC indicated to Delphi that it was open to "consider[ing] a resolution by mutually agreed to settlement."  (R 298-99, 326-31).

Delphi subsequently requested an extension of time in which to respond to the Charge of Discrimination, to which the EEOC consented.  (R 299, 333).  On November 6, 2006, Delphi responded to the Charge of Discrimination.  (R 299).  At that time, Delphi's position was to essentially admit the factual allegations of Straughter's complaint, but to contend that he could not demonstrate a prima facie case of retaliation or violation of the ADA.  Relying on EEOC guidance that an employer "may ask an employee to justify his/her use of sick leave by providing a doctor's note or other explanation, as long as it has a policy or practice of requiring all employees . . . to do so," Delphi argued that it was permitted to require its employees to execute a release so that the company could obtain medical records and speak with personal physicians to question the validity of a doctor's note.[2] Delphi did not, however, respond to the EEOC's Request for Information.  (R 299, 335-43).

On January 31, 2007 — more than three months since the information was

_____

[2]     Delphi has since taken an entirely different position, denying that it has a sick leave policy requiring employees to execute blanket medical releases and refusing to acknowledge the contours of the policy that applied to Straughter, or at which facilities that policy was in force.  (R 379 ("the Commission's apparent view of this case as involving a policy or procedure that extends across Delphi is simply incorrect."); *see also* R 548 (denying allegation, R 538, that Delphi had a "policy to check all doctors' notes to verify that the reasons for the absence are acceptable"); R 304 ("Delphi has not even identified the facilities at which the policy was or is in place")).

first due, and more than a month after the last deadline[3] — Delphi responded to the EEOC's Request for Information. Among other things, Delphi indicated that it was "unable to answer" the EEOC's request for documentation regarding employees who had been required to sign a medical authorization pursuant to Delphi's unlawful policy because "it does not keep a log of every employee asked to sign an authorization." Delphi did provide, however, the identity of three other employees who had, like Straughter, refused to sign an authorization. (R 300, 347-62).

After reviewing Delphi's submissions, the EEOC determined that it needed further information to investigate the claim of discrimination. Therefore, in late February 2007, the EEOC sent Delphi a second Request for Information. Among other things, the second Request sought an explanation of why Straughter's modified medical authorization was insufficient in view of Delphi's proffered justification for its policy; a copy of the policy; exemplars of medical authorizations used by Delphi; and certain information pertaining to the other employees who had refused to sign authorizations. Delphi was to respond by March 19, 2007. (R 300-01, 364-65).

On April 4, 2007, Delphi finally responded to the EEOC's second Request for Information, providing some documentation and objecting to a variety of the EEOC's requests as, variously, irrelevant or overly broad. (R 301, 367-69). Throughout this give-and-take process with Delphi, the EEOC simultaneously

---

[3]    On December 11, 2006, the EEOC contacted Delphi to remind the company that it had not fully responded to the Request for Information. The EEOC gave Delphi until December 29, 2006, to provide a complete response. (R 300, 345).

8

pursued other avenues of investigating the Charge of Discrimination, including collecting further information from Straughter.  (R 301).

On May 22, 2007, the EEOC issued its Letter of Determination.  In relevant part, the EEOC concluded:

> The investigation determined that [Delphi] subjected [Straughter] and a class of employees nationwide to an unlawful policy of making disability-related inquiries that are not job-related and consistent with business necessity, in violation of the ADA. [Straughter] offered to sign a revised release that would have allowed [Delphi] to speak with his doctor and verify the dates he was off work and that it was for a legitimate, medical reason.  This should have satisfied [Delphi]'s need to verify the absence. [Straughter]'s refusal to sign the release as it was written and his objection that the medical inquiry was overly broad was protected activity as defined by the statute.   Consequently, [Delphi]'s discharge of [Straughter] for opposing the policy was unlawful retaliation.

The EEOC also informed Delphi that it would like to "eliminate the unlawful practices through informal methods of conciliation" and invited Delphi to discuss settlement.  (R 301, 371-72).

The following day, the EEOC contacted Delphi to begin conciliation efforts (as required by law), and proposed a comprehensive remedy for Delphi's discriminatory practices, which included, among other things:  (a) eliminating Delphi's unlawful sick leave policy, (b) providing anti-discrimination training to Delphi employees, (c) posting EEOC materials in conspicuous places throughout Delphi facilities, (d) developing a meaningful anti-discrimination complaint procedure, (e) reinstating Straughter, (f) paying monetary damages to Straughter to make him whole for Delphi's unlawful discrimination, as well as similar relief for

any other individuals determined to have been harmed by Delphi's discriminatory practices, and (g) paying pain and suffering damages to Straughter.  In addition, the EEOC proposed that Delphi agree to permit it to monitor compliance with the terms of any conciliation agreement for not less than three years.  Delphi was to respond to the EEOC's offer, as well as certain additional requests for information, by June 6, 2007.  (R 302, 374-77).

On June 12, 2007, Delphi responded to the EEOC's offer of conciliation.  Delphi flatly rejected the EEOC's offer, and indicated that it did "not intend to submit a counter-proposal."  (R 302, 379).

A week later, the EEOC confirmed to Delphi that conciliation efforts had failed, and that the case was being forwarded to the legal unit of the EEOC's New York District Office for review to determine whether the EEOC would file an enforcement action in United States District Court.  (R 302-03, 381).  On the same day, the EEOC sent a similar notice to Straughter.  (R 302-03, 383).

The EEOC's Regional Attorney's Manual outlines the internal steps that the EEOC must take before filing a federal court action to remedy alleged violations of the ADA.  *See* www.eeoc.gov/litigation/manual/index.html.  In cases (such as this one) that require approval from the Commissioners at EEOC headquarters in Washington prior to filing suit, the legal unit must prepare a "presentation memorandum" to the General Counsel containing its assessment of the case.  The presentation memorandum is extensive, requiring the legal unit not only to describe the background and legal analysis involved in a case, including the proof that it

10

anticipates introducing, but also to prepare a breakdown of anticipated litigation costs and to include a draft of the complaint to be filed.  The Commissioners must then authorize the litigation before it can be filed.  (R 303).

In this case, the pre-filing process — and indeed the entire investigation — unfolded very quickly.  (R 792 (finding it undisputed that the EEOC's investigation and filing was "a timely and rapid process")).  The EEOC filed a complaint on behalf of a class of Delphi employees in the United States District Court for the Western District of New York just over three months after conciliation efforts had failed.  *See EEOC v. Delphi Corp.*, No. 07-cv-06470-MAT (W.D.N.Y. filed September 28, 2007) (R 385-90).  In the enforcement proceeding, the EEOC's complaint seeks injunctive relief, as well as monetary relief to make the victims of Delphi's policy whole.  The EEOC's complaint also seeks punitive damages.  (R 303, 385-90).[4]

## B.    Debtors' Bankruptcy and the Bar Date Order

Meanwhile, in October 2005, Delphi and approximately forty of its domestic affiliates (collectively, the "Debtors") — manufacturers of automotive parts and electronics — had filed voluntary Chapter 11 petitions.  (R 3).  The bankruptcy court subsequently entered an "Order Under 11 U.S.C. §§ 107(b), 501, 502 and 1111(a) and Fed. R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), and 5005(a) Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof," referred to as the "Bar Date Order."  (R 694-702).  Under the terms of the

---

[4]    Delphi answered on November 30, 2007; the answer did not assert any bankruptcy-related defenses.  (R 304, 396-99).

Bar Date Order, "all persons and entities, including . . . governmental units . . . holding or wishing to assert claims (as such term is defined in 11 U.S.C. § 101(5)) against the Debtors . . . shall file a . . . proof of claim . . . on or before . . . July 31, 2006." (R 695). If a potential creditor failed to timely file a proof of claim in the form prescribed by the Bar Date Order, that creditor was to be "forever barred, estopped, and enjoined" from asserting its claim. (R 700).

## C.    The EEOC Claim

The EEOC sought to protect its interest by filing claims in Delphi's bankruptcy. On October 16, 2007, the EEOC filed two claims with the Debtors' claims agent. Claim number 16727 (the "EEOC Claim") — the only claim at issue in this appeal — asserts an unliquidated priority claim, corresponding to damages caused by Delphi's pre-petition conduct. (R 304, 392). Claim number 16728 asserts an unliquidated priority administrative expense claim, corresponding to damages caused by Delphi's post-petition conduct. (R 304, 394).

Debtors subsequently filed two objections to the claims filed by the EEOC, which were adjourned by the bankruptcy court when the Government filed its response; neither hearing has been rescheduled. (R 2-91, 102-111, 754).[5]

---

[5]    Although Debtors objected to it as untimely, claim number 16728 is actually an administrative claim for Debtors' post-petition liabilities, and so is not subject to the bar date at all. (R 696 (Bar Date Order, providing "Proofs of claim are not required, at this time, to be filed by any Person or Entity . . . which asserts a Claim allowable . . . as an administrative expense of the Debtors' chapter 11 cases.")). *See generally In re Pro Set, Inc.*, 193 B.R. 812, 815-16 (Bankr. N.D. Tex. 1996) ("Because administrative expense claimants . . . do not file proofs of claim, the deadlines set for filing a proof of claim do not apply to them.") (citing WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND PRACTICE 2d § 42:14 (1994)).

**D.      The Late Claim Motion and the Bankruptcy Court's Decision**

On January 28, 2008, Debtors filed a "Notice of Deadline to File Motion for

Leave to File Late Claim With Respect to Late Claim Filed by United States Equal

Employment Opportunity Commission (Proof of Claim 16727)."  (R 269-71).  In

response, the Government filed a motion on Friday, February 22, 2008, seeking an

order permitting the EEOC Claim to be accepted for filing.  (R 277-95).  Delphi filed

its opposition papers the following Thursday, for the first time responding to the

Government's arguments — first advanced in the EEOC's November 2007 response

to Debtors' Twenty-Second Omnibus Objections — and laying out their legal

theories.  (R 405-26).

The bankruptcy court convened a hearing on the motion the next day,

February 29, 2008, (R 440-44), at which the court received written declarations and

deposition testimony into evidence in lieu of live witnesses.  (R 445, 731).[6]  On the

basis of these documents, the bankruptcy court concluded that the material facts

underlying the Government's motion, as recited above, were uncontested.  (R 788).

After hearing the parties' arguments, the court orally denied the Government's

motion and ordered the EEOC Claim to be expunged.

In its decision, the bankruptcy court applied the "excusable neglect" standard

---

[6]      Despite the expedited motion schedule, the parties also engaged in
discovery, exchanging documents and conducting depositions.  Nonetheless, counsel
for the Government began the hearing by requesting a brief (less than one week)
adjournment of the hearing date to permit the Government time to file reply
papers.  (R 725).  The bankruptcy court denied that request, and likewise denied the
Government's alternative request to put in post-hearing reply papers.  (R 729).

that applies to late-filed claims, *see* Fed. R. Bankr. P. 9006(b), and the related balancing test established by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380 (1993).  (R 782-83, 795). Recognizing that Straughter's charge of discrimination was not filed with the EEOC until after the bar date, (R 789), the court considered whether the EEOC demonstrated excusable neglect in waiting until its administrative process had played out before filing a proof of claim, or whether it was required to have filed its claim at some earlier time.  (R 794-95).

At the outset, the bankruptcy court questioned — but did not decide one way or the other — whether the EEOC's failure to file a proof of claim earlier than it did was the product of neglect at all.  (R 795-97).  Despite its "serious doubts" on that point, the court then rested its decision largely on the conclusion that "the EEOC's neglect is not excusable."  (R 803).  The bankruptcy court concluded that the delay in filing the claim was caused by the EEOC itself, and was without good reason.  (R 797-800).  The court rejected the Government's argument, premised on one of the EEOC's governing statutes and considerations of public policy, that the EEOC was required to complete its administrative process before unveiling Straughter's charge of discrimination.  (R 802-03).

The bankruptcy court also identified three prejudices that would befall the Debtors if the EEOC's claim were permitted to be filed.  *First*, under the Equity Purchase and Commitment Agreement (known as the "EPCA") that governed the exit financing of Debtors' plan of reorganization, all unliquidated claims had to be

14

liquidated "in time to preclude an assertion of default under the EPCA." (R 805). *Second*, the EPCA also imposed a $1.45 billion cap on all unsecured claims, and allowing the EEOC's claim could endanger that cap and therefore cause a default. (R 805). *Third*, the court noted that "there is the prejudice generally" associated with late claims in Chapter 11 cases, (R 805), including the risk "that other late filed claims could come out of the woodwork," (R 804).

Last, the court held that, as an "independent" reason for denying the EEOC's motion, no individual employee had filed a proof of claim concerning Delphi's allegedly discriminatory policy. Analogizing the EEOC's "class action" claim to Civil Rule 23 class actions, the bankruptcy court held that the EEOC could not assert "a class claim on behalf of people who did not file pre-petition claims for the very same claim before the bar date." (R 805-06).

A final order embodying the bankruptcy court's decision was entered on March 6, 2008, (R 779), and on Monday, March 17, 2008, the Government timely appealed, (R 808). *See* Fed. R. Bankr. P. 8002(a) (ten-day period to appeal); Fed. R. Bankr. P. 9006(a) (computation of time).

## SUMMARY OF ARGUMENT

The judgment of the bankruptcy court should be reversed, and the EEOC should be permitted to file its claim. The bankruptcy court's decision rested on a series of legal and evidentiary errors.

First, the bankruptcy court correctly perceived a conflict between the bankruptcy laws — which on their own terms seem to require the EEOC to file a

proof of claim as soon as it receives a charge of discrimination — and the anti-discrimination laws — which forbid the EEOC from making public a charge of discrimination before it files an enforcement action or the employee files a private civil suit.  But the bankruptcy court improperly resolved that conflict in favor of the bankruptcy laws, concluding that Congress intended the Code to have broad effect that trumps any confidentiality requirements contained in Title VII.  In fact, the Bankruptcy Code can be read in harmony with the blanket confidentiality provisions of Title VII by recognizing that those confidentiality rules constitute good cause for the late filing of the EEOC Claim.  *See infra* Point I.B.

Even as a simple matter of equities, however, the bankruptcy court abused its discretion in expunging the EEOC Claim.  The Supreme Court has explained that at least four factors govern the late-claim determination:  prejudice, the reason for the delay, the length of the delay, and good faith.  Each and every one of those factors weighs in favor of the EEOC.  As the bankruptcy court's conclusion to the contrary had no basis in the record, it was an abuse of discretion.  And in addition to the four factors explicitly identified as relevant by the Supreme Court, a fifth factor — the public interest — also weighs heavily in favor of allowing the EEOC's claim.  *See infra* Point I.C.

In barring the EEOC Claim, the bankruptcy court also mistakenly analogized the EEOC's claim to a private class action.  That ruling is contrary to the Supreme Court's decision in *General Telephone Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318 (1980), which held that an EEOC civil charge is nothing like a private class

16

action, and that, as a result, private class action principles have "no application" to an EEOC enforcement action. *See infra* Point I.D.

Finally, even if this Court believes that the bankruptcy court was correct to deny the EEOC Claim, it should vacate and remand this matter because of subsequent events that have totally changed the state of affairs in Delphi's bankruptcy, and which moot the prejudices perceived by the bankruptcy court to result from the EEOC Claim. Specifically, on April 4, 2008, Delphi lost in excess of $2.5 billion in exit financing, eviscerating its plan of reorganization and associated agreements. Because the bankruptcy court's decision rested largely on terms of the exit-financing agreement, this Court should remand so that the bankruptcy court can revisit its ruling in light of the new circumstances. *See infra* Point II.

## STANDARD OF REVIEW

"Bankruptcy court decisions to deny a request to file late are reviewed for abuse of discretion." *Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 124 (2d Cir. 2005) ("*Enron*"). A bankruptcy court abuses its discretion when it arrives at "(i) a decision resting on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (ii) a decision that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*, 352 F.3d 671, 678 (2d Cir. 2003) (internal quotation and alteration marks omitted); *see also United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007);

17

*Harris v. Albany County Office (In re Harris)*, 464 F.3d 263, 268 (2d Cir. 2006).

Thus, this court should accept the bankruptcy court's "factual findings unless

clearly erroneous but review[] its conclusions of law *de novo*." *Enron*, 419 F.3d at

124; *see also* Fed. R. Bankr. P. 8013.

**ARGUMENT**

**POINT I**

**THE EEOC'S CLAIM SHOULD HAVE BEEN ACCEPTED FOR FILING**

**A.    THE CLAIMS PROCESS, THE BAR DATE ORDER, AND THE LAW
OF EXCUSABLE NEGLECT**

Under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure,

"[a]ny creditor . . . whose claim . . . is not scheduled or scheduled as disputed,

contingent, or unliquidated shall file a proof of claim" to protect its right to

payment.  Fed. R. Bankr. P. 3003(c)(2); *see also* 11 U.S.C. § 501.  "The court shall fix

and *for cause shown* may extend the time within which proofs of claim or interest

may be filed."  Fed. R. Bankr. P. 3003(c)(3) (emphasis supplied); *see also* 11 U.S.C. §

502(b)(9).

Although "cause" is not defined in Rule 3003(c), that sub-section is also read

in conjunction with Bankruptcy Rule 9006(b)(1), which provides:

> [W]hen an act is required or allowed to be done at or within a
> specified period by these rules or by a notice given thereunder or
> by order of court, the court for cause shown may at any time in its
> discretion . . . on motion made after the expiration of the specified
> period permit the act to be done where the failure to act was the
> result of excusable neglect.

Fed. R. Bankr. P. 9006(b)(1).  "The burden of proving excusable neglect lies with the

18

late-claimant." *Enron*, 419 F.3d at 121 (quoting *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000)).

The Supreme Court defined the term "excusable neglect" in *Pioneer Investment Services v. Brunswick Associates Limited Partnership*, 507 U.S. 380 (1993). In *Pioneer*, a Chapter 11 case, a creditor sought an extension of the claims bar date under Rule 9006(b)(1) after the bar date had lapsed. The Court held that Congress intended Rule 9006(b)(1) to be a "flexible" rule, and defined neglect broadly, as an "elastic concept" that "entails a correspondingly equitable inquiry." *Id.* at 392, 395. *See also id.* at 388 (permitting courts "to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control").

The Court therefore identified a non-exhaustive list of factors that should be considered in each case to determine whether the neglect is "excusable":

> [1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.

*Id.* at 395. The Second Circuit has observed, however, that three of the four *Pioneer* factors — the danger of prejudice, the length of the delay, and the movant's good faith — will in most cases "weigh in favor of the party *seeking* the extension." *Enron*, 419 F.3d at 122 (quoting *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003) (emphasis supplied)). A court's excusable neglect determination, therefore, should be "focused on the third factor: the reason for the delay, including whether it was within the reasonable control of the movant." *Id.* (quoting

19

*Silivanch*, 333 F.3d at 366, and *Pioneer*, 507 U.S. at 395).

Nonetheless — and despite the "hard line" taken in this circuit on claims of excusable neglect, *Silivanch*, 333 F.3d at 370 — the excusable neglect determination "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer*, 507 U.S. at 395 (footnote omitted). "No single circumstance controls," therefore, "nor is a court to simply proceed down a checklist ticking off traits. Instead, courts are to look for a synergy of several factors that conspire to push the analysis one way or the other." *In re 50-Off Stores, Inc.*, 220 B.R. 897, 901 (Bankr. W.D. Tex. 1998).

## B.   THE GOVERNMENT WAS PROHIBITED FROM FILING ITS CLAIM UNTIL THE COMMISSIONERS OF THE EEOC AUTHORIZED SUIT

As the bankruptcy court found, the EEOC waited until September 2007 to file its proof of claim, even though it previously was aware of Stanley Straughter's allegations of discrimination, out of a desire to comply with the statutory process outlined in Title VII. (R 802 (finding that "the EEOC's delay in filing the claim resulted from its desire to comply with 42 U.S.C. § 2000e-5")). The confidentiality rules contained in Title VII govern charges as they move through the EEOC's administrative process and foreclosed the possibility of filing a proof of claim prior to the initiation of the *EEOC v. Delphi* enforcement action in the Western District.

No court has ever decided whether the EEOC must file a proof of claim if the bar date comes before the agency's administrative process runs its course. Nor has any court decided when or if *any* other body of federal law must give way when it conflicts with a bar date provided for under the Bankruptcy Code. Notwithstanding

20

that fact, the bankruptcy court concluded, without citation or further elaboration, that

> the [confidentiality] requirements set forth in 42 U.S.C. § 2000e-5 would not . . . reasonably be read to preclude [the EEOC] from filing a proof of claim in this case before the commencement of the District Court litigation. . . .  Given the definition of 'claim' in the Bankruptcy Code and the important purposes of that broad definition, I believe that what Congress had in mind there was far more extensive than either the definition of 'charge' or a 'civil action' in 42 U.S.C. § 2000e-5. . . .

(R 803).

As the bankruptcy court correctly recognized, the anti-discrimination laws and the Bankruptcy Code are (at least superficially) in conflict.  The court was wrong, however, to resolve that conflict in favor of the bankruptcy laws.

### 1.    "Claims" Under the Bankruptcy Code

Under the Code, a "claim" includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) & (A).  As the bankruptcy court noted, Congress had in mind an extremely broad concept in adopting this definition of "claim."  *See* S. Rep. No. 95-989, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5808 ("By this broadest possible definition and by the use of the term throughout the title 11 . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.  It permits the broadest possible relief in the bankruptcy court.").  Notably, "a person may hold a 'contingent' claim and thereby be a 'creditor' within the meaning of the Bankruptcy

21

Act, even though he presently has no cause of action against the debtor."

*Schweitzer v. Consolidated Rail Corp. (In re Central Railroad Co. of New Jersey)*,

758 F.2d 936, 942 (3d Cir. 1985) (citing *In re Radio-Keith-Orpheum Corp.*, 106 F.2d

22, 26-27 (2d Cir. 1939)).

Applying this definition to government agencies, the Second Circuit has held,

for example, that the Environmental Protection Agency must file a bankruptcy

claim for response costs to remedy environmental hazards, even if it did not

actually incur those costs until after the bankruptcy filing.  *See In re Chateaugay*

*Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991).  That the Government did not know the

location of the contamination sites, whether their clean-up was covered by the

environmental laws, or when or how much that clean-up would cost, "are all steps

that may fairly be viewed, in the regulatory context, as rendering EPA's claim

'contingent,' rather than as placing it outside the Code's definition of 'claim.'"  *Id.*

In the context of employment discrimination, therefore, an employee's "claim"

against a debtor arises at the time of the adverse employment action.  *See McSherry*

*v. Trans World Airlines, Inc.*, 81 F.3d 739, 740-41 (8th Cir. 1996) (per curiam)

(rejecting creditor's argument that ADA claim arose for bankruptcy purposes when

right-to-sue letter was issued, because his "claim accrued at the time of

termination"); *accord O'Loghlin v. County of Orange*, 229 F.3d 871, 874 (9th Cir.

2000) (claim of employment discrimination "arises, for purposes of discharge in

bankruptcy, at the time of the events giving rise to the claim, not at the time

plaintiff is first able to file suit on the claim").[7]

Thus, absent statutory authority to the contrary, the EEOC's claim would ordinarily be thought to arise — for bankruptcy purposes — when a charge of discrimination is filed with the agency. *Cf. Occidental Life Ins. Co. of California v. EEOC*, 432 U.S. 355, 360 (1977) (recognizing that EEOC's *cause of action* accrues under Title VII thirty days after charge is filed).[8] Federal anti-discrimination laws,

---

[7]    Title VII's confidentiality rules, discussed immediately below, do not in any way affect an employee's ability — as opposed to the ability of the agency itself — to file a timely individual proof of claim, because there is no prohibition on the charging party revealing the existence of a charge. *See Sears, Roebuck & Co. v. EEOC*, 581 F.2d 941, 946-47 (D.C. Cir. 1976) ("there is nothing to prevent charging parties from redistributing what they receive from the EEOC to whomever they please"). The confidentiality provisions are in that sense analogous to grand jury secrecy rules, where the Government is enjoined from revealing a witness's testimony to the public, but the witness himself can speak freely. *See* Fed. R. Crim. P. 6(e); *see also In re American Historical Ass'n*, 49 F. Supp. 2d 274, 283 (S.D.N.Y. 1999) ("pursuant to Rule 6(e)(2), any grand jury witness may disclose publicly anything that occurred therein, including the questions asked of the witness and the answers given" (citing *Butterworth v. Smith*, 494 U.S. 624, 634-35 (1990))).

[8]    The bankruptcy court seemed to entertain the possibility that the EEOC's claim might not have arisen for bankruptcy purposes until it had some reason to believe that Straughter's claim had merit, such as when Delphi responded to the charge and admitted its policy (an admission later recanted), or when the EEOC issued its Letter of Determination. (R 797-98). Under the very cases cited by the bankruptcy court, however, it is clear that under principles of bankruptcy law alone, a claim arises regardless of whether a claimant is satisfied that the claim will ultimately have merit. (R 798-99). For example, the court cited *In re Enron Corp.*, No. 01-16034, 2007 WL 294114 (Bankr. S.D.N.Y. Jan. 31, 2007), "in which the movant sought leave to file a late proof of claim approximately twenty months after the bar date, stating that it was not sure before then that it had a pre-petition guarantee claim against the debtor because it did not have an executed copy of the guarantee notwithstanding a diligent search. Bankruptcy Judge Gonzales disagreed . . . [finding] that it . . . could have filed a [protective] proof of claim." (R 799). Under pure bankruptcy law, therefore, the EEOC's "claim" arose when Straughter filed his charge of discrimination, if not earlier. Indeed, that is precisely
(continued...)

23

however, provide that the EEOC cannot publically disclose a charge when it is filed

with the agency, or at any point before a district court lawsuit is filed.

### 2. The EEOC is Obligated to Keep Charges of Discrimination Strictly Confidential Until It Completes Its Administrative Process

Title VII and its regulations set forth a comprehensive administrative process

for the EEOC to follow in its investigation of complaints of discrimination. *See*

*EEOC v. Shell Oil Co.*, 466 U.S. 54, 62 (1984) ("Title VII sets forth an integrated,

multistep enforcement procedure [designed] . . . to detect and remedy instances of

discrimination."). The statute and regulations also ensure strict confidentiality

concerning the administrative charge of discrimination and all information

gathered by the EEOC during the investigation of that charge.

### a. The EEOC's Administrative Process for Investigating Complaints of Discrimination

*First*, when the EEOC is contacted by someone complaining of employment

discrimination, it is required to render assistance in the filing of a formal charge of

discrimination, which is filed by or on behalf of an employee who has been

aggrieved by some allegedly unlawful employment practice, and which must be

made under oath or affirmation. *See* 42 U.S.C. § 2000e-5(b); 29 C.F.R. §§ 1601.6(a),

1601.9. *Second*, the EEOC serves the employer with a copy of the charge, and gives

---

[8](...continued)
what Delphi — relying on the same cases as the bankruptcy court — had argued
below. (R 424-25 (arguing that EEOC should have filed claim "when it first
acquired actual notice of an alleged violation from Mr. Straughter's formal executed
complaint against Delphi")).

the employer an opportunity to respond.  *See* 42 U.S.C. § 2000e-5(b); 29 C.F.R.

§ 1601.14(a).  *Third*, the EEOC "shall make an investigation" into the allegations of

discrimination, and is provided with numerous tools (including subpoena power) to

do so.  42 U.S.C. § 2000e-5(b)*; see also* 29 C.F.R. §§ 1601.15-17.

Fourth, the EEOC must make a determination about the validity of the

charge.  *See* 42 U.S.C. § 2000e-5(b).  If the EEOC concludes after investigating "that

there is not reasonable cause to believe that the charge is true," it must dismiss the

charge and give notice of the dismissal to both employee and employer.  *See id.*; *see*

*also* 29 C.F.R. §§ 1601.18, 1601.19(a), 1601.28.  If, on the other hand, the EEOC

concludes that a charge of discrimination is founded, *see* 29 C.F.R. § 1601.21, then it

moves to the *fifth* step of the process, where it is required to engage in "informal

methods of conference, conciliation, and persuasion" to try to eliminate the unlawful

employment practice.  42 U.S.C. § 2000e-5(b); *see also* 29 C.F.R. § 1601.24.  *Sixth*, if

those conciliation efforts fail, the EEOC is required to formally notify the employer

of that fact.  *See* 29 C.F.R. § 1601.25.  Upon failure of conciliation, the EEOC "may

bring a civil action against any respondent . . . named in the charge," except for

municipal government entities, in which case the Department of Justice has

jurisdiction.  *See* 42 U.S.C. § 2000e-5(f)(1); 29 C.F.R. §§ 1601.27, 1601.29.

### b.    The Confidentiality Requirements

During the entire administrative process — up until either the EEOC or the

individual charging party files a lawsuit in United States District Court — both the

employee and the employer are guaranteed absolute confidentiality, on pain of

imprisonment.  The assurance of confidentiality is such an integral part of the

process that it is repeated no less than seven times throughout Title VII and its

regulations.  The statutory section governing the EEOC's investigation, for

example, provides:

> It shall be unlawful for any officer or employee of the Commission to make public *in any manner whatever any information* obtained by the Commission pursuant to its authority under this section *prior to the institution of any proceeding under this subchapter* involving such information.  Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year.

42 U.S.C. § 2000e-8(e) (emphasis supplied).  The section governing the EEOC's

enforcement powers likewise provides:

> Charges [of discrimination] shall not be made public by the Commission. . . .  Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

42 U.S.C. § 2000e-5(b).

The EEOC's regulations amplify what it means not to "make public" a charge

of discrimination:

> Neither a charge, nor information obtained during the investigation of a charge of employment discrimination under the ADA or title VII, nor information obtained from records required to be kept or reports required to be filed pursuant to the ADA or title VII, shall be made matters of public information by the Commission prior to the institution of any proceeding under the ADA or title VII involving such charge or information. This provision does not apply to such earlier disclosures to charging parties, or their attorneys, respondents or their attorneys, or witnesses where disclosure is deemed necessary for securing appropriate relief. This provision also does not apply to such

26

> earlier disclosures to representatives of interested Federal, State, and local authorities as may be appropriate or necessary to the carrying out of the Commission's function under title VII or the ADA, nor to the publication of data derived from such information in a form which does not reveal the identity of charging parties, respondents, or persons supplying the information.

29 C.F.R. § 1601.22.  *See also* 29 C.F.R. § 1610.17(b) (providing that EEOC shall not disclose charges of discrimination in response to requests under the Freedom of Information Act).[9]

The Supreme Court has squarely addressed Title VII's confidentiality provisions, finding that the regulations mean what they say:  before litigation has been filed, the EEOC may only reveal the existence of a charge to (a) the respondent or her lawyers; (b) the charging party or her lawyers; or (c) witnesses, and it may only reveal the charge to that limited group of people if and only if "disclosure is deemed necessary for securing appropriate relief."  29 C.F.R. § 1601.22 (also permitting disclosure to federal, state, and local law enforcement authorities when necessary).

In *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590 (1981), the Supreme Court considered whether the EEOC was permitted to disclose information

---

[9]    Other confidentiality provisions are located, for example, at 42 U.S.C. § 2000e-5(b) ("Nothing said or done during and as a part of such informal [conciliation] endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned."); 29 C.F.R. § 1601.26 (further providing that "nothing that is said or done" during the conciliation process may be revealed absent consent); and 29 C.F.R. § 1601.7(a) (requiring, on request, the EEOC to keep confidential the name of an aggrieved employee if a charge is filed on her behalf by someone else).

contained in its files to the charging party himself.  After reviewing the applicable statutes and regulations (which were materially the same then as now), the Court observed that "Congress imposed on the Commission a duty to maintain this information [*i.e.*, the charge and material obtained during its investigation] in confidence." *Id.* at 596.  Although the Court did not define precisely who the EEOC could disclose information to and who it could not, the upshot of the Court's analysis is that the term "public" in the confidentiality provisions means anyone other than "the parties to the agency proceeding." *Id.* at 598. "This reading of the statute," the Court explained, "is consistent with the coordinated scheme of administrative and judicial enforcement which Congress created to enforce Title VII." *Id.* at 600. Disclosures are authorized, in other words, only when they further the remedial purposes of Title VII.  *See id.* at 602.

Despite permitting disclosure to the charging party of information in his own file, however, the *Associated Dry Goods* Court insisted upon a literal — and restrictive — reading of the confidentiality regulations.  The Court therefore concluded that the EEOC could *not* disclose material in one charging party's file to another charging party who had filed a virtually identical complaint against the same employer, and which the EEOC had deemed so similar that it had administratively consolidated the charges.  *See id.* at 603-04 ("there is no reason why the charging party should know the content of any other employee's charge, and he must be considered a member of the public with respect to charges filed by

other people").[10]

Decisions from other courts have likewise read Title VII's confidentiality provisions to permit disclosure only to the parties to the charge. In *Scott v. Leavenworth Unified School District*, 78 F. Supp. 2d 1198 (D. Kan. 1999), the defendant subpoenaed the EEOC for documents concerning charges filed by the plaintiff against her former employer, *see id.* at 1199, presumably in an attempt to discredit the plaintiff. The district court quashed the subpoena, holding that Title VII permitted disclosure *only* in the circumstances identified by the regulations and in *Associated Dry Goods*. *See id.* at 1200. The court did so even though the plaintiff herself had agreed to waive any confidentiality, because disclosure "would be improper and in violation of both Title VII and the EEOC's regulations," and would undermine "one of the purposes behind the non-disclosure provisions." *Id.*

More recently, Judge Lynch of this Court agreed that the EEOC has a "statutory obligation not to disseminate materials except to one narrow category of person: the parties to the proceeding and their attorneys." *EEOC v. Morgan Stanley*, 132 F. Supp. 2d 146, 157 (S.D.N.Y. 2000). Likewise, the D.C. Circuit has squarely held that, in enacting the confidentiality requirements of 42 U.S.C. § 2000e-8(e), "Congress meant to prohibit the EEOC from giving information from its investigative files to any individual outside the government." *Sears, Roebuck &*

---

[10]    The Supreme Court has mentioned the EEOC's confidentiality provision on one other occasion. *See University of Pennsylvania v. EEOC*, 493 U.S. 182, 192 & n.5 (1990) (noting that "Congress apparently considered the issue of confidentiality, and it provided a modicum of protection.").

*Co. v. EEOC*, 581 F.2d 941, 946 (D.C. Cir. 1976) (Lumbard, *J.*).  And the Third

Circuit has also held, in the context of a motion to quash an EEOC subpoena, that

the confidentiality provisions contain a "general prohibition" on disclosure, with the

only exception being the regulatory "carve out . . . [for] the charging parties, the

respondents, their attorneys, and witnesses when disclosure[ is] necessary for

securing appropriate relief." *EEOC v. University of Pittsburgh*, 643 F.2d 983, 986-

87 (3d Cir. 1981) (concluding that "*Associated Dry Goods* mandates disclosure *only*

to . . . the charging party, and her attorney" (emphasis supplied)).  *See also Venetian*

*Casino Resort v. EEOC*, 453 F. Supp. 2d 157, 162-63 (D.D.C. 2006) (upholding

EEOC's practice of releasing investigative information to charging parties without

notice to respondent, and deferring to EEOC's confidentiality regulations), *rev'd on*

*other grounds*, — F.3d —, 2008 WL 2549912 (D.C. Cir. June 27, 2008).

*    *    *

In short, Title VII and its regulations prohibit the EEOC from revealing a

charge of discrimination, or information gathered when investigating that charge,

to anyone other than the parties and their lawyers, or to "witnesses where

disclosure is deemed necessary for securing appropriate relief."  29 C.F.R. § 1601.22;

*see also* 42 U.S.C. § 2000e-5(b).  Disclosure to any other entity, even if necessary to

secure relief, is prohibited.

It does not appear that any court has ever held that the EEOC is permitted

to disclose a charge to any other person prior to litigation, including to any court.[11]
And the issue presented in this case — whether the EEOC is required to file a proof
of claim prior to the bar date, where the agency has not completed its
administrative review of the case and so the EEOC's confidentiality rules still apply
— is one of first impression nationally.

---

[11]    The closest case is *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746 (9th Cir.
1991), in which the Ninth Circuit considered an appeal from the grant of a
preliminary injunction to the EEOC, enjoining the defendant from destroying
records responsive to an agency subpoena investigating a charge of discrimination.
Fearing that the records would be destroyed imminently, the EEOC had filed its
complaint (with the charge appended) under seal.  After a TRO was granted, the
EEOC asked the seal to be lifted, which it was, making the charge a matter of
public record; the EEOC also issue a press release.  The defendant then sought
sanctions against the EEOC, arguing that it violated its own regulations when it
publicized the charge prior to the initiation of an enforcement action.  *See id.* at
748-49.  Neither the Ninth Circuit nor the district court below reached the
sanctions argument, however.  *See id.* at 757-58.  In any case, different rules govern
the EEOC's ability to file for preliminary injunctive relief, *see generally* 42 U.S.C.
§ 2000e-5(f)(2), as well as administrative subpoena enforcement, *see* 29 C.F.R.
§ 1601.16, whereas no regulations speak directly to the EEOC's ability to file a
protective proof of claim.

        Consistent with the fact that this is an issue of first impression, the
EEOC has no settled agency position on whether it is specifically permitted or
required to file proofs of claim before the bar date, when it is still subject to its
statutory confidentiality requirements.  Delphi is likely to point out — and the
bankruptcy court seemed to find relevant, (R 802) — that the EEOC may have filed
early proofs of claim in other cases.  In fact, the record on appeal is silent on this
point. (R 746-47, 754-55, 802).  But in any event, the fact that other district offices
may have filed early proofs of claim does not undermine the position taken in this
appeal, which is a purely legal one.  The absence of a settled agency position in no
way undermines the legal arguments presented in this brief, which should be
reviewed *de novo*.

31

3.    **The EEOC Is Not Required — Because It Is Not Authorized — To File a Proof of Claim Until Either the EEOC or the Charging Party Files a Civil Action**

Taken together, Title VII and the Bankruptcy Code seem to conflict.  Under the Code, the EEOC had a "claim" — a contingent right to payment — the moment that Stanley Straughter filed his charge of discrimination with the agency.  But under Title VII, the EEOC was not authorized to disclose the existence of that charge "prior to the institution of any proceeding under the ADA," 29 C.F.R. § 1601.22, *i.e.*, a civil enforcement action by the EEOC or a private suit by Straughter himself.  The bankruptcy court resolved this conflict in favor of the Code, noting only that Congress intended the concept of "claim" to sweep broadly. (R 803).  But the court ignored the fact that the anti-discrimination laws are equally broad, *see Castellano v. City of New York*, 142 F.3d 58, 69 (2d Cir. 1998) (noting "ADA's broad remedial purpose"); *Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 861 (1st Cir. 1998) (observing that ADA is a remedial statute and so should be construed broadly); *see also* 29 C.F.R. § 1601.34 ("These rules and regulations shall be liberally construed to effectuate the purpose and provisions of title VII and the ADA."), and eschewed ordinary principles for choosing between two bodies of conflicting law.

Under those principles, a court's first task is to assure itself that the two statutes actually conflict, and cannot be reconciled with one another.  *See Stewart v. Smith*, 673 F.2d 485, 492 (D.C. Cir. 1982).

> When one statute speaks in general terms while the other is specific, conflicting provisions may be reconciled by carving out an

> exception from the more general enactment for the more specific
> statute. But even when the literal terms of statutory provisions
> would allow the specific language to be controlled by the more
> general, we cannot ignore evidence that Congress intended to
> address a specific situation through special legislation.

*Id.* (citations omitted). Thus, the task for a court trying to reconcile two seemingly-conflicting statutes is to give full effect to Congressional intent, and to look for exceptions where they can reasonably be found.

In this case, though seemingly at odds, the Code and Title VII can indeed be reconciled precisely because, though the confidentiality provisions of Title VII are largely inviolate, the claims-filing procedures of the Bankruptcy Code have exceptions. As discussed at length above, the only exceptions to the EEOC's confidentiality provisions permit it to disclose information to the parties and their lawyers. Thus, under the terms of Title VII, the EEOC could not have filed a proof of claim with Delphi's claims agent, to be docketed with the bankruptcy court, until it filed its enforcement action in September 2007.

The Bankruptcy Code, on the other hand, requires that proofs of claim be filed before the bar date, which would seem to require the EEOC to (in these circumstances) violate its confidentiality provisions or forfeit any claim. But Bankruptcy Rule 3003(c) permits the court to extend the bar date "for cause shown," including upon a showing of excusable neglect under Bankruptcy Rule 9006(b)(1). The two statutes can therefore be harmonized by recognizing — as the Government urged the bankruptcy court to do — that respecting the confidentiality provisions of Title VII and permitting the EEOC to complete its statutorily-mandated

administrative process constitute good cause for the tolling of the bar date.[12]

If, on the other hand, the court concludes (as the bankruptcy court seemingly did) that the conflict between Title VII and the Bankruptcy Code is intractable, then it should be resolved in favor of the Government. Any other result — which would require the EEOC to file a proof of claim every time it receives a charge of discrimination after the bar date — results in absurdities that cannot have been intended by Congress and that fatally frustrate the purposes of Title VII without meaningfully advancing the aims of the Bankruptcy Code.

*First*, such a rule will frustrate pre-litigation settlement of charges by unduly embarrassing both the charging party and the respondent, moving resolution of the charges into a litigation posture prematurely, even where the charge turns out to be (upon investigation) utterly meritless. *See Associated Dry Goods*, 449 U.S. at 602 ("Pointless litigation burdens both the parties and the federal courts"). *Second*, it will require the EEOC to put its imprimatur on uninvestigated and potentially unsubstantiated charges of discrimination by filing proofs of claim in its own name, further embarrassing respondents and diluting the agency's effectiveness in enforcing the anti-discrimination laws. *Third*, it will undermine the EEOC's investigation by making witnesses less likely to be candid about the substance of

---

[12]    The two statutes can be harmonized in at least one other way: if the EEOC's claim is non-dischargeable. *See* 11 U.S.C. § 523(a)(3) (claim is not dischargeable if debt is not scheduled "in time to permit . . . timely filing of a proof of claim"). That result, however, only functionally preserves the EEOC's claims in chapter 11 cases, where the Government can look to the reorganized debtor for relief; in liquidation cases where the debtor's assets are distributed entirely through the bankruptcy, the ability to assert the claim later may not be meaningful.

the charges.  *See generally United States v. Nixon*, 418 U.S. 683, 705 (1974)

("Human experience teaches that those who expect public dissemination of their

remarks may well temper candor with a concern for appearances and for their own

interests to the detriment of the decisionmaking process.").  *Fourth*, it will require

the EEOC to expend incredible resources filing proofs of claim corresponding to

virtually every charge of discrimination, drawing resources away from the

prosecution of meritorious claims.  *See generally Federal Express Corp. v. Holowicki*,

— U.S. —, 128 S.Ct. 1147, 1156 (2008) (noting that the EEOC "processes over

175,000 inquiries a year," of which 76,000 are ultimately docketed as "charges").

The resources argument has special force because the EEOC acts in the public

interest, and obtains no financial benefit from filing proofs of claim or lawsuits.  (R

598).

> Although the EEOC can secure specific relief, such as hiring or
> reinstatement, constructive seniority, or damages for backpay or
> benefits denied, on behalf of discrimination victims, the agency is
> guided by "the overriding public interest in equal employment
> opportunity . . . asserted through direct Federal enforcement." 118
> Cong. Rec. 4941 (1972).  When the EEOC acts, albeit at the behest
> of and for the benefit of specific individuals, it acts also to vindicate
> the public interest in preventing employment discrimination.

*General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 326 (1980) (footnote

omitted; alteration in original).  *See also Richardson v. Comm'n on Human Rights &*

*Opportunities*, — F.3d —, 2008 WL 2630055, at *4 (2d Cir. July 7, 2008) ("The

EEOC strives to conciliate employers and aggrieved employees, and acts primarily

to vindicate the public interest" (internal citations omitted)); *cf. Occidental Life Ins.*

*Co. v. EEOC*, 432 U.S. 355, 368 (1977) ("the EEOC does not function simply as a

35

vehicle for conducting litigation on behalf of private parties; it is a federal administrative agency charged with the responsibility of investigating claims of employment discrimination and settling disputes, if possible, in an informal, noncoercive fashion"). The bankruptcy court's decision therefore places the EEOC on the horns of a dilemma: either file proofs of claim without a sufficient basis for the underlying charges — a result that would both waste public resources and needlessly embarrass the targets of complaints that turned out to be unfounded — or don't file claims at all — and thereby allow an employer's bankruptcy to excuse its discrimination in the very worst cases, *i.e.*, those where the EEOC itself would file suit.

Permitting the EEOC to file after the bar date, on the other hand, does not in any serious way affect the function of the Bankruptcy Code because the EEOC would only actually file a late claim in that very small subset of cases where it (a) completes its investigation after the bar date *and* (b) actually decides to file an enforcement action on its own behalf. Even in those few cases, the EEOC is one creditor among many, and would only in the rare case have a financial claim the magnitude of which would be significant in comparison to the debtor's entire estate.

Put simply, the bankruptcy court's decision endangers the EEOC's ability to prosecute all instances of discrimination by mis-allocating its resources, and makes it more difficult to resolve those cases it does choose to prosecute (or to settle those it does not), at the expense of adding a bit of uncertainty to a small handful of bankruptcies. That rule does not make sense, and does not properly weigh the

competing and important concerns of the two statutes. Accordingly, to the extent the two conflict on this point, Title VII displaces the Bankruptcy Code.

## C.   UNDER THE EXCUSABLE NEGLECT STANDARD, THE EEOC CLAIM SHOULD HAVE BEEN ACCEPTED

Assuming that the EEOC was permitted to file a proof of claim earlier, notwithstanding Title VII's confidentiality rules, its failure to do so could still be forgiven if it was excusable. The bankruptcy court, in concluding that the EEOC failed to demonstrate excusable neglect, abused its discretion for two reasons. *First*, the bankruptcy court's decision was in many places totally unsupported (and in some cases contradicted) by the undisputed evidence; in other places, the bankruptcy court based its decision on inadmissible evidence; and in others still its decision was not based on any evidence at all, but arose from "generic" concerns. *Second*, the bankruptcy court weighed the equities without regard for the unique role of the EEOC, whose claim was asserted only in the public interest.

Reviewing the actual evidentiary record, "taking account of all relevant circumstances surrounding the [EEOC]'s omission," and weighing the equities accordingly, *Pioneer*, 507 U.S. at 395, there can be no dispute that the EEOC's failure to timely file a proof of claim was excusable.[13]

---

[13]    The bankruptcy court seemed to suggest — but did not hold — that the EEOC may not have made a threshold showing of neglect because the EEOC made a "conscious decision" not to file the claim. (R 795). But that cannot be correct. As the bankruptcy court also found, the reason for the EEOC's delay in filing was its desire to complete the administrative review process. (R 802 (finding that EEOC's "deposition testimony does suggest that the EEOC's delay in filing the claim resulted from its desire to comply with 42 U.S.C. § 2000e-5")). If that view was

(continued...)

### 1.    There Was No Prejudice From the EEOC Claim

The first *Pioneer* factor concerns whether the debtor will be prejudiced by allowing the claim to be deemed timely filed.  As the Second Circuit has held, this factor typically favors the movant seeking to file a late claim.  *See Enron*, 419 F.3d at 122.  While the Supreme Court did not define the term "prejudice" in *Pioneer,* the Fifth Circuit has held that an important consideration is whether "the debtor's plan was formulated, negotiated, and confirmed before notice was given of a substantial late claim."  *Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.),* 62 F.3d 730, 737 (5th Cir. 1995) (citing *In re Drexel Burnham Lambert Group, Inc.,* 148 B.R. 1002, 1007 (S.D.N.Y. 1993)).  Such is not the case here.

The bankruptcy court confirmed Delphi's chapter 11 plan on January 25, 2008. (R 415).  On October 2, 2006 — over fourteen months before confirmation — the EEOC forwarded Straughter's Charge of Discrimination to Delphi for a response, along with a Request for Information as part of its investigation.  A give-and-take process with Delphi ensued, until the EEOC issued its determination letter on May 22, 2007.  Conciliation efforts began the next day, but, on June 19, 2007, the EEOC confirmed to Delphi that those efforts had failed.  The EEOC filed its complaint in the Western District of New York on September 28, 2007.

---

[13](...continued)
correct then, as set forth above, its failure to timely file was excused as a matter of law.  If, on the other hand, this Court concludes that the EEOC's position is wrong as a matter of law, then — because the EEOC's position is a reasonable reading of the applicable statutes and regulations — any neglect by the EEOC was excusable under the *Pioneer* factors.

(Throughout this entire process, Delphi did not once assert a bankruptcy-related defense or even remind the EEOC that it was in bankruptcy).  On or about October 16, 2007, the EEOC filed its proof of claim with Delphi's claims agent.  Thus, there is no question that Debtors knew of the EEOC's claim — both in the district court in the Western District of New York and in the bankruptcy court — long before confirmation of their chapter 11 plan, and that it had actual notice of the substance of the EEOC's claim almost immediately after Stanley Straughter filed his charge with the EEOC.  Debtors therefore cannot seriously claim prejudice.  *See In re Sage-Dey, Inc.*, 170 B.R. 46, 53 (Bankr. N.D.N.Y. 1994) (finding excusable neglect for late filing of IRS claim, holding that "there is no danger of prejudice to the Debtors in that they were notified of the [basis for the claim] prior to the bar date and failed to respond to the inquiry by the IRS").

The bankruptcy court, however, perceived three sources of prejudice if the EEOC Claim were allowed, all of which flowed from the so-called EPCA that governed Debtors' exit financing and, accordingly, their emergence from bankruptcy.   The bankruptcy court was wrong, however; the undisputed evidence does not support any prejudice to the Debtors.

1.      First, and foremost, the court was concerned that the magnitude of the EEOC Claim could endanger the EPCA, pursuant to which Debtors obtained $2.55 billion in exit financing and which was an integral part of their plan, as confirmed. If Debtors defaulted under the EPCA, in other words, the plan itself was endangered.  Among other things, one of the closing conditions of the EPCA was

that the total of all of Debtors' unsecured claims not exceed $1.45 billion. Because Debtors were only $2 million under that cap when the plan was confirmed in late January 2008, the bankruptcy court worried that allowing the EEOC Claim could result in a default under the EPCA. (R 805 (liquidation of the EEOC's claim "would not necessarily result in an amount under the [EPCA] cap")). As a threshold matter, it is important to note that permitting the Government's claim to be deemed timely filed does *not* mean that the claim will actually be allowed. Debtors are free to object to the claim on any other basis permitted by law, as it has done to numerous other claims. The only issue before this Court is whether the EEOC's claim should be rejected out of hand as untimely. Moreover, in reaching its conclusion, the bankruptcy court relied on evidence that should have been excluded under Federal Rule of Evidence 408. And even if that evidence was properly admitted, it does not show that the EEOC Claim would have exceeded the EPCA cap.

Rule 408 bars the admission of "conduct or statements made in compromise negotiations regarding the claim" when such evidence is "offered to prove liability for, invalidity of, *or amount of* a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed. R. Evid. 408(a) (emphasis supplied). The rule also contains exceptions, one of which allows the admission into evidence of the fact of settlement negotiations for the purpose of "negating a contention of undue delay." Fed. R. Evid. 408(b). "[W]hen offered to explain delay, it is the fact of the negotiations, not the content of offers that is

relevant." 23 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5312 (2008).

On May 23, 2007, the EEOC sent Delphi a conciliation letter containing, among other things, the EEOC's monetary demands, which Delphi rejected. Consistent with the undue delay exception in Rule 408(b), the Government submitted this letter — along with virtually all of the pre-litigation correspondence between the EEOC and Delphi — as an exhibit only to demonstrate that the EEOC did not unduly delay in adhering to its statutory obligations to attempt conciliation prior to bringing an enforcement action. (R 726).

In their response to the Government's motion, however, Delphi referred not only to the dollar figures demanded in the EEOC's conciliation letter, but also to an e-mail sent by the EEOC's counsel to Delphi's counsel on January 24, 2008 — marked "FOR SETTLEMENT PURPOSES ONLY" — containing an offer to cap the EEOC's unliquidated claim. (R 716). Delphi sought to admit this evidence to probe the amount of the EEOC Claim, a use specifically barred by Rule 408. (R 409 (comparing amounts of EEOC demands)).[14] Debtors claimed that this evidence would allow the bankruptcy court "to draw its own inference regarding whether the

---

[14] Debtors also claimed that the EEOC threatened to delay adjudication of the claim by moving to withdraw the reference if the Debtors began estimation proceedings, (R 411, 425), another reference to the substance of settlement negotiations, and an inaccurate one at that. What counsel actually said was if Delphi intended to litigate the merits of the EEOC claim, the parties might wish to avoid duplication of effort by *agreeing* to a withdrawal of the reference of the claim and consolidation in the Western District of New York, where the enforcement action is pending. (R 728).

EEOC is acting in good faith in prosecuting the Motion[.]  The good faith of the

moving party is an additional *Pioneer* factor."  (R 425).  At oral argument, however,

Delphi took a different tack and argued that the e-mail "goes to the issue of we're

negating a negative contention of undue delay . . . under Federal Rule 408."  (R

749).  Over the Government's objection, the bankruptcy court admitted the exhibit

as "marginally relevant," though the Court did not explain whether this ruling was

based on the issue of good faith, undue delay, or a combination of both.  (R 731).

Debtors' conduct is not only contrary to the protections of Rule 408(b), but

also at odds with its own conduct before the bankruptcy court.  Indeed, Delphi

relied upon the existence of settlement discussions in order proceedings before the

bankruptcy court while at the same time claiming that the substance of these

settlement negotiations was confidential.  In response to the argument that Delphi

waited too long to commence certain adversary proceedings, counsel argued that

Delphi "was engaged in confidential settlement negotiations in an effort to resolve

all issues that needed to be resolved so that the closing could occur and the plan

could be consummated. . . . *While the substance of those settlement discussions is

confidential, we believe that the fact of those discussions is not confidential . . . .*"

Transcript of May 29, 2008 hearing, *In re Delphi Corp.*, No. 05-44481 (Bankr.

S.D.N.Y.) ("5/29/08 Tr.") (emphasis supplied).[15]

The bankruptcy court's Rule 408 ruling was erroneous and affected the

---

[15]    A copy of the May 29th hearing transcript, of which the Court may take judicial notice, *see* Fed. R. Evid. 201, is attached as Exhibit C to the Declaration of Matthew L. Schwartz.

EEOC's substantive rights.  *See Ball v. A.O. Smith Corp.,* 321 B.R. 100, 106

(N.D.N.Y. 2005) (district court reviews the bankruptcy court's evidentiary rulings

for abuse of discretion, and will reverse the ruling when it "affects a party's

substantial rights.").  Debtors offered the evidence not to negate a contention of

undue delay, as required by the plain language of Rule 408(b), but to *support* their

contention of undue delay (in their words, "to rebut the rebuttal of the contention of

undue delay," (R 730)), by indicating the amount of the EEOC Claim.  This clearly

was an impermissible application of Rule 408, and the bankruptcy court abused its

discretion in admitting the evidence at all.  *See* 23 WRIGHT & GRAHAM, *supra*,

§ 5312 ("Rule 408 permits the use of compromise evidence to 'negative' a contention

of delay.  This means, of course, that the offeror cannot himself raise the issue of

delay as a justification for the admission of the evidence.")

    And even if the evidence *was* properly admitted, it does not support the

proposition that the EEOC claim would cause Debtors' to exceed the cap.  According

to Dean Unrue, Debtors' Claims Administrator, Debtors were *at least* $24 million

below the EPCA cap of $1.45 billion cap.  (R 657-58 (noting that $24 million was

Debtors' "worst case scenario," if every disputed claim was allowed in full)).  As the

EEOC's highest demand was to cap its claim at $15 million, (R 716), the evidence

does not support the bankruptcy court's finding that the EEOC Claim might cause

Delphi to exceed the EPCA cap.

    2.    The second prejudice identified by the bankruptcy court stemmed from

its concern that the EEOC Claim might not "be liquidated *in time* to preclude an

assertion of default under the EPCA." (R 805 (emphasis supplied)). The bankruptcy court did not define the meaning of "in time" in this context, although presumably there is some time constraint in the EPCA before which all unliquidated claims were to have been capped or estimated. The bankruptcy court did not elaborate or explain why the EEOC Claim could not be liquidated or capped in time, and Delphi itself did not advance this argument. Indeed, Delphi's Claims Administrator identified only two, related sources of prejudice from the EEOC Claim: that the EEOC Claim itself might cause a default because its size could cause the aggregate value of unsecured claims to exceed the $1.45 billion EPCA cap, and that it might encourage other late claims, which in turn would also endanger the $1.45 billion EPCA cap. Both of those concerns surround the *size* of the claims, not the time that it might take to liquidate them. Mr. Unrue disclaimed any other source of prejudice. (R 649). The bankruptcy court's concern about the timing of the EEOC Claim's liquidation, therefore, finds no support in the record.

3.     The third and final prejudice to Delphi identified in the bankruptcy court's ruling was a "floodgates" concern; *i.e.,* "by opening the door by granting a motion on this shaky foundation, I would encourage other late claimants to seek relief under Rule 9006 or to seek reconsideration of the Court's prior orders denying them relief under Rule 9006." (R 805). But this was a generic concern that had nothing to do with the unique characteristics of the EEOC Claim. In fact, the EEOC's claim — as a law enforcement agency that must adhere to statutory and regulatory requirements before commencing an action, and which acts primarily to

44

vindicate the public interest in preventing illegal employment discrimination — is sufficiently unique that allowing it to be filed would not result in a torrent of similar late claims because there are no similar claims. *See In re Enron Corp.*, No. 01-16034 (AJG), order at 12-14 (Bankr. S.D.N.Y. Sept. 23, 2003)) (permitting multi-million dollar claim filed five months after bar date, noting that the "the facts here are sufficiently unique that . . . allowing [the claimant]'s late proofs of claim against the Debtors would [not] create 'floodgate' concerns" (quoted in *Enron*, 419 F.3d at 132)). Debtors' Claims Administrator acknowledged as much when he admitted that there was "[n]othing in particular about the EEOC claim [that would open the floodgates to other late claims]; just the fact that it is a proof of claim that's filed late." (R 650; *see also* R 650-51 (noting that no other government agencies have filed late claims, except taxation authorities)).

*    *    *

For these reasons, the undisputed record evidence demonstrates that Debtors would not be prejudiced if the EEOC Claim were allowed to be filed. At the time of its filing, Debtors' bankruptcy "ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets." (R 4). In 2006, Debtors had global net sales of $26.4 billion and global assets of approximately $15.4 billion. (R 4). Allowing the EEOC to assert its comparatively small claim would neither prejudice Debtors nor impact the administration of the bankruptcy. On the other hand, if the EEOC's claim is disallowed the agency will be prejudiced because it will have been

45

foreclosed from fulfilling its Congressional mandate to investigate and vindicate instances of employment discrimination, and the innocent Delphi employees who were subjected to the company's discriminatory policy will likewise be prejudiced because they will get no compensation for their injuries. Affirming the bankruptcy court's decision, moreover, entails adopting a rule that, in the future, will either require the EEOC to file a proof of claim before it has a chance to complete its investigation — wasting public resources and needlessly embarrassing employers and employees alike — or not file a claim at all, allowing an employer's bankruptcy to excuse its noncompliance with anti-discrimination laws. And under that rule, bankrupt employers would have an incentive to stonewall the EEOC's investigations and then claim prejudice arising from delay, rather than cooperate with law enforcement to eliminate unlawful discriminatory practices through conciliation.

### 2.    The Length of Delay Was Not Excessive

The second *Pioneer* factor concerns the length of delay and similarly tips in favor of allowing the late claim. Delphi fired the Charging Party three weeks after the July 31, 2006 bar date had passed. The Charging Party contacted the EEOC on August 22, 2006 and filed his formal complaint with the agency on September 22, 2006. The EEOC promptly opened an investigation. Finding the Charging Party's allegations to have merit, and unable to reach a conciliation with Delphi, the EEOC initiated an enforcement action in the Western District of New York on September 28, 2007. The EEOC then promptly filed a proof of claim as

soon as it believed it was able; there can be no claim that the EEOC dragged its feet during this process, and Delphi has not asserted as much.

The Second Circuit has adopted a flexible test for determining whether the length of delay is substantial enough to warrant disallowance of the claim:

> We agree that the lateness of a claim must be considered in the context of the proceeding as a whole. It stands to reason, for example, that in some circumstances a claim filed six *months* late will be more disruptive to a reorganization process than one filed six *weeks* late. Under other conditions, however, a claim filed six months late will not be disruptive at all — if, for example, the proceeding has come to a temporary halt for other reasons — while one filed six weeks late, while the proceedings are in full swing, will threaten to upset the entire process.

*Enron,* 419 F.3d at 128. In this case, after learning of the Charging Party's complaint, the EEOC moved expeditiously through the investigative and conciliation process, as required by regulation, before commencing the enforcement action in the Western District of New York and submitting the proof of claim to Debtors' Claims Administrator. As discussed above, all of these events *pre-dated* the confirmation of Debtors' chapter 11 plan on January 25, 2008.

Moreover, to the extent there is any inexcusable delay in the year that elapsed between the Charging Party's initial complaint of discrimination and the EEOC's filing of its enforcement action, it is largely attributable to Delphi. During that year, Delphi sought at least one extension of time, and on several occasions simply failed to respond to the EEOC's requests, prolonging the investigation. The time breaks down as follows:

8/28/2006:                    EEOC contacted by the Charging Party

47

| | |
|---|---|
| 8/28/2006 - 9/22/2006: | Waiting for the Charging Party to finalize claim |
| 10/2/2006 - 11/6/2006: | Waiting for Delphi to Respond to Claim and Request for Information |
| 11/6/2006 - 1/31/2007: | Waiting for Delphi to Respond to Request for Information |
| 2/26/2007 - 4/4/2007: | Waiting for Delphi to Respond to Second Request for Information |
| 5/22/2007: | Letter of Determination |
| 5/23/2007 - 6/12/2007: | Waiting for Delphi to Respond to Conciliation Offer and Request for Information |
| 6/19/2007 - 9/28/2007: | Administrative Process Relating to Filing of enforcement action in Western District of New York |
| 10/12/2007: | EEOC claim filed. |

In short, approximately six months of time between notice and filing was attributable to Delphi's delay, another month related to waiting for the Charging Party to finalize his complaint so that the EEOC's investigation could begin, and three months were consumed by the EEOC's administrative review process — required by regulation — for filing federal court litigation. This was not a case where the creditor dragged its feet.

### 3.    The EEOC Had Good Reason to Delay

Even if the EEOC's delay could be characterized as lengthy, "a long delay (presumably more likely in most circumstances to occasion more disruption) *with a strong explanation* might be more acceptable than a short delay with a weak explanation — even if both explanations are credible." *Id.* at 129 (emphasis supplied). The EEOC certainly had a strong explanation for its delay because; as

48

the bankruptcy court found, "the EEOC's delay in filing the claim resulted from its desire to comply with [Title VII]."  (R 802).

The Second Circuit has described the third *Pioneer* factor — the reason for delay and whether it was in the control of the movant — as the focal point of excusable neglect analysis.  *Enron,* 419 F.3d at 122.  The court explained that "the equities will rarely if ever favor a party who fail[s] to follow the clear dictates of a court rule," and "that where the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test." *Silivanch v. Celebrity Cruises, Inc.,* 333 F.3d 355, 366 (2d Cir. 2003) (internal quotation marks and citation omitted).

In concluding that the EEOC did not have a good reason for its delay in filing a claim, the bankruptcy court relied heavily on case law involving private litigants. (R 798-99).  Citing *Aristeia Capital, LLC v. Calpine Corp. (In re Calpine Corp.),* Nos. 05-60200 (BRL), 07 Civ. 8493 (JGK), 2007 WL 4326738, at *6-7 (S.D.N.Y. Nov. 21, 2007) (holding claims of convertible note holders and indenture trustees untimely), *In re Northwest Airlines, Corp.,* No. 05-17930 (ALG), 2007 WL 498285, at *3 (Bankr. S.D.N.Y. Feb. 9, 2007) (denying corporate creditor's motion for reconsideration of denial of leave to file a late claim), and *In re Enron Corp.,* No. 01-16034, 2007 WL 294114 (Bankr. S.D.N.Y. Jan. 31, 2007) (denying gas supplier's motion to file a late claim), the court ruled that "the EEOC would have believed that there was a basis for asserting a pre-petition 'claim' at least as early as November 2006, and it acknowledges that it made a formal 'determination' on May 22, 200[7]."  (R 798).

49

The court went on to hold that "the EEOC has not explained why it could not have filed a protective proof of claim, particularly given the fact that it had formed the belief that there was a claim at least by May 22, 200[7], and arguably — or more than arguably — would have been able to do so at least by November 2006." (R 800).[16]

As explained in detail above, the anti-discrimination laws required the EEOC to keep the charges of discrimination strictly confidential during the administrative process, resulting in a conflict with the bankruptcy. The EEOC's adherence to Title VII's confidentiality provisions was consistent with a recognition that "the courts have generally held the EEOC to a higher standard of compliance with the requirements of [Title VII] and its own regulations." *EEOC v. Westvaco Corp.,* 372 F. Supp. 985, 991 (D. Md. 1974) (citing cases). Moreover, the legislative history of the confidentiality provisions similarly indicates that "[t]he maximum results from the voluntary approach will be achieved if the investigation and conciliation are carried on in privacy." *EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 599 n.16 (1981) (quoting Senator Dirksen's remarks in 110 Cong. Rec. 8193). Given the fundamental importance of the confidentiality scheme to the investigation of discrimination claims, the EEOC reasonably could have concluded that it was not

---

[16]    As the Determination Letter was issued on May 22, 2007, the Government assumes that the bankruptcy court was mistaken in repeatedly referring to the letter as having been issued in 2006. Of course, the mistake could be significant. If the bankruptcy court fixed the date of the Determination Letter one year too early (and therefore before the bar date passed), that error could have influenced its *Pioneer* analysis.

obligated to file a proof of claim until after it concluded its investigation and attempts at conciliation and filed suit, as explained above.  But even if this were not the case, the EEOC's desire to comply with Title VII provides a powerful reason for delay under the *Pioneer* analysis.

### 4.    The EEOC Acted in Good Faith

The last *Pioneer* factor concerns whether the movant acted in good faith. Where, as here, "there is no indication in the record that [the movant] acted in a manner other than in good faith in seeking to file [the] proof of claim," the good-faith factor tips in favor of the movant.  *In re Enron Corp.,* No. 01-16034 (AJG), 2007 WL 610404, at *11 (Bankr. S.D.N.Y. Feb. 23, 2007).  Here, the EEOC acted in good faith by pursuing its investigation quickly and then filing its claim approximately two weeks after filing the enforcement action in the Western District of New York; the bankruptcy court made no finding to the contrary.

### 5.    Allowing the EEOC Claim Serves the Public Interest

Finally, this Court should not lose sight of the fact that allowing the EEOC Claim to be filed would serve the public interest.  Although the Supreme Court did not specifically identify the public interest as a relevant factor in *Pioneer*, it did recognize that the four factors it enumerated were not exhaustive, and that the excusable neglect determination "is at bottom an equitable one, taking account of *all* relevant circumstances surrounding the party's omission."  *Pioneer*, 507 U.S. at 395 (emphasis supplied; footnote omitted).  Although the bankruptcy court did not think that public policy concerns played any part in the excusable neglect analysis,

(R 748 (dismissing policy concerns and asserting that the statutory confidentiality argument is "the only argument that has any possible merit here"), the Government respectfully submits that the public interest is relevant.  And for the reasons given throughout this brief, the public interest is strongly undermined by expunging the EEOC's claim.

*      *      *

For the foregoing reasons, even if the EEOC was not legally precluded from filing its proof of claim by virtue of Title VII's confidentiality provisions, its failure to file earlier was excusable under Bankruptcy Rule 9006(b)(1) and *Pioneer*, and the bankruptcy court abused its discretion in holding otherwise.

**D.    THE BANKRUPTCY ERRED BY DRAWING AN ANALOGY BETWEEN THE EEOC SUING ON BEHALF OF A CLASS AND A RULE 23 CLASS REPRESENTATIVE — AN ANALOGY THAT THE SUPREME COURT HAS EXPRESSLY REJECTED**

The bankruptcy court also erred as a matter of law in rejecting the EEOC Claim because of "the reluctance of courts in this district to certify classes for purposes of class proofs of claim under Bankruptcy Rule 7023 and Federal Rule 23." (R 805-06).  Noting its concern that "no individual employee or former employee . . . filed a claim that could be construed to assert this type of claim, which the EEOC is asserting on behalf of such a class," the bankruptcy court analogized to Federal Rule of Civil Procedure 23 in concluding that "it would similarly undermine my bar date order to let in a class claim on behalf of people who did not file pre-petition claims for the very same claim before the bar date, under these particular circumstances, at least." (R 805-06).  This ruling was erroneous because the

52

Supreme Court has expressly held that Rule 23 does not apply where the EEOC

files an enforcement action.

In 1972, Congress enacted the Equal Employment Opportunity Act, which

granted the EEOC authority to commence a civil action in district court against an

employer suspected of violating Title VII.  *See* 42 U.S.C. § 2000e-5(f)(1).  Since that

time, the Supreme Court repeatedly has held that when the EEOC commences suit,

it does not act strictly on behalf of the aggrieved employees, but rather to protect

the public from illegal employment discrimination.  *See EEOC v. Waffle House, Inc.,*

534 U.S. 279, 291 (2002) ("[Title VII] clearly makes the EEOC the master of its own

case and confers on the agency the authority to evaluate the strength of the public

interest at stake."); *General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318,

326 (1980) ("When the EEOC acts, albeit at the behest of and for the benefit of

specific individuals, it acts also to vindicate the public interest in preventing

employment discrimination."); *Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S.

355, 368 (1977) ("[T]he EEOC does not function simply as a vehicle for conducting

litigation on behalf of private parties; it is a federal administrative agency charged

with the responsibility of investigating claims of employment discrimination and

settling disputes, if possible, in an informal, noncoercive fashion.").

In *General Telephone,* the Supreme Court addressed whether an employer

was entitled to dismissal of the "class action aspects" of an EEOC claim for

injunctive relief and backpay on behalf of its female employees.  *See General

Telephone,* 446 U.S. at 320-22.  The Court permitted the claim, reasoning that "the

53

EEOC need look no further than § 706 [of Title VII] for its authority to bring suit in its own name for the purpose, among others, of securing relief for a group of aggrieved individuals.  Its authority to bring such actions is in no way dependent upon Rule 23, and the Rule has no application to a § 706 suit."  *Id.* at 324.  The Court also noted that the existence of a private right of action in section 706 of Title VII, along with a private party's right to intervene in an EEOC enforcement action, "suggest that the EEOC is not merely a proxy for the victims of discrimination and that the EEOC's enforcement suits should not be considered representative actions subject to Rule 23."  *Id.* at 326.

The bankruptcy court's reliance on Rule 23 was contrary to the express holding of *General Telephone.  See EEOC v. Dinuba Med. Clinic,* 222 F.3d 580, 588 (9th Cir. 2000) ("[T]here is no principled reason to depart from *General Telephone Company* and require class certification under Rule 23 simply because the EEOC is now authorized to sue for damages in addition to equitable relief.").[17]  Moreover,

---

[17]    The bankruptcy court incorrectly relied on *EEOC v. Jefferson Dental Clinics, PA,* 478 F.3d 690 (5th Cir. 2007), and *O'Loghlin v. County of Orange,* 229 F.3d 871 (9th Cir. 2000), for the proposition that the EEOC's proof of claim is precluded because no Delphi employee filed a timely pre-petition claim based on similar facts, (R 793-94).  In *Jefferson Dental Clinics*, the court held that the EEOC could not pursue a claim that had already been rejected at trial when brought by the charging party.  In doing so, the court applied the doctrine of *res judicata*, which requires a prior adjudication on the merits.  *See* 478 F.3d at 694; *see generally Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir. 1997).  *Jefferson Dental Clinics* therefore does not support the bankruptcy court's ruling, because the individual employees' claims in this case were forfeited on procedural grounds, not rejected on their merits.  *O'Loghlin* is even less helpful to Delphi, because it did not involve a claim by the EEOC at all.  *See* 229 F.3d at 874-75 (holding that individual employee must file proof of claim before the bar date, even if she has not received
(continued...)

given the Supreme Court's pronouncements concerning the EEOC's obligations to

the general public, there is no "close analogy" — or any analogy — between an

EEOC claim and a class proof of claim under Rule 23. As Judge Posner recently

wrote for the Seventh Circuit:

> The main reason the Supreme Court thought Rule 23
> inapplicable to EEOC class actions was that the EEOC is
> not an exact or even close counterpart to the class
> representative (and class lawyer) in a Rule 23 class action.
> The EEOC's primary role is that of a law enforcement
> agency and it is merely a detail that it pays over any
> monetary relief obtained to the victims of the defendant's
> violation rather than pocketing the money itself and putting
> them to the bother of suing separately.

*In re Bemis Co.,* 279 F.3d 419, 421 (7th Cir. 2002). The analogy to Rule 23 also fails

because "EEOC enforcement actions are not limited to the claims presented by the

charging parties. Any violations that the EEOC ascertains in the course of a

reasonable investigation of the charging party's complaint are actionable." *General

Telephone,* 446 U.S. at 331. Indeed, as the Seventh Circuit has observed, "[h]aving

to persuade the district court that the class was numerous and homogeneous and

that the EEOC's interest was aligned with that of the class members, the sort of

things that compliance with Rule 23 would entail, would interfere with the

Commission's exercise of its prosecutorial discretion." *Bemis,* 279 F.3d at 421.

Indeed, the EEOC's investigation in this case led it to file an enforcement action

---

[17](...continued)
right-to-sue letter, but saying nothing about claims brought by EEOC).

that went significantly farther than the allegations of the charging party, encompassing an alleged company-wide discriminatory policy.

The cases cited by the bankruptcy court are therefore inapplicable because they involved proofs of claim by a class of private litigants under Rule 23. *See In re Musicland Holding Corp.,* 362 B.R. 644 (Bankr. S.D.N.Y. 2007) (two former employees moved to certify a class of store managers with respect to claims of deprivation of overtime pay and benefits); *In re Ephedra Prods. Liab. Litig.,* 329 B.R. 1 (S.D.N.Y. 2005) (consumer class claims arising out of marketing of ephedra supplements); *Bailey v. Jamesway Corp. (In re Jamesway Corp.),* Nos. 95 B 44821 (JLG), 96/8389A, 1997 WL 327105 (Bankr. S.D.N.Y. June 12, 1997) (former employees sought class certification in adversary proceeding alleging violations of Worker Adjustment and Restraining Notification Act, 29 U.S.C. §§ 2101-09 ("WARN Act")); *In re Sacred Heart Hosp. of Norristown,* 177 B.R. 16 (Bankr. E.D. Pa. 1995) (hospital's former employees moved to file a class claim on behalf of employees for alleged wrongful termination under the WARN Act). Even if, as the bankruptcy court noted, these cases stand for the proposition that "bankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action," *Ephedra,* 329 B.R. at 5,[18] this analysis is irrelevant because *General Telephone* makes clear that an EEOC claim is not a Rule 23 "class action."

---

[18]    At least one circuit court has held that class actions are entirely compatible with the goals of bankruptcy. *See In re Charter Co.,* 876 F.2d 866, 872 (11th Cir. 1989) ("[A]pplication of a class filing procedure would be particularly appropriate to vindicate the purpose of the bankruptcy statute.").

## POINT II

## IN THE ALTERNATIVE, THIS CASE SHOULD BE REMANDED TO THE BANKRUPTCY COURT TO RECONSIDER THE GOVERNMENT'S MOTION IN LIGHT OF THE IMPLOSION OF DELPHI'S EXIT FINANCING AGREEMENTS, WHICH WERE THE BASIS FOR ANY ARGUMENT THAT DELPHI WAS PREJUDICED BY THE EEOC'S LATE CLAIM

For the reasons just given, the bankruptcy court incorrectly denied the Government's motion as a matter of law, and misconstrued the undisputed factual record as well, and should be reversed. But even if this Court is not inclined to reverse the bankruptcy court on the merits of its decisions, it should at least vacate the bankruptcy court's decision and remand to that court, because the relevant facts about the Debtors' bankruptcy have changed dramatically since the Government's motion was first decided.

As explained at length above, the bankruptcy court based its finding that Delphi would be prejudiced by the EEOC Claim almost entirely on the terms of the so-called EPCA, which was a "crucial piece of the intricate and complex arrangements necessary for the consummation of the Plan . . . pursuant to which [Delphi's] Investors . . . commit[ted] to invest up to $2.55 billion of equity financing in the reorganized Delphi." Complaint ¶ 6, *Delphi Corp. v. Appaloosa Management, L.P. (In re Delphi)*, Adv. Proc. No. 08-1232 (RDD) (filed May 16, 2008).[19] As described above, the EPCA contained limits on the aggregate amount of unsecured claims, and the bankruptcy court determined that if they EEOC were permitted to

---

[19]    The *Appaloosa* complaint is attached as Exhibit A to the Schwartz Declaration.

57

file its claim, those limits would be endangered, which would in turn endanger the EPCA and, ultimately, Delphi's entire restructuring.

Subsequent to the court's decision in this case, however, Delphi's exit financiers unilaterally terminated the EPCA themselves. As the bankruptcy court predicted, the termination of the EPCA disrupted the Debtors' plan of reorganization and endangered its exit from bankruptcy. Indeed, "[o]n April 4, 2008, the Debtors were set to emerge from Chapter 11 pursuant to the Plan and the [EPCA]" and were "ready, willing and able to close on all financing and other agreements embodied in the Plan." *Id.* ¶¶ 4-5. Debtors could not have been clearer about the effect of the termination of the EPCA: "[The investors'] failure to honor their contractual commitments . . . derailed Delphi's progress toward emergence from Chapter 11 in April 2008, and has prevented the consummation of the Plan." *Id.* ¶ 4.

On May 16, 2008, Delphi commenced two adversary proceedings — *Delphi Corp. v. Appaloosa Management L.P.,* Adv. No. 08-1232, and *Delphi Corp v. UBS Securities, LLC,* Adv. No. 08-1233 — asserting fraud claims and seeking specific performance of EPCA plan investors' obligations to fund their equity commitments. As the bankruptcy court recently recognized, the chances of resurrecting the EPCA are remote, *see* 5/29/08 Tr. at 53 (referring to Delphi's demand for specific performance of the EPCA as "bizarre" in light of its allegations of fraud, and observing that the only reason for asserting such a claim could be to gain "litigation leverage"), and in recognition of that fact, Delphi indicated to the court that it "is

trying as hard as it can to develop a modified plan" with new exit financing, 5/29/08 Tr. at 27.  That modified plan would presumably not incorporate the EPCA, and therefore the EPCA cap on unsecured claims.

The EPCA, in other words, is almost certainly dead.  The prejudices that the bankruptcy court relied upon in rejecting the EEOC's Claim and which flowed directly from the terms of the EPCA, accordingly, are moot.  In view of this dramatic change in the posture of the bankruptcy, the court below should at least be given the opportunity to revisit its decision.

The Second Circuit has frequently recognized that when post-judgment developments alter the basis for the decision on appeal, the case should be remanded to the trial court to consider the new state of affairs.

> [E]ven if . . . we have the power to decide these issues now, we do not think that that power would be wisely exercised in the present context of this case.  *See Singleton v. Wulff*, 428 U.S. 106, 120-21 (1976). Ordinarily, "where circumstances have changed between the ruling below and the decision on appeal, the *preferred procedure* is to remand to give the district court an opportunity to pass on the changed circumstances," unless the new situation "demands one result only."  *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir. 1972); *accord, Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646, 649-50 (5th Cir. 1978); *see also Singleton v. Wulff, supra*, 428 U.S. at 121.

*New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.*, 646 F.2d 779, 783-84 (2d Cir. 1981) (emphasis supplied; parallel citation omitted) (remanding for reconsideration decision that Iran not entitled to sovereign immunity in light of new international agreements). *See In re Sundial Asphalt Co.*, 147 B.R. 72, 83 (E.D.N.Y. 1992) (in bankruptcy appeal, remanding to the

bankruptcy court to re-open hearing to consider new facts about debtor's business performance that affected whether sale of asphalt plan satisfied business judgment rule); *see also Electronic Data Sys. Corp. Iran v. Social Sec. Org. of the Gov't of Iran*, 610 F.2d 94, 95 (2d Cir. 1979) (per curiam) (remanding for reconsideration order attaching funds in light of new developments, including the seizure of American hostages at the U.S. embassy in Tehran); *Korn*, 456 F.2d 1206, 1208 (in appeal from denial of class certification in securities fraud case, noting that change of plaintiff's counsel was a "significant operative change since the ruling below" that "drastically alter[ed] the nature of the case" and would ordinarily require remand, but reversing instead because the new facts demanded grant of certification, and district court would have abused its discretion if it had adhered to prior decision on remand).

In light of the dissolution of the EPCA and the likely unraveling of Delphi's plan of reorganization, the bankruptcy court on remand may well weigh the equities differently in exercising its discretion under *Pioneer*.  The Court of Appeals has been especially willing to remand for consideration of new circumstances when it is reviewing a trial court's discretionary determination.  *See, e.g., Walker v. City of Waterbury*, 253 Fed. Appx. 58, 62 (2d Cir. 2007) (unpublished) (noting that "events that have transpired during the pendency of this appeal . . . are at least *potentially relevant* to" the district court's discretionary determination under Rule 19, and remanding "so that the District Court may consider on remand whether and to what degree the [new development] affects its earlier Rule 19(b) determination" (emphasis supplied)).  Thus, even if this court believes that the bankruptcy court's

*legal* rulings were correct, it should therefore remand to the bankruptcy court to reconsider its *discretionary* decision, considering the current state of affairs.  *See generally In re Adelphia Bus. Solutions, Inc.*, 280 B.R. 63, 72 n.42 & 86 n.125 (Bankr. S.D.N.Y. 2002) (exercising discretion to grant debtor's adequate assurance motion, but explicitly "provid[ing] for an opportunity for reconsideration" "in the event of material changes in the facts," referring to a change with respect to the availability of financing as a "classic example").

## CONCLUSION

The judgment of the bankruptcy court should be reversed and the EEOC should be permitted to file its claim.  In the alternative, the judgment of the bankruptcy court should be vacated and the case remanded to the bankruptcy court to consider whether the United States can demonstrate excusable neglect for its late filing of the EEOC Claim in light of events subsequent to the judgment.  *See* Fed. R. Bankr. P. 8013 ("On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.").

Dated:       New York, New York
             July 14, 2008

                      Respectfully submitted,

                      MICHAEL J. GARCIA,
                      United States Attorney
                      *Attorney for the Appellant*

By:    /s/  Matthew L. Schwartz
                      MATTHEW L. SCHWARTZ
                      JOSEPH N. CORDARO
                      Assistant United States Attorneys
                      Telephone: (212) 637-1945
                      Facsimile:  (212) 637-2750
                      E-mail:  matthew.schwartz@usdoj.gov